1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    CHARLES D. RIEL,

11              Petitioner,                    No. CIV S-01-0507 LKK KJM

12         vs.                                 DEATH PENALTY CASE

13    ROBERT L. AYERS, JR.,
      Warden of California State
14    Prison at San Quentin,

15              Respondent.                    ORDER

16    _____/

17              On August 29, 2007 the undersigned heard argument on petitioner's motion for

18    evidentiary hearing.  Tivon Schardl and Robert Bacon appeared for petitioner.  Paul Bernardino

19    and Marcia Fay appeared for respondent.  Upon review of the motion and the documents in

20    support and opposition, upon hearing the arguments of counsel, and good cause appearing, the

21    court finds and orders as follows.

22    /////

23    /////

24    /////

25

26

                                                  1

BACKGROUND FACTS[1]

I.      Guilt Phase

        A.      Prosecution's Case

        During the night of November 2-3, 1986, Edward Middleton worked the night shift at Rambo's Truck Stop on Interstate 5 near Weed.  In the early morning hours, he was robbed, driven to Shasta County, and murdered.  The evidence showed that three persons committed the crime: petitioner, Virgil Edwards, and John Osborne.[2]

        After the crime, the drawer to the store's cash register was left open.  Middleton's eyeglasses and hearing aid were found inside the store along with a gasoline charge slip bearing Osborne's signature.  The store owner determined that about $328 was missing from the cash register.  Beer cans found at the truck stop revealed petitioner's and Osborne's fingerprints, and Osborne's fingerprint was found on a store doorknob.  Middleton's body was found down an embankment below Soda Creek Road in northern Shasta County.  A bloody tire iron and an air pressure gauge were found on the road.  The victim died of multiple blunt force injuries to the head and face, consistent with being hit with the tire iron, and of multiple stab wounds to the chest and back.

        Edwards testified.  He said he had agreed to testify truthfully in exchange for pleading guilty to first degree murder and receiving a prison sentence of 25 years to life.  On November 2, 1986, he drove with petitioner from Klamath Falls, Oregon, to Weed in his 1973 Oldsmobile Cutlass.  That afternoon, they met Osborne, whom they both knew, at Rambo's

---

        [1] This overview of the facts is derived from the California Supreme Court's findings of facts, which are presumed to be correct, 28 U.S.C. § 2254(e)(1), and from the court's independent review of the state court record.  The trial transcripts, clerk's transcript, briefs submitted in the automatic appeal, and briefs and documents submitted in both state habeas proceedings were lodged herein on July 31, 2003.

        [2] The three were originally codefendants, but the cases were severed.  Edwards testified against petitioner and eventually pleaded guilty to one count of first degree murder pursuant to a plea bargain.  Osborne pleaded guilty in return for a sentence of life without the possibility of parole.

Truck Stop, where Osborne worked.  The group smoked marijuana, drank beer, and visited various other persons and places.  Edwards said that during the afternoon and evening, defendant and Osborne got "drunk," and he was "stoned."  Eventually, the three returned to the truck stop, arriving around 2:15 a.m. on November 3, 1986.  Middleton was on duty, and a truck driver was present with his truck.  Edwards filled his car with gas – which they charged on a credit card – while petitioner and Osborne, both drinking beer, went inside the store and talked with Middleton.  The three then drove up a nearby dirt road.  Edwards retrieved a knife from the trunk.  As they were "sitting in the car, [they] cut [their] fingers," then put them together to "become blood brothers."  The three planned to wait until the truck driver left, then petitioner "would go inside, knock the guy out, and just take the money."

After the truck driver left, Edwards drove the car back to the truck stop. Petitioner got out and "went around the side of the building," where he remained for about a minute and a half.  Then Osborne joined him.  About 30 seconds later they returned with Middleton between them.  Petitioner and Osborne forced Middleton into the backseat.  Petitioner sat next to him, and Osborne sat in the front.  Edwards said that petitioner put a knife to Edwards's throat and told him to drive. Edwards drove onto the freeway.  While they were driving, petitioner hit Middleton and demanded his wallet.  Middleton gave petitioner his wallet. Petitioner opened it, took out some money, and said, "Thirteen bucks.  I'm going to kill you now."  Edwards pulled to the side of the road and parked.  He and Osborne said to let the man go.  Petitioner told them to "shut up," or he would kill them too.  He directed Edwards to continue driving.  Edwards did so, eventually leaving the freeway and stopping in a dark area.

They all got out of the car.  Edwards opened the trunk and, at petitioner's direction, took out a tire iron and gave it to petitioner.  Petitioner hit Middleton in the head with the tire iron.  Middleton fell to the ground.  Petitioner, who had the knife, said to the others, "We are all in this together; and now you got to stab him . . . .  If you don't stab him you will be right here with him."  Edwards and Osborne stabbed Middleton.  Petitioner then "went to move the

1   guy off the side of the road."  As he was doing so, he lost his footing and "fell down the hill with

2   the man on top of him."  Osborne helped petitioner "move the body off."  The trio drove away.

3   While they were driving, petitioner licked some blood off the knife and ordered the others to do

4   the same.  Later they washed the knife at a rest area and split up the money.  Edwards received

5   $33.  They continued driving, finally stopping at petitioner's sister's house in Vacaville.

6          Various people who were with the trio in Weed before the crime or in the

7   Vacaville/Fairfield area after the crime also testified.  Melinda Peterson testified that petitioner,

8   Edwards, and Osborne were at her home in Weed shortly before the crime.  Petitioner and

9   Osborne asked her husband, Rick, for a gun.  He told them no.  Edwards said, "Well, we don't

10  need a gun.  I have a knife."  The three left.  Before they left, petitioner said, "Come on, let's get

11  out of here and get this over with."  Melinda Peterson testified that, based on petitioner's

12  statements, she thought they were planning to commit a robbery, and she did not want her

13  husband to go with them.  Rick Peterson testified that Osborne and one of the other men, who

14  Peterson identified as Edwards sometimes and as petitioner other times, asked him for a gun.

15         Tami Sisco testified that on the night of the murder, she saw two men, apparently

16  Edwards and Osborne, and an older car with Oregon license plates in the area of the truck stop.

17  She testified that she saw no one in the car with Oregon plates.  James Tolley, a truck driver,

18  testified he stopped at the truck stop around 1:15 to 1:30 that morning.  He observed two people,

19  whose descriptions matched Edwards and Osborne.

20         After the crime, the trio visited several people in the Vacaville/Fairfield area,

21  including a woman who purchased methamphetamine for them, petitioner's sister, and Osborne's

22  uncle.  The men stopped at the home of petitioner's sister, Roslyn Walker, and Candy Cobb.

23  Cobb heard petitioner say "they had gotten fucked up and there was a man in a coma."  Walker

24  testified that petitioner told her, "Sis, I have something to tell you.  There is a man in a coma."

25  Other testimony showed that at several points, petitioner was separated from Edwards and

26  Osborne.  During one such separation, Edwards and Osborne purchased new clothes and changed

4

most or all of their clothing.  Within a short time, Edwards heard petitioner had been arrested.

Osborne called his girlfriend, Pamela Silkwood, in Weed a number of times.  She borrowed a car

and drove to Fairfield, met Edwards and Osborne, and headed north.  En route, Highway Patrol

officers stopped the car and arrested Edwards and Osborne.

Forensic analysis of blood found on petitioner's boots and pants showed it could

not have come from petitioner, Edwards, or Osborne, but was consistent with Middleton's blood.

B.      Defense Case

Petitioner testified.  He admitted being with Edwards and Osborne before and

after the robbery and murder.  But he said that he had been doing so much drinking the day of the

crime that he fell asleep in the back seat of Edwards's car and slept through the crime.  After he

fell asleep, the next thing he remembered was that Edwards woke him up and told him to help

Osborne "move a body."  He got out of the car and saw a body "lying on the road."  Osborne told

him that he, Osborne, had killed the man.  He "helped [Osborne] move the body off the side of

the road," tripped and fell down the embankment with the body, then got back in the car and fell

asleep again.  Petitioner denied any involvement in the killing itself.

The defense sought to show Osborne was the most violent of the three men and

their likely leader.  A number of people testified that Osborne became aggressive and violent

when drunk.  Wes Coley, Osborne's employer and friend, testified that he locked up his guns

when Osborne was drunk.  Irene Poehler, Coley's girlfriend, testified that she knew Osborne had

shot and killed a prior girlfriend and that he frequently hit his current girlfriend.  Pam Silkwood,

Osborne's then current girlfriend, testified that Osborne beat her and that the manager of her

apartment complex paid her to leave it because Osborne caused so much trouble.  Osborne's

uncle, Aaron Stockman, testified Osborne was "belligerent, obnoxious and aggressive" when

drinking.  A Weed police officer testified that Osborne had a number of alcohol-related run-ins

with the police and had threatened to kill the police chief.  Others, including a Weed bartender

/////

1   and petitioner's sister's housemate Candy Cobb testified that Osborne appeared to be the leader

2   of the group before and after the crime.

3         C.     <u>Bifurcated Trial on Prior Prison Term</u>

4            After the guilt verdict, at a bifurcated trial, the jury found true that petitioner had

5   suffered two prior felonies, both for second degree burglary, for which he served  prison terms.

6   Edwards testified at the bifurcated trial that he was a cellmate of petitioner's for about 18 months

7   in 1984 and 1985.  The facts underlying the prior convictions were not presented in any way.

8   II.     <u>Penalty Phase</u>

9            The prosecution presented no additional evidence at the penalty phase.

10           After an extremely brief opening statement in which defense counsel simply listed

11   the witnesses he would present at this phase of trial, the defense presented two witnesses in

12   mitigation.  Ardell Morgan, the director of a private special education school in Washington that

13   petitioner attended for eight months when he was a teenager, testified about his good qualities,

14   that he was gentle and helpful.[3]  She also described his learning disability.  At the time, petitioner

15   was fifteen years old and was doing school work at a 4th to 5th grade level.  She testified that

16   petitioner did not have any support at home and that she took him in during the time he attended

17   the school.

18          Joseph Ross, a supervisor at the McNeil Island Correctional Center in

19   Washington where petitioner was incarcerated for eight months in 1985, testified that petitioner

20   was a good worker in prison and presented no problems.  In his opinion, petitioner would not be

21   a problem in prison if he received a sentence of life without the possibility of parole.  Ross also

22   testified that Virgal Edwards and John Osborne had been incarcerated at McNeil Island.  He

23   stated that Osborne was a continuous problem.

24   /////

25

26       [3]  Petitioner claims school records and other testimony show he only attended the school for four months.  Reply to Opp'n to Mot. for Evid. Hrg. at 18.

1       In his closing argument, defense counsel focused on two things.  First, he argued

2 petitioner's case was not so egregious as to deserve the death penalty.  Second, he showed

3 petitioner and his co-defendants were, in the eyes of the law, equally guilty but his co-defendants

4 would not necessarily receive the death penalty.  Based on his plea bargain, Virgal Edwards

5 estimated he would be out of prison in about thirteen years.  John Osborne, who had a prior

6 homicide conviction, had not yet gone to trial.  Counsel pointed out that he could very well not

7 receive the death penalty.

8                        PROCEDURAL HISTORY

9       On April 5, 1988, the jury returned its verdicts finding petitioner guilty on all

10 counts – first degree murder, robbery, and kidnaping.  It also found true both special

11 circumstances - murder perpetrated during a robbery and murder perpetrated during a kidnaping.

12 On April 19, the jury returned a death verdict.  On May 18, 2000 the California Supreme Court

13 affirmed the conviction and sentence.  <u>People v. Riel</u>, 22 Cal. 4th 1153 (2000).  The United

14 States Supreme Court denied certiorari review in early 2001.  <u>Riel v. California</u>, 531 U.S. 1087

15 (2001).

16       On December 15, 1999, petitioner filed his first state habeas petition ("1999 State

17 Pet.").  On February 28, 2001, the California Supreme Court summarily denied the petition

18 without issuing an order to show cause.  <u>In re Riel</u>, No. S084324.  Petitioner filed a second state

19 petition on March 22, 2002 ("2002 State Pet.").  On May 15, 2002, the California Supreme Court

20 again issued a summary denial.  <u>In re Riel</u>, No. S105455.

21       Petitioner initiated this federal action by filing a motion for appointment of

22 counsel on March 14, 2001.  He filed a first petition on March 29, 2002 and an amended petition

23 on May 22, 2002.   In an order filed July 15, 2003, this court granted petitioner's unopposed

24 motion to expand the record to include all exhibits to petitioner's state habeas petitions.  On

25 February 22, 2005 petitioner filed the present motion for an evidentiary hearing.  The motion

26 covers all claims for which petitioner seeks an evidentiary hearing except claim 36.  Claim 36

1  alleges that the California death penalty scheme unconstitutionally fails to narrow the class of

2  murderers eligible for the death penalty.  Petitioner's request for discovery on claim 36 was

3  granted.  However, he will rely on the information obtained in a parallel discovery request

4  granted in Frye v. Ayers, CIV S 99-628 LKK KJM.  See Oct. 12, 2004 Order.  That discovery is

5  still proceeding.  See Docket Nos. 196, 197, 198, 199.

6  MOTION FOR EVIDENTIARY HEARING

7  Petitioner's primary claim is ineffective assistance of counsel at the penalty phase

8  for failure to investigate and present mitigating evidence.  Petitioner also seeks a hearing on

9  claims of ineffective assistance of counsel at the guilt phase, competence of his mental health

10  expert, the jury's reliance on false evidence, vague penalty phase instructions, and method of

11  execution.[4]

12  I.    Legal Standards

13  A writ of habeas corpus:

14  shall not be granted with respect to any claim that was adjudicated
15  on the merits in State court proceedings unless the adjudication of
   the claim–

16  (1) resulted in a decision that was contrary to, or involved
17  an unreasonable application of, clearly established Federal law, as
   determined by the Supreme Court of the United States; or

18  (2) resulted in a decision that was based on an unreasonable
19  determination of the facts in light of the evidence presented in the
   State court proceeding.

20  28 U.S.C. § 2254(d).  An evidentiary hearing is appropriate under the following circumstances:

21  If the applicant has failed to develop the factual basis of a
22  claim in State court proceedings, the court shall not hold an
   evidentiary hearing on the claim unless the applicant shows that –

23  /////

24  _____

25  [4]  Petitioner's brief includes a request for an evidentiary hearing on claim 38 (conditions
   of confinement).  At oral argument on the motion, petitioner's counsel stated the court's July
   2003 expansion of the record included evidence relevant to claim 38 and he had nothing further

26  to offer.  Effectively, petitioner withdrew the request for an evidentiary hearing on claim 38.

1             (A) the claim relies on –

2             (i) a new rule of constitutional law, made
       retroactive to cases on collateral review by the
3      Supreme Court, that was previously unavailable; or

4             (ii) a factual predicate that could not have been
       previously discovered through the exercise of due
5      diligence; and

6      (B)  the facts underlying the claim would be
       sufficient to establish by clear and convincing
7      evidence that but for constitutional error, no
       reasonable factfinder would have found the
8      applicant guilty of the underlying offense.

9      28 U.S.C. § 2254(e)(2).

10            Various decisions of the Court of Appeals for the Ninth Circuit establish a three-

11     step process to consider the necessity or propriety of an evidentiary hearing in a federal

12     proceeding under section 2254.  Initially, the court must "determine whether a factual basis exists

13     in the record to support the petitioner's claims."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th

14     Cir. 1999).  If the facts do not exist or are inadequate and a hearing might be appropriate, then

15     [the] court's first task in determining whether to grant an
       evidentiary hearing is to ascertain whether the petitioner has "failed
16     to develop the factual basis of a claim in State court."  If so, the
       court must deny a hearing unless the applicant establishes one of
17     the two narrow exceptions set forth in §2254(e)(2)(A) & (B).  If,
       on the other hand, the applicant has not "failed to develop" the
18     facts in state court, the district court may proceed to consider
       whether a hearing is appropriate, or required under Townsend.

19

20     Id.; Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005) (same).

21            A petitioner will only be charged with a "failure to develop" the facts if "there is

22     lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

23     Williams v. Taylor, 529 U.S. 420, 432 (2000).  The petitioner must have "made a reasonable

24     attempt, in light of the information available at the time, to investigate and pursue claims in state

25     court."  Id. at 435.  "Diligence will require in the usual case that the prisoner, at a minimum, seek

26     an evidentiary hearing in the state court in the manner prescribed by state law."  Id. at 437.

1        During argument on petitioner's motion, respondent contended that petitioner

2  "failed to develop" many claims because he failed to provide to the state court every item of

3  evidence presented here.  Respondent's contention is not supported by the federal habeas statute.

4  Provisions in the statute for discovery, expansion of the record, and evidentiary hearings show

5  that evidence not presented to the state court may be accepted by the federal court.  Cf. Rules 6

6  and 7, Rules Governing § 2254 Cases; 28 U.S.C. § 2254(e).  "Where the state courts simply fail

7  to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on

8  otherwise exhausted claims."  Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997).  Petitioner

9  requested an evidentiary hearing in both his state habeas proceedings.  1999 State Pet. at 165;

10  2002 State Pet. at 139.  By summarily denying both petitions without issuing an order to show

11  cause, the California Supreme Court denied these requests for hearings.  In re Riel, No. S084324

12  (Cal. Sup. Ct. Feb. 28, 2001); In re Riel, No. S105455 (Cal. Sup. Ct. May 15, 2002).  The fact

13  that petitioner did not present all evidence to the state court that he presents here does not require

14  this court to find he "failed to develop" those facts.

15        The second step in determining the propriety of an evidentiary hearing is

16  application of the AEDPA standard to determine whether "the state court's decision was an

17  unreasonable determination of the facts."  Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir.

18  2005), cert. denied, 547 U.S. 1159 (2006).  In Townsend v. Sain, 372 U.S. 293, 313 (1963), the

19  /////

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

1    Supreme Court held an evidentiary hearing is mandatory in six circumstances:

2              (1) the merits of the factual dispute were not resolved in the state
       hearing; (2) the state factual determination is not fairly supported
3      by the record as a whole; (3) the fact-finding procedure employed
       by the state court was not adequate to afford a full and fair hearing;
4      (4) there is a substantial allegation of newly discovered evidence;
       (5) the material facts were not adequately developed at the state-
5      court hearing;[5] or (6) for any reason it appears that the state trier of
       fact did not afford the habeas applicant a full and fair fact hearing.

6

7    See also Jones, 114 F.3d at 1010.  According to the Court of Appeals, a state court's decision is

8    "based on an unreasonable determination of the facts" in a case in which the petitioner

9    establishes any one of the Townsend factors.  Earp, 431 F.3d at 1167.

10              The third step requires the court to find petitioner has a "colorable claim for relief

11   and has never been afforded a state or federal hearing on this claim."  Id.  To show a colorable

12   claim, a petitioner must "allege specific facts which, if true, would entitle him to relief." Id. at

13   1167 n.4 (quoting Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998)).  The Court of Appeals

14   has stressed that a petitioner "only needs to allege a colorable claim for relief" which is "a low

15   bar." Id. at 1170 (emphasis in original) (citing Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir.

16   2001)).  More recent Supreme Court law may have raised the bar when determining whether an

17   evidentiary hearing is mandatory.  In Schriro v. Landrigan, ___ U.S. ___, 127 S. Ct. 1933, 1940

18   (May 14, 2007), the Court held that courts reviewing motions for evidentiary hearing must "take

19   into account" the "deferential standards" for reviewing the state court's denial of petitioner's

20   claims.  It appears then that petitioner's claim is colorable if he can show his facts, if proved,

21   would require this court to find the California Supreme Court's decision denying his claim "was

22

23        [5] The fifth factor was overruled in Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).  In
     Keeney, the Court held that a petitioner who failed to develop facts in state court must show
24   cause and prejudice.  The Supreme Court has held that Congress codified the Keeney "failure to
     develop" standard in the first clause of §2254(e)(2).  Williams, 529 U.S. at 434.  Therefore, if
25   petitioner meets the "failure to develop" standard in step one of this analysis, he has satisfied the
     concerns of Keeney and the court may use the fifth factor in determining whether or not to hold
26   an evidentiary hearing.

1   contrary to or involved an unreasonable application of clearly established Federal law" or

2   "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C.

3   § 2254(d).  Petitioner need not, however, "point to specific facts he will establish that will entitle

4   him to relief;" rather, he must show "his allegations would entitle him to relief and the hearing is

5   likely to elicit the factual support for those allegations." Teti v. Bender, 507 F.3d 50, 62 (1st Cir.

6   2007), cert. denied, 2008 WL 355218 (Mar. 24, 2008).

7          Prior to enactment of the AEDPA, federal courts had discretion to hold an

8   evidentiary hearing even if the standards set out above were not met. Townsend, 372 U.S. at

9   318; see also Hillery v. Pulley, 533 F. Supp. 1189, 1204 (E.D. Cal. 1982) ("[E]ven  where not

10  otherwise mandated, the federal court has the discretion to hold an evidentiary hearing

11  particularly where material issues of fact are in dispute.").  The Court warned that this power

12  should not be wasted on frivolous claims. Townsend, 372 U.S. at 318.  "Factors relevant to the

13  District Court's discretionary determination include the existence of a factual dispute, the strength

14  of the proffered evidence, the thoroughness of prior proceedings, and the nature of the state court

15  determination." Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (citations omitted).  "The

16  attachment of the presumption of correctness to a particular finding of fact does not deprive the

17  federal district court of the discretion to hold an evidentiary hearing." Knaubert v. Goldsmith,

18  791 F.2d 722, 727 n.3 (9th Cir. 1986) (emphasis in original); Richmond v. Ricketts, 774 F.2d

19  957, 962 (9th Cir. 1985); Pagan, 984 F.2d at 64.

20         In cases covered by the AEDPA, courts retain the discretion to hold an evidentiary

21  hearing. See Guidry v. Dretke, 397 F.3d 306, 323 (5th Cir. 2005) ("[R]ead in conjunction with

22  Rule 8(a), subpart (e)(2) implies a federal habeas court has discretion to conduct an evidentiary

23  hearing where none of the bars apply."), cert. denied, 547 U.S. 1035 (2006); Clark v. Johnson,

24  202 F.3d 760, 765 (5th Cir. 2000) ("habeas statute does not further limit this discretion once a

25  petitioner meets the prerequisites of §2254(e)(2)").  The Court in Landrigan did not eliminate

26  that discretion. Teti, 507 F.3d at 61; Ashmus v. Ayers, No. 3-93-cv-594-TEH, 2007 WL

12

1624612 at *1 (N.D. Cal. June 4, 2007); <u>Johnson v. Norris</u>, No. 6:06-cv-6063, 2007 WL

2153581 at *1 (W.D. Ark. July 24, 2007).  The Supreme Court held only that "a district court is

not required to hold an evidentiary hearing" if the record "precludes habeas relief." <u>Landrigan</u>,

127 S Ct. at 1940.  In <u>Ashmus</u>, Judge Henderson noted the difficulty in determining the

meritoriousness of petitioner's claims without a hearing:  "until the relevant claims are developed

at an evidentiary hearing, the Court is unable to determine whether Petitioner is entitled to relief

on them, for the record neither establishes that Petitioner is entitled to relief on these claims nor

precludes relief on them."  2007 WL 1624612 at *2.  Further, consideration of the AEDPA

standards for relief is  made difficult by the California Supreme Court's failure to provide any

rationale for its determinations of the merits of petitioner's state habeas claims.  Reviewing the

state Supreme Court decisions requires the federal court to review the record independently to

assess whether the state court decision was objectively unreasonable under controlling federal

law.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  Although the record is reviewed

independently, this court must "still defer to the state court's ultimate decision."  <u>Pirtle v.</u>

<u>Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).  The undersigned keeps these standards in mind

when considering each of petitioner's requests for an evidentiary hearing.

II.   <u>Analysis</u>

     A.   <u>Ineffective Assistance of Counsel for Failure to Investigate and Present</u>
        <u>Petitioner's Background and Mental Deficiencies at Guilt and Penalty Phases -</u>
        <u>Claim 2</u>

     Petitioner argues counsel was ineffective for failing to pursue evidence related to

petitioner's family and socio-medical history and his organic, developmental, psychological, and

alcohol-related impairments, and failed adequately to prepare and consult with qualified experts

about these topics.

     1.  <u>Failure to Develop</u>

     Exhibits 90, 91 and 92, presented in support of claim 2, do not appear to have

been presented to the state court.  Exhibit 90 is a letter from defense attorney Frank O'Connor to

1  Dr. Edwards asking him to perform on Charles Riel the same tests he performed on O'Connor's

2  former client Roy Sheffield.  Exhibit 91 is Dr. Edwards' report.  Exhibit 92 is a series of reports

3  from defense investigator Joseph Berger on his interviews with Dr. Strayer (the special education

4  school psychologist), petitioner's mother and Ms. Morgan (the school principal).  The

5  information in Exhibit 90 was described in Dr. Edwards' declaration, which was presented to the

6  state court as Appendix 3.  1999 State Habeas Pet. at 15 & App. 3.  Similarly, Dr. Edwards' state

7  court declaration summarized the important parts of his report for the state court.  Id. at 16.

8  Petitioner did not fail to develop the facts contained in Exhibits 90 and 91.  Exhibit 92 may

9  contain some new information, but most of it was already presented to the state court through the

10  declarations of Mr. Berger and those of many family members and friends.  See Dec. 1999 Decl.

11  of Joseph G. Berger, App. 35 to 1999 State Pet. ("Berger Decl.").  Given the state court's refusal

12  to allow evidentiary development of petitioner's claims, it cannot be said that petitioner failed to

13  develop the factual basis of claim 2.[6]

14              2.  Necessity of Evidentiary Hearing

15          According to petitioner, his trial counsel's investigation consisted of receiving

16  police, probation, prison, parole and school records and conducting interviews with petitioner,

17  his mother, his sister, three probation officers, two prison counselors, another prison employee, a

18  school psychologist and a school principal.  After conducting the interviews, the defense

19  investigator Joseph Berger told trial counsel that petitioner's mother told him that, among other

---

21      [6]  Petitioner argues that in light of respondent's stipulation to expansion of the record to
22  include all state court exhibits, he has waived any argument that petitioner failed to develop the
facts supporting his claims.  Given the timing of respondent's concession, that is not necessarily
the case.  In 2003, respondent stated he did not oppose petitioner's request to expand the record
23  under Rule 7.  See July 15, 2003 Order at 19.  Later, the Court of Appeals for the Ninth Circuit
made clear that the standards of § 2254(e)(2) apply equally to expansion of the record.  See
24  Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of
§ 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they
do not seek an evidentiary hearing) (citing Holland v. Jackson, 542 U.S. 649, 652-53 (2004) (per
25  curiam)).  In 2003, it was not clear that satisfaction of the failure to develop standard was
necessary to expand the record.  Accordingly, the court will not charge respondent with a waiver
26  of the "failure to develop" argument.

1  things, she had a nervous breakdown around the time petitioner was born, failed to supervise him

2  as he was growing up, and threatened suicide several times.  Berger Decl.  Berger also reported

3  that according to petitioner's mother petitioner was not violent, was shy and withdrawn, was an

4  alcoholic at a young age, and threatened suicide two months before the crimes at issue here.  Id.

5  Berger's interview with petitioner's sister primarily concerned the visit she received from

6  petitioner and his codefendants after the crime.  Id.  She did tell Berger, however, that petitioner

7  reached certain developmental stages, such as walking and talking, late.  Id.  Based on his

8  conversations with Dr. Strayer, the school psychologist, and Mrs. Morgan, the school principal,

9  Berger described to counsel petitioner's educational handicaps, substance abuse, "inability to

10  deal with his social environment," and such low intellectual capacity that he "would not be able

11  to plan, formulate, lead, and execute activity such as the robbery and homicide with which

12  [petitioner] was charged."  Id.  Berger recommended counsel conduct IQ and psychological

13  testing of petitioner.  Id.  Berger recalled that counsel did not ask him to "do any additional life

14  history interviews or to attempt to locate any additional life history witnesses with respect to any

15  of these topics."  Id.

16         Trial counsel did obtain a mental health evaluation from Dr. Daniel Edwards, a

17  psychologist.  However, counsel did not request the evaluation until jury selection was underway.

18  The only instructions provided to Dr. Edwards were to "perform on Charles Riel the same tests

19  you performed on Roy Sheffield."  Dec. 30, 1999 Decl. of Daniel W. Edwards, Ph.D., App. 3 to

20  1999 State Pet. ("Dr. Edwards Decl.") at 1.  Dr. Edwards recalled that Sheffield was also a

21  capital case.  He "did not receive more specific instructions or reference questions from Mr.

22  Riel's counsel."  Id. at 2.  Dr. Edwards did not receive any information concerning the crimes or

23  petitioner's life history, except what petitioner told him during the interview.  Id.  Dr. Edwards

24  stated that this sort of "blind" psychological testing was not unusual for him at that time.  "In

25  those cases, my test results were then furnished to a psychiatrist who prepared an evaluation for

26  counsel which integrated my test results with family history and other relevant information."  Id.

1    Dr. Edwards interviewed petitioner on February 28, 1988.  Id.  At some time

2    thereafter, he discussed the results with a defense investigator on the telephone.  Id.  He sent a

3    report to counsel on April 7, 1988.  It was stamped "received" by the Shasta County Public

4    Defender's Office on April 12, the same day the defense presented its penalty phase witnesses to

5    the jury.  Id.; Apr. 7, 1988 Letter and Report of Psychological Evaluation from Dr. Edwards to

6    Frank O'Connor, App. 91 to Pet'r's Feb. 22, 2005 Mot. for Evid. Hrg. ("Dr. Edwards' Report");

7    RT 7570-7637. Dr Edwards concluded that petitioner

8           is a person of probably low-average intellectual ability who has had
            a long history of anti-social problems, many of which are
9           connected with alcohol abuse.  The alcohol abuse seems to stem in
            part from longer standing characterological issues and internal
10          discomfort, and also in part from more on-going, acute problems
            with depression and anxiety.

11
            [S]igns [of brain damage] were minimal. . . .  In summary, we did
12          not feel that there was strong evidence for brain dysfunction due to
            organic damage and that Mr. Riel's major problems were more of a
13          psychogenic nature.

14          Mr. Riel clearly has problems with anxiety, depression and alcohol
            abuse.  He also has significant and long-standing personality
15          problems where he tends to, at least when sober, want to be
            avoidant, dependent, somewhat schizoid and passive-aggressive.

16
            His relationship to reality is somewhat tenuous, although he is not
17          frankly psychotic.  His ego boundaries probably are somewhat
            tenuous and may tend to respond to internal stimuli in a manner
18          that normal individuals do not.  This might be accentuated with the
            influence of alcohol when normal defenses and impulse controls
19          are somewhat in abeyance.

20   Dr. Edwards' Report at 12-13.  There is no indication trial counsel provided any other mental

21   health professionals with Dr. Edwards' results.  Indeed, counsel would not have had time to do

22   so.

23          Trial counsel did not present the testimony of any mental health experts at either

24   the guilt or penalty phases.  Petitioner argues trial counsel should have.  Both Dr. Strayer, the

25   school psychologist, and Dr. Edwards opined that petitioner lacked the abilities to undertake the

26   leadership and planning role in the crimes described in co-defendant Edwards' testimony.  The

1   record does show that counsel considered putting on mental health testimony at the guilt phase to

2   show petitioner was not capable of planning and carrying out the crimes charged.  Defense

3   counsel planned to put on Dr. Strayer.  RT 5641.  However, based on the prosecutor's assertion

4   that he would likely cross-examine Dr. Strayer using examples of petitioner's other criminal

5   activities that show planning and/or leadership, and the trial court's recognition that such cross-

6   examination might be permissible, trial counsel decided not to put Dr. Strayer on the stand.

7   RT 5670-5671, 5679.

8          Generally, to establish ineffective assistance of counsel, petitioner must show

9   counsel's conduct did not meet an objective standard of reasonableness.  Strickland v.

10  Washington, 466 U.S. 668, 687 (1984).  If the conduct is unreasonable, then petitioner must

11  show counsel's conduct prejudiced him.  Id. at 691-92.  Prejudice is found where "there is a

12  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

13  would have been different."  Id. at 694.

14         With respect to the failure to develop a mental defense, counsel has different

15  duties at the guilt and penalty phases with respect to mental health experts.  At the guilt phase,

16  counsel does not have an obligation to provide retained mental health experts with background

17  materials absent a specific request by the expert.  Hendricks v. Calderon, 70 F.3d 1032, 1038-39

18  (9th Cir. 1995).  "In general, an attorney is entitled to rely on the opinions of mental health

19  experts in deciding whether to pursue an insanity or diminished capacity defense."  Id. at 1038.

20  Requiring counsel to "second-guess their experts . . . would effectively eliminate the legitimate

21  role experts play in guiding and narrowing an attorney's investigation."  Id. at 1039.

22  Accordingly, petitioner must show either that counsel acted unreasonably in hiring the mental

23  health expert or that counsel unreasonably failed to suspect the expert's advice was unsound.

24  See Washington v. Murray, 952 F.2d 1472, 1481-82 (4th Cir. 1991); Jones v. Murray, 947 F.2d

25  1106, 1112 (4th Cir. 1991).  Expectations for the penalty phase are different.  In Wallace v.

26  Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999), the court held that an attorney may render

17

1   ineffective assistance at the penalty phase for failing to investigate the defendant's background

2   and adequately prepare expert witnesses.

3   Petitioner has not shown a sufficient likelihood of success on the merits with

4   respect to the guilt phase aspect of claim 2.  While petitioner focuses on the reasonableness of

5   counsel's conduct in dealing with Dr. Edwards, and has a good argument that counsel's cursory

6   directions to Dr. Edwards were insufficient, the focus here is properly on prejudice.  Petitioner

7   has not shown a reasonable likelihood that different conduct by counsel would have led to a

8   different guilt verdict.  The felony murder rule requires only that petitioner have the specific

9   intent to commit robbery or kidnaping.  See People v. Reynolds,186 Cal. App. 3d 988, 994

10  (1986); RT 7074-7075 (felony-murder jury instruction).  The evidence showed petitioner

11  participating in the events leading up to, at the very least, a robbery.  In fact, petitioner even

12  argues that evidence would show petitioner to be a follower "so desperate for attention that he

13  would go along with the schemes of others, no matter how ill-advised, and that as a result he

14  would find himself accused of the misdeeds of others."  Pet'r's Feb. 22, 2005 Mot. for Evid. Hrg.

15  at 51.  Even had the jury accepted petitioner's testimony that he was asleep during the

16  perpetration of the crimes, other testimony showed petitioner was sufficiently involved in the

17  planning.  The jury was instructed that one who aids and abets a crime is also liable.

18          If a human being is killed by any one of several persons
        engaged in the perpetration of or attempt to perpetrate the crime of
19      robbery, all persons who either directly and actively commit the act
        constituting such crime or who with knowledge of the unlawful
20      purpose of the perpetrator of the crime and with the intent or
        purpose of committing, encouraging or facilitating the commission
21      of the offense aid, promote, encourage or instigate by act or advice
        its commission are guilty of murder in the first degree, whether the
22      killing is intentional, unintentional or accidental.

23  RT 7075.  As the California Supreme Court pointed out, the jury did not need to believe all of

24  Edwards' testimony to convict petitioner.  Riel, 22 Cal. 4th at 1182.  It seems most likely the jury

25  believed all three men were involved because all were generally together and mutually

26  cooperating before the crime, during the crime and after the crime.  Id.  Even if petitioner could

1  show counsel failed to support his testimony that he was asleep during the crime, uncontroverted

2  testimony showed petitioner involved with Osborne and Edwards, and apparently planning a

3  robbery, before the crime.  Thus, there is no reasonable probability counsel's failure to support

4  petitioner's testimony with mental health or other evidence would have changed the guilt phase

5  result.

6          The potential for prejudice with regard to the penalty determination is an entirely

7  different matter.  First, petitioner makes a good argument that he would not have been eligible for

8  a penalty phase absent the ineffective assistance of counsel.  The felony-murder special

9  circumstance required proof of intent to commit murder.  With respect to the special circumstance

10 of murder during the commission of a robbery, the jurors were instructed:

11          To find that the special circumstance referred to in these
           instructions as murder in the commission of a robbery is true, it
12         must be proved:

13          One, that the murder was committed while the defendant
            was engaged in or was an accomplice in the commission of a
14          robbery, or that the murder was committed during the
            immediate flight after the commission of a robbery by the
15          defendant or to which the defendant was an accomplice;

16          And number two, that the defendant intended to kill a
            human being or intended to aid another in the killing of a
17          human being;

18          And number three, that the murder was committed in order
            to carry out or advance the commission of the crime of
19          robbery or to facilitate the escape therefrom or to avoid
            detection.

20

21 RT 7081-7082.[7]  Petitioner's arguments regarding counsel's failures with the mental health

22 professionals do demonstrate the potential for prejudice with respect to any finding of intent to

23 commit murder.  While the evidence showed petitioner participating in planning what appeared to

24 _____

25      [7] At the time of petitioner's crimes, the California Supreme Court had held that intent to
   kill was a requirement of the felony-murder special circumstance.  Carlos v. Superior Court, 35
   Cal. 3d 131, 153-54 (1983).  While Carlos was later overruled, it was the applicable law in
26 petitioner's case.  See People v. Osband, 13 Cal. 4th 622, 680 (1996).

1  be a robbery, the only testimony connecting petitioner to planning or intending to commit a

2  murder was the testimony of Edwards.

3            With respect to the penalty determination, petitioner also has made a sufficient

4  showing of success on the merits.  As a general rule, counsel's investigation of some aspects of

5  his client's past is not necessarily enough.  "Although counsel is not required 'to investigate every

6  conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the

7  defendant at sentencing,' they are in no position to decide, as a tactical matter, not to present

8  mitigating evidence or not to investigate further just because they have <u>some</u> information about

9  their client's background."  <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1175 (9th Cir. 2005) (quoting

10  <u>Wiggins v. Smith</u>, 539 U.S. 510, 527 (2003)) (emphasis in original), <u>cert. denied</u>, 547 U.S. 1159

11  (2006).  Again relying on <u>Wiggins</u>, the Court of Appeals also has held that certain elements of a

12  defendant's background trigger a duty to further investigate.  They include "a family history of

13  alcoholism, abuse, and emotional problems."  <u>Id.</u>  In addition, counsel's failure to provide Dr.

14  Edwards with any background information or specific instructions is unreasonable on its face

15  under <u>Wallace</u>.  Because so little mitigating evidence was presented at the penalty phase, and no

16  aggravating evidence was presented, there is a reasonable possibility petitioner was prejudiced by

17  the failure to further investigate and present evidence of petitioner's background and mental

18  health.

19            Claim 2 also includes allegations that counsel failed to investigate and present

20  evidence of Osborne's violent past to impeach Edwards' testimony that petitioner was the leader

21  in the killing.  As described above, some of this evidence came out at trial.  A number of

22  witnesses testified to Osborne's violent behavior when he had been drinking.  A couple also

23  testified that he appeared to be the leader of the group.  Petitioner claims he has additional

24  evidence of Osborne's history of threatening and violent behavior and his heavy

25  methamphetamine use just prior to the murder at issue here.  All of this would have been relevant

26  to support the defense theory that Edwards and Osborne were the real killers, who were

1  cooperating to blame petitioner and shift the focus away from themselves.  Petitioner has

2  adequately shown a possibility of success on the merits for the special circumstance and penalty

3  phase aspects of claim 2 so as to justify a hearing.

4         B.  Due Process Right to Competent Mental Health Expert - Claim 19

5         Petitioner argues Dr. Edwards' assistance was not "competent or appropriate."

6  The court need not reach this question because petitioner has not shown he has a constitutional

7  right to challenge the adequacy of a court-appointed psychiatrist.  In Ake v. Oklahoma, the

8  Supreme Court examined a criminal defendant's right to the assistance of a psychiatrist.

> [W]hen a defendant demonstrates to the trial judge that his sanity at
> the time of the offense is to be a significant factor at trial, the State
> must, at a minimum, assure the defendant access to a competent
> psychiatrist who will conduct an appropriate examination and assist
> in evaluation, preparation, and presentation of the defense.  This is
> not to say, of course, that the indigent defendant has a constitutional
> right to choose a psychiatrist of his personal liking or to receive
> funds to hire his own.  Our concern is that the indigent defendant
> have access to a competent psychiatrist.

14  470 U.S. 68, 83 (1985).  The Court of Appeals for the Ninth Circuit considered the question

15  presented here:  whether Ake created a right to the assistance of a competent psychiatrist at trial.

16  In Harris v. Vasquez, the court held that Ake provided a right of access to a competent

17  psychiatrist.  Ake did not guarantee the competence of that psychiatrist.  949 F.2d 1497, 1517-18

18  (9th Cir. 1990); Williams v. Vasquez, 817 F. Supp. 1443, 1468 (E.D. Cal. 1993), aff'd, 52 F.3d

19  1465 (9th Cir. 1995).  The court in Harris rejected a rule "that would require federal courts to

20  conduct a 'psychiatric medical malpractice review' in a federal habeas proceeding to determine

21  whether a state prisoner's psychiatrists 'competently' assisted the defense."  Id. at 1518.

22         The Court of Appeals for the Fourth Circuit examined a claim that a mental health

23  expert's examination was not "appropriate."  In Wilson v. Greene, 155 F.3d 396, 401 (4th Cir.

24  1998), the court similarly held that Ake "reflects primarily a concern with ensuring a defendant

25  access to a psychiatrist or psychologist."  "The Constitution does not entitle a criminal defendant

26  to the effective assistance of an expert witness."  155 F.3d at 401.

1    The Court of Appeals was quite clear in <u>Harris</u>. This court is bound by the holding

2  in <u>Harris</u>.  Further, this court cannot find the California Supreme Court's denial of this claim

3  violated "clearly established Federal law" when the United States Supreme Court has not

4  established a constitutional right to a competent mental health expert.  Because petitioner cannot

5  show a possibility of success on the merits of claim 19, he is not entitled to an evidentiary hearing

6  on this claim.

7    C.   <u>Jury Reliance on False and Unreliable Evidence - Claims 5, 6 and 9</u>

8    Claims 5 and 6 allege ineffective assistance of counsel for failing to challenge the

9  introduction of evidence at trial.  Claim 5 involves the presentation of evidence regarding the

10  location of a beer can with petitioner's fingerprints found at the crime scene.  The beer can was

11  important because officers testified it was found inside the cashier's office.  Petitioner testified

12  that he was asleep while at the truck stop and did not go inside the office.  Claim 9 alleges

13  prosecutorial misconduct for the presentation of false evidence regarding the location of the beer

14  cans.

15    Claim 6 involves evidence of the victim's blood on petitioner's pants.  The

16  prosecutor presented it to show petitioner was involved in the assault on the victim.  Petitioner

17  argues his counsel should have had the pants analyzed to show that the blood stains were not

18  consistent with a direct spatter during the assault but more likely occurred when the pants brushed

19  against another object stained with blood.  This latter argument would have supported petitioner's

20  testimony that he was awakened to help dispose of the victim's body.

21    1.   <u>Failure to Develop</u>

22    Petitioner presented a good deal of evidence to the California Supreme Court in

23  support of his state habeas petition.  <u>See</u> Appendices 29, 30 and 56 to 1999 State Pet.  In support

24  of his federal petition and motion for an evidentiary hearing here, he presents only a few

25  additional items: enlargements and reproductions of trial exhibits, notes from Deputy Morey and

26  Morey's training records.  Petitioner argues he did not fail to develop claims 5, 6 and 9 because he

1  requested, and was denied, discovery and an evidentiary hearing on all claims raised in his state

2  petition.

3          As noted, the California Supreme Court denied petitioner's 1999 habeas petition

4  without issuing an order to show cause.  At the time of petitioner's state habeas proceeding,

5  California court rules required the issuance of an order to show cause before a petitioner was

6  permitted to conduct discovery.  People v. Gonzales, 51 Cal. 3d 1179, 1258 (1990) (a habeas

7  petition that does not state a prima facie case for relief "must be summarily denied, and it creates

8  no cause or proceeding which would confer discovery jurisdiction."), superseded by statute as

9  stated in In re Steele, 32 Cal. 4th 682, 690 (2004) (Gonzales superseded by statute effective Jan. 1,

10 2003).  It is clear, then, that petitioner had no chance to conduct discovery or present evidence

11 during his state habeas proceeding.  Deputy Morey's notes and training records were available to

12 petitioner only through discovery, which he obtained in this federal proceeding.  Petitioner cannot

13 be charged with a failure to develop the facts supporting claims 5, 6 and 9.

14          2.   Necessity of Evidentiary Hearing

15          This court already has considered the importance of the beer can evidence:  "the

16 location of the crushed beer can with petitioner's fingerprints was important.  The prosecution's

17 evidence showed the crushed can was found in the cashier's office.  This evidence corroborated

18 co-defendant Edwards' testimony that petitioner and Osborne were the ones to enter the cashier's

19 office and commit the robbery.  Edwards' testimony contradicted petitioner's testimony that he

20 fell asleep and did not go into the cashier's office or participate in the robbery."  Nov. 18, 2003

21 Order at 2; see also July 15, 2003 Order at 4.

22          Petitioner shows that Deputy Morey failed to follow basic crime scene

23 investigation protocol by failing to record the location of each beer can on a drawing or by a

24 photo.  A crime scene sketch presented at trial had been changed from prior sketches to reflect a

25 crushed beer can in the cashier's office.  The prior sketches did not show the location of any beer

26 cans.

1   With respect to the blood stain evidence, petitioner would present the testimony of

2   an expert that the blood stain on petitioner's pants appears to be a smear from a secondary transfer

3   rather than a spatter through the air.

4   Respondent does little more than argue the merits of each claim.  He contends

5   counsel had good reasons for not challenging the beer cans or blood stains.  However,

6   respondent's analysis is not supported by the record.  Nothing shows petitioner's trial counsel

7   made reasoned, strategic decisions not to challenge the beer can or blood stain evidence.

8   The more difficult question at this point is whether or not counsel's actions, or

9   inactions, prejudiced petitioner.  The beer can and blood stain evidence certainly tended to

10   implicate petitioner but they were not conclusive.  As the defense pointed out at trial, petitioner

11   could have touched the beer can at some point before it was taken to the cashier's office.[8]

12   Showing the blood stain was caused by a smear rather than a spatter does not seem particularly

13   important – both show petitioner participated in the events to some extent.

14   As described above, because there was sufficient other, unchallenged evidence to

15   connect petitioner to the robbery, this evidence was not sufficiently significant to have affected

16   the guilt phase.  The difficult question is its effect on the special circumstance and penalty phase

17   determinations.  Throughout the guilt and penalty phases, the defense argued that petitioner was

18

19   [8] In closing, defense counsel argued:  "The important thing that he [Robert Dolliver, the Justice Dept. fingerprint expert] had to testify to was he found beer can – fingerprints on beer

20   cans.  One of the fingerprints happened to be Chap's fingerprint.  And it was found open [sic] a beer can in the shelf area near where the cash register was.  What does that mean?  That means

21   that at some time in the probably near past, Chap had had his hand on that beer can.  And that after Chap had his hand on the beer can, the beer can got to the shelf near the cash register.  So

22   what does that mean?  Not much.
   Chap, John, Virgal [sic], everybody, they were getting the beer out.  People were handing

23   beer cans around.  And at some point Chap touched that beer can.  Somebody else could have too.  Because we know that everybody touching a beer can doesn't leave their fingerprints on it.

24   Because we have Tolley telling us that he picked up a beer can that was – and threw it away. And that same beer can was dusted for fingerprints, and his weren't found on it.

25   Who took that beer can in there?  I don't know.  I submit it was probably John Osborne. We don't have any evidence that anybody at the time the robbery was going down took a beer

26   can into that area.  And it's illogical to think that they would, really."  RT 6849-6850.

the least culpable of the three.  The only evidence implicating petitioner as the leader of the group was Edwards' testimony.  Additional evidence tending to reduce petitioner's role and show someone else was the leader may have prevented the jury from finding that petitioner had the intent to kill for purposes of the special circumstance determination and would have provided support to petitioner's otherwise minimal mitigation case.  The undersigned finds an evidentiary hearing necessary to resolve claims 5, 6 and 9 as they relate to the special circumstance and penalty determinations.

D. Penalty Phase Jury Issues - Claims 29 and 37

These claims comprise the following arguments:  (1)  jurors misunderstood the meaning of a death sentence due to one juror's statement that even if the jury voted for death the judge would reduce the sentence to life without parole (claim 29); (2) jurors misunderstood the meaning of life without parole due to defense counsel's statements during voir dire indicating that petitioner may not spend his full life in prison (claim 29);[9] and (3) various challenges on mostly vagueness grounds to the sentencing instructions (claim 37).

1. Failure to Develop

Apparently, the only evidence petitioner intends to present in support of these claims are the studies cited in his brief analyzing evidence collected by the Capital Jury Project (the "CJP").  During the early and mid-90s the CJP interviewed 1155 capital jurors from 340 trials in 14 states, including California.  According to petitioner, analyses of these interviews show that most jurors do not understand their penalty phase duties, including the concept of mitigation. During argument on the present motion, petitioner's counsel stated that at an evidentiary hearing he would present the testimony of those who participated in the CJP studies.

---

[9]  During the voir dire of several chosen jurors, defense counsel described that LWOP "means the person presumably dies of old age in prison," RT 1780 (Juror Cheryl Ary); "means literally that, that the person dies, hopefully, of old age in prison," RT 1075 (Ruth Haug); means the "person dies in prison, hopefully of old age, but in our prison system that's not guaranteed either," RT 1127 (Roy Hunt); "means, supposedly, just that.  A person dies of tottering old age in our good state prison."  RT 1983 (Kathleen Marchione).

1    Respondent argues the CJP data was not provided to the state court.  However, in

2   his appellate opening and reply briefs, petitioner discussed the CJP data and cited several articles

3   examining the CJP studies.  See May 29, 1998 Appellant's Opening Brief at 334-35; Sept. 16,

4   1999 Appellant's Reply Brief at 78, 89 & n. 25.  Because he had no further opportunity to develop

5   evidence in the state proceedings, petitioner adequately developed the CJP evidence for purposes

6   of 28 U.S.C. § 2254(e)(2).

7    2.  Necessity of Evidentiary Hearing

8    Petitioner relies on Simmons v. South Carolina, 512 U.S. 154 (1994), for the

9   proposition that the CJP data, a statistical study, may be used here in support of a claim of

10   constitutional error.  In Simmons, the Court considered whether a trial court must explain that a

11   defendant was ineligible for parole where the penalty phase instructions gave jurors the choice

12   between death and a "life sentence," where the prosecutor argued future dangerousness as an

13   aggravating factor, and where the deliberating jurors expressed confusion about the possibility of

14   parole in a note to the judge, which the judge answered by telling them to look to the "plain

15   language" of the instructions.  On these facts, the Court held due process required the jurors be

16   informed of the defendant's ineligibility for parole.  In examining the judge's answer to the note,

17   the Court mentioned an analysis of CJP data showing that jurors misunderstand the meaning of

18   "life imprisonment."  Simmons, 512 U.S. at 170 n.9.  It is important to note that the Simmons

19   Court's reliance on the CJP data was just a small part of its analysis of the due process problems

20   in that case.

21    Before and after Simmons, courts have rejected the use of the same studies

22   petitioner presents here.  The studies were used in numerous cases to argue the Federal Death

23   Penalty Act ("FDPA") was unconstitutional because its penalty phase scheme - which resembles

24   California's - could not be applied appropriately by jurors.  Most courts to examine the issue,

25   including a number of appellate courts, have rejected the argument.  See United States v. Sablan,

26   No. 00-CR-00531, 2006 WL 1028780 at *8 (D. Colo. Apr. 18, 2006) (collecting cases); United

1  States v. Cheever, 423 F. Supp. 2d 1181 (D. Kan. 2006);  United States v. Llera Plaza, 179 F.

2  Supp. 2d 444, 450 n.5 (E.D. Pa. 2001).  The few decisions crediting statistical studies to overturn

3  the FDPA or state capital sentencing laws were overturned on appeal.  United States v. Fell, 217

4  F. Supp. 2d 469 (D. Vt. 2002), vacated, 360 F.3d 135 (2d Cir. 2004); United States v. Free, 806 F.

5  Supp. 705 (N.D. Ill. 1992) (using a study that examined only Illinois cases), rev'd in relevant part,

6  12 F.3d 700 (7th Cir. 1993); cf. United States v. Young, 376 F. Supp. 2d 787 (M.D. Tenn.) (court

7  relies on statistical studies, including CJP research,  showing guilt phase jurors are prejudiced

8  when going into penalty phase; holds separate jury necessary for penalty phase), vacated, 424 F.3d

9  499 (6th Cir. 2005).

10          The issues in claim 37 are specific to the California instructions.  The CJP study

11  included 1155 interviews with capital jurors.  However, it appears only 68 of those jurors were

12  Californians and they were drawn from only 15 cases.  See James Luginbuhl & Julie Howe, How

13  Jurors Decide on Death, 66 Brooklyn L. Rev. 1011, 1017 (2001).  There is no indication this is a

14  statistically significant sample of jurors from California capital cases or even that those jurors

15  participated in cases with instructions identical to the ones in this case.  Accordingly, the CJP

16  study does not bear enough relevance to the issues raised in claim 37 to justify its admission in

17  support of that claim.

18          With respect to the juror misconduct allegations of claim 29, petitioner has not

19  supported the underlying factual basis of that claim.  In state court, petitioner simply presented the

20  statement of a defense investigator that a juror told him she overheard another juror make the

21  statement regarding sentencing.  Petitioner has not supported claim 29 with the testimony of any

22  juror on this point.  Without some sort of non-hearsay factual underpinning for this claim of juror

23  misconduct, petitioner cannot succeed on the juror misconduct aspect of claim 29.

24          Petitioner's second allegation in claim 29, that counsel misled jurors during voir

25  dire into believing a sentence of life without parole might allow for petitioner's release, is not

26  borne out by the record.  Defense counsel's closing argument stressed that a life sentence meant

1  petitioner would spend the rest of his life in prison.[10]  Those statements were not controverted by

2  the prosecutor's closing argument or the jury instructions in any way.  In this case, unlike

3  Simmons, there is no reason to think the jury would have misunderstood the meaning of life

4  without parole.  Because petitioner has not shown that he can succeed on the merits of claim 29,

5  he is not entitled to supplement that claim with additional evidence.

6      E.  Lethal Injection Procedures - Claim 39

7         The parties have agreed that this court should defer ruling on petitioner's request

8  for an evidentiary hearing on this claim because California's lethal injection procedures are

9  currently being litigated in the Northern District of California case of Morales v. Tilton,

10  Nos. C 06 219 JF RS, C 06 926 JF RS.  See Morales v. Tilton, 465 F. Supp. 2d 972 (N.D. Cal.

11  2006).

12         For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED

13  as follows:

14        1.     Petitioner's February 22, 2005 Motion for an Evidentiary Hearing is

15               granted in part and denied in part.

16              a.     The undersigned will hold an evidentiary hearing on the issues

17                  raised in claims 2, 5, 6 and 9 as they affected the special

18                  circumstance and penalty phase determinations.

19  /////

20  /////

21  /////

---

[10]  During penalty phase closing argument, defense counsel repeatedly referred to LWOP as meaning that petitioner would spend the remainder of his life in prison: "He's already sentenced to life without possibility of parole . . . .  Which, as you know, means exactly that.  He's only 26 years old.  He's going to live a long time in state prison, never knowing the date of his death."  RT 7694.  "[H]e's waiting for your judgment as to whether he's going to be executed, or whether he's going to live out his days in state prison."  Id.  "[T]he rest of his life Mr. Riel is going to be spending time in a very small cell . . . .  he has no possibility of getting out of prison because of the sentence."  RT 7699-7700.

1             b.     A ruling on petitioner's request for an evidentiary hearing on claim

2                39 is deferred pending resolution of the Northern District of

3                California case of <u>Morales v. Tilton</u>, Nos. C 06 219 JF RS,

4                C 06 926 JF RS.

5             c.     Petitioner's motion is denied in all other respects.

6       2.     On April 23, 2008 at 11:00 a.m. in courtroom # 26, the undersigned will

7           hold a status conference.  Counsel need not file status reports but shall be

8           prepared to discuss procedures and a schedule for preparing for and

9           conducting an evidentiary hearing.

10  DATED:  April 11, 2008.

11

12

13                               U.S. MAGISTRATE JUDGE

14

15

16

17

18  rielevi.or

19

20

21

22

23

24

25

26