1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES D. RIEL,                          No.  2:01-cv-0507 MCE DAD

12                  Petitioner,                DEATH PENALTY CASE

13        v.                                   FINDINGS & RECOMMENDATIONS

14   WARDEN, San Quentin State Prison,

15                  Respondent.

16

17          Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to 28

18   U.S.C. § 2254.  In 2009, then United States Magistrate Judge Kimberly J. Mueller and Senior

19   District Judge Lawrence K. Karlton, both of whom were then assigned to this action, granted

20   petitioner's motion for an evidentiary hearing with respect to his claims 2, 5, 6, and 9.  (ECF Nos.

21   204 & 212.)

22          In 2011, however, the United States Supreme Court rendered decisions changing the

23   federal courts' analysis of federal habeas corpus petitions under 28 U.S.C. § 2254.  See

24   Harrington v. Richter, 562 U.S. 86 (2011); Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388

25   (2011).  Accordingly, on November 17, 2011, this court then stayed the evidentiary hearing

26   proceedings and ordered the parties to brief the application of 28 U.S.C. §2254(d) to each claim

27   upon which petitioner had previously been granted an evidentiary hearing, as well as with respect

28   ////

                                                    1

1   to petitioner's claim 36, upon which his motion to expand the record or for an evidentiary hearing

2   is pending before the court.  (ECF No. 507.)

3         After careful consideration of the parties' briefs and of the state court record, for the

4   reasons set out below, the undersigned concludes that petitioner has satisfied the requirements of

5   § 2254(d) with respect to his claims 2 and 5 regarding the special circumstance and penalty phase

6   determinations in his case.  The undersigned further concludes that petitioner has failed to meet

7   those requirements with respect to his claims 2 and 5 regarding the guilt phase determination in

8   his case and with respect to his claims 6, 9, and 36.

9                                    BACKGROUND FACTS[1]

10  I. Guilt Phase

11        A. Prosecution's Case

12        On the night of November 2-3, 1986, Edward Middleton was working the night shift at

13  Rambo's Truck Stop on Interstate 5 near Weed, California.  In the early morning hours, he was

14  robbed, driven to Shasta County and murdered.  The evidence introduced at trial showed that

15  three persons committed the crime:  petitioner, Virgal Edwards and John Osborne.[2]

16        After the murder, the drawer to the truck stop's cash register was left open.  Mr.

17  Middleton's eyeglasses and hearing aid were found inside the store along with a gasoline charge

18  slip bearing Osborne's signature.  The store owner determined that about $328 was missing from

19  the cash register.  Beer cans found at the truck stop revealed the fingerprints of both petitioner

20  and Osborne, and Osborne's fingerprint was found on a doorknob at the store.  Mr. Middleton's

21  body was found down an embankment below Soda Creek Road in northern Shasta County.  A

22  bloody tire iron and an air pressure gauge were found on the road above.  The victim died of

23

---

[1]  This overview of the facts is derived from the California Supreme Court's findings of
facts, which are presumed to be correct, 28 U.S.C. § 2254(e)(1), and from the undersigned's
review of the state court record.  See People v. Riel, 22 Cal. 4th 1153 (2000).

[2]  The three were originally co-defendants, but the cases against each were severed.  Edwards
eventually pleaded guilty to one count of first degree murder pursuant to a plea bargain and
testified against petitioner at the latter's trial.  Osborne pleaded guilty in return for a sentence of
life without the possibility of parole.

1    multiple blunt force injuries to the head and face, consistent with being hit with the tire iron, and

2    of multiple stab wounds to the chest and back.

3         At petitioner's trial Edwards was called as a prosecution witness.  During his testimony he

4    acknowledged that he had agreed to testify truthfully in exchange for pleading guilty to first

5    degree murder and receiving a prison sentence of 25 years to life in prison.  With respect to the

6    events surrounding the murder, Edwards testified as follows.  On November 2, 1986, Edwards

7    drove with petitioner from Klamath Falls, Oregon, to Weed in his 1973 Oldsmobile Cutlass.  That

8    afternoon, they met Osborne, whom they both knew, at Rambo's Truck Stop, where Osborne

9    worked.  The group smoked marijuana, drank beer and visited various other persons and places.

10   Edwards said that during the afternoon and evening, defendant and Osborne got "drunk," and that

11   he was "stoned."  Eventually, the three returned to the truck stop, arriving around 2:15 a.m. on

12   November 3, 1986.  Mr. Middleton was on duty at that time, and a truck driver was present with

13   his truck.  Edwards filled his car with gas – which they charged on a credit card – while petitioner

14   and Osborne, both drinking beer, went inside the store and talked with Mr. Middleton.  The three

15   then drove up a nearby dirt road.  Edwards retrieved a knife from the trunk.  As they were "sitting

16   in the car, [they] cut [their] fingers," then put them together to "become blood brothers."  The

17   three planned to wait until the truck driver left, then petitioner "would go inside, knock the guy

18   out, and just take the money."

19        After the truck driver left the truck stop, Edwards drove their car back to that location.

20   Petitioner got out and "went around the side of the building," where he remained for about a

21   minute and a half.  Then Osborne joined him.  About 30 seconds later they returned with Mr.

22   Middleton between them.  Petitioner and Osborne forced Middleton into the backseat.  Petitioner

23   sat next to him, and Osborne sat in the front.  Edwards said that petitioner put a knife to

24   Edwards's throat and told him to drive.  Edwards drove onto the freeway.  While they were

25   driving, petitioner hit Mr. Middleton and demanded his wallet.  Middleton gave petitioner his

26   wallet.  Petitioner opened it, took out some money, and said, "Thirteen bucks.  I'm going to kill

27   you now."  Edwards pulled to the side of the road and parked.  He and Osborne said to let

28   ////

3

1  Middleton go.  Petitioner told them to "shut up," or he would kill them too and directed Edwards

2  to continue driving.  Edwards did so, eventually leaving the freeway and stopping in a dark area.

3       They all got out of the car.  Edwards opened the trunk and, at petitioner's direction, took

4  out a tire iron and gave it to petitioner.  Petitioner hit Middleton in the head with the tire iron and

5  Middleton fell to the ground.  Petitioner, who had the knife, said to the others, "We are all in this

6  together; and now you got to stab him . . . .  If you don't stab him you will be right here with

7  him."  Edwards and Osborne stabbed Middleton.  Petitioner then "went to move the guy off the

8  side of the road."  As he was doing so, he lost his footing and "fell down the hill with the man on

9  top of him."  Osborne helped petitioner "move the body off."   The trio then drove away.  While

10  they were driving, petitioner licked some blood off the knife and ordered the others to do the

11  same.  Later they washed the knife at a rest area and split up the money.  Edwards received $33.

12  They continued driving, finally stopping at petitioner's sister's house in Vacaville.

13  Various individuals who were with the trio in Weed before the murder, or were in the

14  Vacaville/Fairfield area after the murder, also testified at petitioner's trial.  Melinda Peterson

15  testified that petitioner, Edwards and Osborne were at her home in Weed shortly before the

16  murder.  Petitioner and Osborne asked Peterson's husband, Rick, for a gun.  Her husband told

17  them no.  Edwards said, "Well, we don't need a gun. I have a knife."  The three then left.  Before

18  they left, petitioner said, "Come on, let's get out of here and get this over with."  Melinda

19  Peterson testified that, based on petitioner's statements, she thought they were planning to

20  commit a robbery, and she did not want her husband to go with them.  Rick Peterson testified that

21  Osborne and one of the other men, who Peterson identified as Edwards during some of his

22  testimony and as petitioner at other times, asked him for a gun.

23       Tami Sisco testified at petitioner's trial that on the night of the murder, she saw two men,

24  apparently Edwards and Osborne, and an older car with Oregon license plates in the area of the

25  truck stop.  She testified that she saw no one in the car with Oregon plates.  James Tolley, a truck

26  driver, testified that he had stopped at the truck stop around 1:15 to 1:30 that morning.  He

27  observed two people, whose descriptions matched Edwards and Osborne.

28  ////

4

After the murder, the trio visited several people in the Vacaville/Fairfield area, including a woman who purchased methamphetamine for them, petitioner's sister, and Osborne's uncle. The men stopped at the home of petitioner's sister, Roslyn Walker, and Candy Cobb. Cobb heard petitioner say "they had gotten fucked up and there was a man in a coma." Walker testified that petitioner told her, "Sis, I have something to tell you. There is a man in a coma." Other trial testimony indicated that at several points, petitioner was separated from Edwards and Osborne. During one such separation, Edwards and Osborne purchased new clothes and changed most or all of their clothing. Within a short time, Edwards heard that petitioner had been arrested. Osborne called his girlfriend, Pamela Silkwood, in Weed a number of times. She borrowed a car and drove to Fairfield, picked up Edwards and Osborne and headed north. En route, Highway Patrol officers stopped the car and arrested both Edwards and Osborne.

Forensic analysis of blood found on petitioner's boots and pants showed it could not have come from petitioner, Edwards or Osborne, but was consistent with Mr. Middleton's blood.

B. <u>Defense Case</u>

Petitioner testified in his own defense at his trial. He admitted being with Edwards and Osborne before and after the robbery and murder. However, he testified that he had been doing so much drinking on the day in question that he fell asleep in the back seat of Edwards's car and slept through the commission of the crime. After he fell asleep, the next thing he remembered was that Edwards woke him up and told him to help Osborne "move a body." He got out of the car and saw a body "lying on the road." Osborne told him that he, Osborne, had killed the man. He "helped [Osborne] move the body off the side of the road," tripped and fell down the embankment with the body, then got back in the car and fell asleep again. Petitioner denied any involvement in the killing itself.

The defense sought to show that Osborne was the most violent of the three men and their likely leader. A number of people testified at petitioner's trial that Osborne became aggressive and violent when drunk. Wes Coley, Osborne's employer and friend, testified that he locked up his guns when Osborne was drunk. Irene Poehler, Coley's girlfriend, testified that she knew

1    Osborne had shot and killed a prior girlfriend of his and that he frequently hit his current

2    girlfriend.  Pam Silkwood, Osborne's then current girlfriend, testified that Osborne beat her and

3    that the manager of her apartment complex paid her to leave it because Osborne caused so much

4    trouble there.  Osborne's uncle, Aaron Stockman, testified Osborne was "belligerent, obnoxious

5    and aggressive" when drinking.  A Weed police officer testified that Osborne had a number of

6    alcohol-related run-ins with the police and had threatened to kill the police chief.  Others,

7    including a Weed bartender and petitioner's sister's housemate Candy Cobb, testified that

8    Osborne appeared to be the leader of the group both before and after the crime.

9             C. Bifurcated Trial on Petitioner's Prior Prison Term

10            After the jury returned its guilty verdict against petitioner, at a bifurcated trial, the jury

11   also found true the allegation that petitioner had suffered two prior felony convictions, both for

12   second degree burglary, for which he served prison terms.  Edwards testified at petitioner's

13   bifurcated trial that he was a cellmate of petitioner's for about 18 months in 1984 and 1985.  The

14   facts underlying petitioner's prior felony convictions were not presented to his jury in any way.

15   II. Penalty Phase

16            The prosecution presented no additional evidence at the penalty phase of petitioner's trial.

17   After a very brief defense opening statement in which defense counsel simply listed the witnesses

18   he would present at this phase of the trial, the defense called two witnesses in mitigation.  Ardell

19   Morgan, the director of a private special education school in Washington which petitioner had

20   attended for eight months when he was a teenager, testified about petitioner's good qualities,

21   stating that petitioner was gentle and helpful.   Ms. Morgan also described petitioner's learning

22   disability.  According to Ms. Morgan, at the time he had attended the special education school,

23   petitioner was fifteen years old but was doing school work only at a 4th to 5th grade level.

24   Morgan testified that petitioner did not have any support at home and that she took him in during

25   the time he attended the school.

26            Joseph Ross, a supervisor at the McNeil Island Correctional Center in Washington where

27   petitioner was incarcerated for eight months in 1985, testified that petitioner was a good worker

28   while imprisoned at McNeil Island and presented correctional authorities no problems.  In Mr.

1   Ross' opinion, petitioner would not be a problem in prison if he received a sentence of life

2   without the possibility of parole.  Mr. Ross also testified that Virgal Edwards and John Osborne

3   had been incarcerated at McNeil Island and that Osborne was a continuous problem for prison

4   officials during that time.

5        In his closing argument to the jury at the penalty phase of petitioner's trial, defense

6   counsel focused on two things.  First, he argued petitioner's case was not so egregious as to

7   deserve the imposition of the death penalty.  Second, he argued that petitioner and his co-

8   defendants were, in the eyes of the law, equally guilty but that petitioner's co-defendants would

9   not necessarily receive the death penalty.  Petitioner's trial counsel noted that based on his plea

10  bargain, Virgal Edwards himself had estimated he would be out of prison in about thirteen years.

11  Petitioner's counsel also observed that John Osborne, who had a prior homicide conviction, had

12  not yet gone to trial but that he too could very well not receive the death penalty for the crime.

13                              PROCEDURAL HISTORY

14       On April 5, 1988, the jury returned its verdicts finding petitioner guilty on all counts –

15  first degree murder, robbery and kidnapping.  It also found true both special circumstance

16  allegations of murder perpetrated during a robbery and murder perpetrated during a kidnapping.

17  Following the penalty phase of petitioner's trial, on April 19, 1988, the jury returned a death

18  verdict.  On May 18, 2000 the California Supreme Court affirmed petitioner's judgment of

19  conviction and sentence on appeal.  People v. Riel, 22 Cal. 4th 1153 (2000).  The United States

20  Supreme Court denied certiorari on January 8, 2001.  Riel v. California, 531 U.S. 1087 (2001).

21       On December 15, 1999, petitioner filed his first state habeas petition ("1999 State Pet.").

22  On February 28, 2001, the California Supreme Court summarily denied that petition on the merits

23  without issuing an order to show cause.  In re Riel, No. S084324.[3]  Petitioner filed a second state

24  petition on March 22, 2002 ("2002 State Pet.").  On May 15, 2002, the California Supreme Court

25  ////

26  ////

27

28

---

[3] The California Supreme Court also denied habeas relief with respect to two claims, which are not before this court at the present time, on procedural grounds.

1   again issued a summary order, denying some of petitioner's claims on procedural grounds and all

2   of his claims on the merits.   In re Riel, No. S105455.[4]

3          Petitioner initiated this federal habeas action by filing a motion for appointment of counsel

4   on March 14, 2001.  He filed a first federal habeas petition on March 29, 2002 and an amended

5   petition on May 22, 2002.  (ECF Nos. 28, 36.)  On February 22, 2005 petitioner moved for an

6   evidentiary hearing covering all claims for which petitioner sought an evidentiary hearing except

7   claim 36.[5]

8          As noted above, this court granted petitioner's motion for an evidentiary hearing on the

9   issues raised in his claims 2, 5, 6, and 9, as they affected the guilt phase, the penalty phase and the

10  special circumstances determinations at petitioner's trial.  (ECF Nos. 204, 212.)  Throughout

11  2009 and 2010, the parties litigated the methods of taking testimony, the identity of witnesses and

12  the issue of whether portions of the evidentiary hearing should be closed, among various other

13  issues.  On March 14, 2011, petitioner filed his motion for an evidentiary hearing or expansion of

14  the record with respect to his claim 36.  (ECF No. 470.)  That motion is still pending before the

15  court.

16         However, in early 2011, the United States Supreme Court issued its decision in Cullen v.

17  Pinholster.  This court then suspended preparation for the evidentiary hearing and ordered the

18  parties to address the impact of the decision in Pinholster on these federal habeas proceedings.

19  (ECF No. 485.)  Thereafter, the court ordered the parties to address whether the requirements of

20  28 U.S.C. § 2254(d) had been satisfied with respect to each of petitioner's evidentiary hearing

21  claims as well as with respect to his claim 36.  (ECF No. 506.)  The parties have completed that

22  supplemental briefing.  (ECF Nos. 516, 530, 535.)

23

24  _____

[4]  The record of transcript from trial ("RT"), the clerk's transcript ("CT"), the briefs and decision
25  on appeal, and the pleadings and appendices from the 1999 and 2002 state habeas proceedings
    have been lodged with this court.  (See ECF Nos. 12, 77-89, 98.)

26
[5]  In his claim 36, petitioner alleges that the California death penalty scheme unconstitutionally
27  fails to narrow the class of murderers eligible for the death penalty.  The court permitted
    petitioner to file a second motion for an evidentiary hearing with respect to this claim after the
28  completion of discovery in connection with it.  (ECF Nos. 146, 150.)

8

1                   APPLICATION OF 28 U.S.C. § 2254(d)

2  I.  Legal Standards

3       Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a

4 petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is

5 available under § 2254 only on the basis of some transgression of federal law binding on the state

6 courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d

7 1083, 1085 (9th Cir. 1985).   A federal writ is not available for alleged error in the interpretation

8 or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire,

9 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton,

10 768 F.2d at 1085.

11       Where a state court resolves a federal constitutional claim on the merits, the petitioner in

12 federal court may not succeed on that claim absent a showing that the state court resolution of the

13 claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard

14 when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death

15 Penalty Act (the "AEDPA").  Thus, § 2254(d) sets forth the following standards for granting

16 federal habeas corpus relief:

17
18           An application for a writ of habeas corpus on behalf of a person in
          custody pursuant to the judgment of a State court shall not be
          granted with respect to any claim that was adjudicated on the merits
19           in State court proceedings unless the adjudication of the claim -

20           (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
21           determined by the Supreme Court of the United States; or

22           (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
23           State court proceeding.

24       Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1) or (2) with

25 respect to a claim for relief, then the federal habeas court considers that claim de novo.  See

26 Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (When § 2254(d) is satisfied, "[a] federal court

27 must then resolve the claim without the deference AEDPA otherwise requires."); Delgadillo v.

28 Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

1  Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

2  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

3  considering de novo the constitutional issues raised.").

4         In 2011, the Supreme Court elucidated the § 2254(d) standards.  First, the Supreme Court

5  made clear that, when making the determination that a state court decision was contrary to law or

6  unreasonable, a federal court may not consider evidence which was not before the state court.

7  Cullen v. Pinholster, 563 U.S. 170, ___, 131 S. Ct. 1388, 1398-1401 (2011).  Second, the Court

8  appears to have "tightened" § 2254(d)'s rule of deference, stating as follows:

9
10                As a condition for obtaining habeas corpus from a federal court, a
                  state prisoner must show that the state court's ruling on the claim
                  being presented in federal court was so lacking in justification that
11                there was an error well understood and comprehended in existing
                  law beyond any possibility for fairminded disagreement.

12  Harrington v. Richter, 562 U.S. 86, 103 (2011).  See also Amado v. Gonzalez, 758 F.3d 1119,

13  1131 (9th Cir. 2014) ("In two recent decisions, [citations omitted], the Supreme Court appears to

14  have tightened the rule of deference with regard to all elements of a claim.").  Thus, federal

15  habeas relief is precluded if "'fairminded jurists could disagree' on the correctness of the state

16  court's decision."  Richter, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664

17  (2004)).  See also Davis v. Ayala, ___U.S.___,___, 135 S. Ct. 2187, 2199 (2015); Boyer v.

18  Chappell, 793 F.3d 1092, 1098 (9th Cir. 2015).  This objective standard of reasonableness applies

19  to review by the federal habeas court under both subsections of 28 U.S.C. § 2254(d).  See Hibbler

20  v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1262

21  (2013).

22         A summary denial of relief by a state court is presumed to be a denial on the merits of the

23  petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012) (The presumption

24  that the denial is based on the merits, rather than on procedural grounds, may be overcome if it is

25  not "plausible."), cert. denied, ___ U.S. ___, 133 S. Ct. 1465 (2013).  While the federal habeas

26  court cannot analyze just what the state court did when it issued a summary denial, it must

27  nonetheless review the state court record to determine whether there was any "reasonable basis

28  for the state court to deny relief."  Richter, 562 U.S. at 98.  The federal habeas court, therefore,

1   "must determine what arguments or theories . . . could have supported, the state court's decision;

2   and then it must ask whether it is possible fairminded jurists could disagree that those arguments

3   or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." 562

4   U.S. at 102. See also Bemore v. Chappell, 788 F.3d 1151, 1161 (9th Cir. 2015). The petitioner

5   bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny

6   relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir.) (quoting Richter, 562 U.S. at 98), cert.

7   denied, ___ U.S. ___, 134 S. Ct. 514 (2013).[6]

8          In the present case, petitioner's claims that are at issue here were raised, and summarily

9   rejected, in petitioner's habeas corpus proceedings before the California Supreme Court. As

10  noted above, a summary denial is presumed to be a denial on the merits of the petitioner's claims.

11  While the federal habeas court cannot analyze just what the state court did when it issued a

12  summary denial, the federal court must review the state court record to determine whether there

13  _____

14  [6]  Throughout petitioner's briefing, counsel looks to respondent's arguments presented to the
    California Supreme Court to determine the bases for the state court's summary denial of his

15  habeas claims. For instance, in his opening brief petitioner contends respondent's state court
    argument could be considered "[o]ne explanation for the California Supreme Court's ruling in the

16  state's favor." (ECF No. 516 at 91:13-14.) In his reply brief, petitioner argues extensively and
    creatively that this court is limited to considering only those arguments previously advanced by

17  respondent when reviewing the state court decision under § 2254(d). (ECF No. 535 at 2-11.) In
    fact, petitioner's counsel even contends it would "violate due process for the state to base its

18  decision on" "a particular theory [that] was not presented in the informal response." (ECF No.
    516 at 92:3-4.) Petitioner's counsel cites the decision in Panetti v. Quarterman, 551 U.S. 930,

19  950 (2007) in support of this broad assertion. However, the cited portion of the decision in
    Panetti involved the process due a death row prisoner seeking a stay of execution on the grounds

20  of insanity. The Supreme Court held in that context that once the prisoner had made a
    "substantial threshold showing of insanity," he was entitled to a "fair hearing," which included an

21  opportunity to be heard. 551 U.S. at 949-50. The Supreme Court's decision in Panetti does not
    support petitioner's argument here. Moreover, the language of the court's decision in Richter and

22  the § 2254(d) analysis in that case lead the undersigned to conclude that it must consider any
    potential support for the state court's denial of relief with respect to each of petitioner's claims.

23  The Supreme Court in Richter clearly stated that petitioner bears the burden of showing that there
    was "no reasonable basis" for the state court to deny relief. 562 U.S. at 98. In its analysis of the

24  petitioner's ineffective assistance of counsel claims in Richter, the Supreme Court considered all
    "arguable" support for the state court's denial of relief. Id. at 106-113. Nowhere did the

25  Supreme Court mention in its decision in Richter that it had to determine what the state court, in
    fact, had relied upon and not once did the Supreme Court refer in its analysis to the arguments

26  advanced by respondent in state court to frame its determination of the possible bases for the state
    court's denial of relief with respect to petitioner's claims.

27

28

1    was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. The federal

2    habeas court "must determine what arguments or theories . . . could have supported, the state

3    court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

4    those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

5    Court." Id. at 102.

6           When reviewing the California Supreme Court's summary denial of a petition, this court

7    must consider that

8                    the California Supreme Court's summary denial of a habeas petition
                     on the merits reflects that court's determination that 'the claims
9                    made in th[e] petition do not state a prima facie case entitling the
                     petitioner to relief.' It appears that the court generally assumes the
10                   allegations in the petition to be true, but does not accept wholly
                     conclusory allegations, and will also "review the record of the trial
11                   . . . to assess the merits of the petitioner's claims."

12    Pinholster, 131 S. Ct. at 402 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993) and citing

13    People v. Duvall, 9 Cal. 4th 464, 474 (1995)).[7]   Accordingly, if this court finds petitioner

14    _____

      [7]   Respondent argues that the California Supreme Court accepts as true only petitioner's
15    statements that are "backed by a proffer of competent, admissible evidence." (ECF No. 530 at
      14:22 (emphasis in original) and 15:11-22.)   Respondent's argument, however, is not supported
16    by the authority cited in support thereof. See In re Martinez, 46 Cal. 4th 945, 955-56 (2009) (at
      the pleading stage, the petitioner should state facts "fully and with particularity" and include
17    "copies of reasonably available documentary evidence"); People v. Brady, 129 Cal. App. 4th
      1314, 1332 (2005) (re offer of proof at trial); In re Sassounian, 9 Cal. 4th 535, 547, 549-51 & nn.
18    12-15 (1995) (to carry his "burden of allegation" petitioner must state "specific facts which, if
      established, entitle him to . . . relief"); People v. Duvall, 9 Cal. 4th 464, 474-75 (1995); People v.
19    Romero, 8 Cal. 4th 728, 739 (1994) (court reviewing the appropriate procedures to take place
      after an order to show cause is issued); Barnes v. Barnes, 95 Cal. 171, 173 (1892) (respondent
20    cites to the court's re-statement of one party's argument in this case from the 19th Century); Kahn
      v. Superior Court, 188 Cal. App. 3d 752, 770 n.7 (1987) (in considering an affidavit based on
21    "information and belief" filed in opposition to a demurrer and a motion for a protective order,
      citing the general rule that the affidavit is hearsay and "must be disregarded"); People v.
22    McCarthy, 176 Cal. App. 3d 593, 596-97 (1986) (petition itself must be verified by oath of party
      making it); People v. Madaris, 122 Cal. App. 3d 234, 241-42 (1981) (no prima facie case is
23    established by unsworn statements of trial attorney and the hearsay statements of appellate
      attorney), disapproved on other grounds in People v. Barrick, 33 Cal. 3d 115 (1982). In these
24    various decisions cited by respondent, the California Supreme Court did not require a habeas
      petitioner to provide evidence that would be "admissible in an evidentiary hearing" making out
25    every aspect of a prima facie case. Rather, as the California Supreme Court stated in In re
      Hawthorne, a petitioner need only present all "reasonably available" documentary evidence. 35
26    Cal. 4th 40, 48 (2005). Even in People v. Gonzalez, 51 Cal. 3d 1179, 1259-60 (1990), superseded
      by statute as stated in In re Steele, 32 Cal. 4th 682, 690 (2004), in which the California Supreme

27

28
                                                   12

1    unarguably presented a prima facie case for relief on a claim, the state court's summary rejection

2    of that claim would be unreasonable.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004);

3    Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003) ("In other words, it was objectively

4    unreasonable for the state court to conclude on the record before it that no reasonable factfinder

5    could believe that Nunes had been prejudiced.")

6           Under subsection (d)(1), a state court decision is "contrary to . . . clearly established

7    Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result

8    different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent,

9    538 U.S. 634, 640 (2003).  A state court decision is an "unreasonable application" of clearly

10   established federal law if "the state court correctly identifies the governing legal principle . . . but

11   unreasonably applies it to the facts of the particular case."  Bell v. Cone, 535 U.S. 685, 694

12   (2002) (citing Williams, 529 U.S. 362, 407-08 (2000)).  See also Lockyer v. Andrade, 538 U.S.

13   63, 75 (2003); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "Clearly established Federal

14   law" is found in the United States Supreme Court's "applicable holdings."  Carey v. Musladin,

15   549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's]

16   decisions' at the time the state court decides the matter."  Cannedy v. Adams, 706 F.3d 1148,

17   1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on

18   other grounds, 733 F.3d 794 (9th Cir. 2013), cert. denied, ___ U.S. ___, 134 S. Ct. 1001 (2014).

19   See also Greene v. Fisher, ___ U.S. ___, ___, 132 S. Ct. 38, 44 (2011); Stanley v. Cullen, 633

20   F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  "'[C]ircuit

21   court precedent may be persuasive in determining what law is clearly established and whether a

22   state court applied that law unreasonably.'"  Stanley v. Cullen, 633 F.3d at 859 (quoting Maxwell

23   v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to

24   refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that

25

26   Court re-affirmed its then-rule that discovery was unavailable to petitioners until after they had
     established a prima facie case, the court required that the petitioner provide only "some concrete
27   information."  The California Supreme Court did not require, and has not since required, that
     information provided meet the evidentiary standards of being admissible at an evidentiary
28   hearing.

1    th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ___ U.S. ___, ___, 133 S. Ct.

2    1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ___, ___132 S. Ct. 2148, 2155 (2012)).

3    Nor may circuit precedent be relied upon to "determine whether a particular rule of law is so

4    widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

5    be accepted as correct."  Id.  Further, where federal appellate courts have diverged in their

6    treatment of an issue, it cannot be said that there is "clearly established Federal law" governing

7    that issue.  Carey, 549 U.S. at 77.

8        It has been held that there are two ways in which a petitioner may satisfy the requirements

9    imposed under §2254(d)(2).  Hibbler, 693 F.3d at 1146.  A petitioner may show that the state

10   court's findings of fact "were not supported by substantial evidence in the state court record" or

11   he may "challenge the fact-finding process itself on the ground it was deficient in some material

12   way."  Id. (citing Taylor, 366 F.3d at 999-1001).  See also Hurles v. Ryan, 752 F.3d 768, 790-91

13   (9th Cir. 2014) ("We have held repeatedly that where a state court makes factual findings without

14   an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding

15   process itself is deficient' and not entitled to deference.")[8]  The standard for determining whether

16   the state court's factfinding process is insufficient requires the federal habeas court to "be

17   satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is

18   pointed out would be unreasonable in holding that the state court's fact-finding process was

19   adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th

20   Cir. 2004)).  Of course, the state court's failure to hold an evidentiary hearing does not

---

21   [8]  Respondent argues strenuously that the court should reject the Ninth Circuit's decisions in

22   Taylor v. Maddox and Hurles, and a long line of other cases, because, according to respondent, the Supreme Court's decisions in Pinholster and Richter preclude a reading of § 2254(d)(2) that a

23   state court's factual finding without a hearing may be an "unreasonable determination of the facts."  However, a Westlaw search reveals that in over 1,000 cases courts have cited the Ninth

24   Circuit's decision in Taylor positively, many on the grounds relevant here.  Further, the Ninth Circuit Court of Appeals, as well as federal district courts including this one, has cited the

25   decision in Taylor with approval even after the Supreme Court rendered its opinions in Pinholster and Richter.  See, e.g., Hurles, 752 F.3d at 790-91; Gulbrandson v. Ryan, 738 F.3d 976, 987 (9th

26   Cir. 2013); Hibbler, 693 F.3d at 1146; Ocampo v. Vail, 649 F.3d 1098, 1106 (9th Cir. 2011);

27   Muhammad v. Pilkington, 2:13-cv-0153-JKS, 2014 WL 2807675, at *10 (E.D. Cal. June 20, 2014); Vermillion v. Hartley, No. 1:12-cv-00623-AWI-SKO-HC, 2012 WL 4673822 at *4 (E.D.

28   Cal. Oct. 3, 2012); Williams v. Woodford, 859 F. Supp. 2d 1154, 1156 (E.D. Cal. 2012).

1    automatically render its fact finding process unreasonable.  Id. at 1147.  However, as the Ninth

2    Circuit explained in Hibbler, federal standards for determining when an evidentiary hearing is

3    mandatory are a useful guide to determining the reasonableness of the state court's refusal to hold

4    such a hearing:

5              A state court's decision not to hold an evidentiary hearing does not
             render its fact-finding process unreasonable so long as the state
6             court could have reasonably concluded that the evidence already
             adduced was sufficient to resolve the factual question.  See Earp,
7             431 F.3d at 1170 (noting that a state court is not required to hold an
             evidentiary hearing when it is possible to resolve the factual
8             question "based on 'documentary testimony and evidence in the
             record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950
9             (9th Cir. 2006) (holding that it is reasonable for a state court to
             resolve a disputed factual question without an evidentiary hearing
10            when the petitioner's allegations are "incredible in light of the
             record, or . . . when the record already before the court is said to
11            establish a fact conclusively").  The ultimate issue is whether the
             state's factfinding procedures were reasonable; this is a fact-bound
12            and case-specific inquiry.

13            Because AEDPA does not provide any specific guidance on
             what sort of procedural deficiencies will render a state court's fact-
14            finding unreasonable, we have sometimes turned for guidance to
             cases considering a similar issue in a different context: when a
15            federal district court considering a habeas petition must or should
             conduct an evidentiary hearing.  See Earp, 431 F.3d at 1166-67,
16            1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963),
             which governs when a federal district court reviewing a habeas
17            petition de novo must grant an evidentiary hearing, in determining
             whether the state court decision was based on an unreasonable
18            determination of the facts).  In this context, the Supreme Court has
             recently clarified that, "[i]n deciding whether to grant an
19            evidentiary hearing, a federal court must consider whether such a
             hearing could enable an applicant to prove the petition's factual
20            allegations, which, if true, would entitle the applicant to federal
             habeas relief."  Landrigan, 550 U.S. at 474.  More specifically, "[i]f
21            the record refutes the applicant's factual allegations or otherwise
             precludes habeas relief, a district court is not required to hold an
22            evidentiary hearing."  Id.  " '[A]n evidentiary hearing is not
             required on issues that can be resolved by reference to the state
23            court record.' "  Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176
             (9th Cir. 1998)).

24

25            While this framework for determining when a district court
             errs in failing to conduct an evidentiary hearing provides useful
26            guidance, it is useful only by analogy and does not answer
             conclusively whether the state court's adjudication "resulted in a
27            decision that was based on an unreasonable determination of the
             facts in light of the evidence presented in the State court
28            proceeding." § 2254(d)(2) . . . .  Unlike our review of a district
             court's determination that an evidentiary hearing is unnecessary,

15

which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative:  if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing.  See Earp, 431 F.3d at 1167.  We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965-66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference).  The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

Hibbler, 693 F.3d at 1147-48.

As noted above, if a petitioner overcomes one of the hurdles posed by § 2254(d), this court may review the merits of the claim de novo.  See Delgadillo, 527 F.3d at 925; Frantz, 533 F.3d at 737.  For the claims upon which petitioner seeks to present evidence, he must meet the requirements of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the standards announced in federal case law for the presentation of evidence in a federal habeas proceeding.  See Pinholster, 131 S. Ct. at 1401.[9]  For the reasons set forth below, the undersigned finds that § 2254(d) does not bar further consideration of two of petitioner's five claims considered herein but that denial of the remaining three claims is appropriate.

////

////

////

---

[9]  As also noted above, this court has previously held that petitioner had made the required showing and met the applicable standards for all of his claims addressed herein, except claim 36, which is the subject of a pending motion for an evidentiary hearing.

1    II.  Petitioner's Challenges to the Application of Section 2254(d)[10]

2            Petitioner makes several broad challenges to the application of § 2254(d).   Some involve

3    vague arguments that capital habeas proceedings before the California Supreme Court's, and in

4    particular that court's summary decision process, are dysfunctional.   Petitioner cites various

5    studies of California's capital case procedures and selectively cites statements from California

6    Supreme Court decisions to demonstrate inconsistencies in that court's review of capital habeas

7    cases.   However, petitioner has not shown that at the time it considered petitioner's claims the

8    California Supreme Court had such a regular practice of requiring petitioners to meet a higher

9    pleading standard than that required under federal law, of inappropriately considering the

10   prejudicial effect of errors, or of giving capital habeas claims inappropriately limited review, that

11   this court should presume the California Supreme Court committed those alleged misdeeds in this

12   case.

13           Petitioner does advance a few, more focused, constitutional challenges to California's

14   capital case procedures.   Largely, respondent does not address those more focused arguments.

15   Each is addressed and rejected by the undersigned below.

16   ////

---

17

18   [10]  In his brief filed May 16, 2011, addressing the effect of the decision in Cullen v. Pinholster on these proceedings, petitioner argued that the court has already determined that § 2254(d) is

19   satisfied with respect to his evidentiary hearing claims.  (ECF No. 490.)  Petitioner did not re-raise this issue in his current briefing.  This court previously informed the parties that the current

20   briefing must address all of their challenges to the application of § 2254(d) to petitioner's evidentiary hearing claims.  (ECF No. 506.)  Accordingly, the court need not address the issue.

21   In any event, to the extent the court previously made a determination about satisfaction of § 2254(d), that determination would no longer be adequate in light of the subsequent decisions of

22   the Supreme Court.  As described above, the standards of "reasonableness" have changed since

23   the court issued its evidentiary hearing orders in this case in 2008 and 2009.  Nowhere in the analyses of petitioner's entitlement to an evidentiary hearing in those earlier decisions is there a

24   determination that the state court's decision was unreasonable under the standards described in Harrington v. Richter.  Further, after 2009, the mechanisms for review under § 2254(d) changed

25   as well.  Contrary to Pinholster's limitation on the consideration of evidence that was not before

26   the state court, the magistrate judge considered the validity of petitioner's claims based on evidence presented for the first time in federal court.  (ECF No. 204.)  Based on the substantial

27   changes in the law brought about by the decisions in Richter and Pinholster, the undersigned does not consider the court's prior decisions on these issues to be determinations that would satisfy

28   current standards of analysis under § 2254(d).

1          A.   Supremacy Clause

2          Petitioner argues that a California rule requiring a petitioner to make a higher showing in

3   his pleadings than that required by federal law frustrates the enforcement of federal law, violating

4   the Supremacy Clause.  (ECF No. 516 at 52-55, 74-75.)  Petitioner relies primarily on the

5   Supreme Court's statement that a "federal right cannot be defeated by the forms of local

6   practice."  Brown v. Western Ry. of Alabama, 338 U.S. 294, 296 (1949).  In Brown, the Supreme

7   Court examined a Georgia law that required a state court considering a demurrer to construe the

8   complaint's allegations "most strongly against the pleader."  Id. at 295.  The Supreme Court held

9   that it would not defer to this state court practice when considering whether the complainant in

10  that case had made a prima facie showing of the violation of a federal law, stating that "we cannot

11  accept as final a state court's interpretation of allegations in a complaint asserting it."  Id. at 296.

12         In support of this argument petitioner also relies on more recent decisions in which the

13  Supreme Court has ruled that state procedures which are inconsistent with the goals of the federal

14  law serving as the basis for the claim are preempted by federal law.  See Felder v. Casey, 487

15  U.S. 131, 138 (1988) (a state notice-of-claim provision found to conflict with the objectives of §

16  1983, with the court recognizing the risk that enforcement of the provision would produce

17  different outcomes in § 1983 claims depending on whether they were asserted in state or federal

18  court); see also ECF No. 516 at 54-55 (collecting cases).  Petitioner contends that in a California

19  habeas proceeding, California law recognizes a presumption that the state court conviction is

20  accurate.  Petitioner relies in this regard upon statements by the California Supreme Court that

21  "[f]or purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the

22  conviction and sentence; defendant thus must undertake the burden of overturning them."  People

23  v. Duvall, 9 Cal. 4th 464, 474 (1995) (quoting People v. Gonzalez, 51 Cal. 3d 1179, 1260 (1990))

24  (emphasis in original).  According to petitioner, the state court's reliance upon this presumption

25  of the accuracy of criminal convictions creates a burden upon the consideration of petitioner's

26  federal habeas claims that runs afoul of the Supreme Court's expressed concern in Brown that

27  federal right cannot be defeated by a state's practice.

28  ////

                                                   18

1     For several reasons, petitioner's Supremacy Clause argument is without merit.[11]  First,

2  petitioner's argument misapprehends the nature of collateral review by plucking his claims out of

3  their procedural context.  His argument that state law burdens the consideration of his federal

4  claims ignores the fact that, had he raised those claims in federal collateral proceedings, they

5  would have been subject to a similar presumption in favor of preserving the finality of the

6  judgment.  In United States v. Frady, 456 U.S. 152 (1982), the Supreme Court considered

7  whether the "plain error" standard applicable on direct appeal to excuse a procedural default

8  should be applied to consideration of a claim for relief brought under 28 U.S.C. § 2255.  In

9  recognizing "the existence of a final judgment perfected by appeal," the Court held that once a

10  defendant's direct review proceedings have concluded, "we are entitled to presume he stands

11  fairly and finally convicted."  456 U.S. at 164.  The Court in Frady "reaffirm[ed] the well-settled

12  principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than

13  would exist on direct appeal."  456 U.S. at 166.

14     The Supreme Court also recognized "the distinction between direct and collateral review,"

15  in Brecht v. Abrahamson, 507 U.S. 619 (1993).  In Brecht, the Court commented on the

16  "extraordinary remedy" of habeas corpus and concluded that the beyond-a-reasonable-doubt

17  harmless error standard applied on direct review should not be applied when determining the

18  impact of a constitutional error raised in a federal habeas proceeding.  507 U.S. at 633-639.

19  While Brecht involved claims raised under 28 U.S.C. § 2254, the Brecht harmless error standard

20  has been applied to claims raised under § 2255 as well.  See United States v. Montalvo, 331 F.3d

21  1052, 1058 (9th Cir. 2003); Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003).  As the

22  Ninth Circuit has observed:

23            [W]e do not read Brecht's "substantial and injurious effect"
              standard as resting primarily on federalism concerns.  It is, more
24            than anything else, motivated by "considerations underlying our
              habeas jurisprudence," [citation omitted], that apply equally to
25

26  [11]  Petitioner also makes an argument in passing that California law violates the Supremacy
    Clause to the extent the California Supreme Court considers the prejudice prong of the ineffective
27  assistance of counsel test under Strickland on an item-by-item basis, rather than cumulatively.
    (ECF No. 516 at 74-75.)   That argument is discussed by the undersigned below in section
28  IV.A.2.c of these findings and recommendations.

1

collateral attacks on both federal and state convictions –
considerations such as the different purposes of direct and collateral
review and the importance of finality in criminal convictions.

2

3

Montalvo, 331 F.3d at 1058 (quoting Brecht, 507 U.S. at 633).

4      Because federal law thus contains similar constrictions on collateral review of criminal

5   convictions as those imposed by state law, it cannot be said that the California Supreme Court's

6   application of the presumption in favor of the truth, accuracy, and fairness of a conviction and

7   sentence under state law amounted to a state-created impingement on a federal right.

8      Moreover, petitioner's argument in this regard is not supported by the authority he cites.

9   In Brown, the Supreme Court held it would not defer to state court rules in construing the

10   pleadings.  This court is not being asked to construe petitioner's claims under any standard

11   announced under California law.  Rather, this court looks to federal, not state law, to determine

12   whether petitioner has established a prima facie case for habeas relief.  If he has, this court looks

13   again to only federal law to determine whether there were any reasonable bases for the California

14   Supreme Court's rejection of his claims.   Accordingly, the concerns at issue in Brown are simply

15   inapplicable here.

16      B.  Article III

17      Petitioner also argues that if the AEDPA requires deference to "novel state court rules for

18   applying the Constitution," then it violates Article III of the United States Constitution by

19   encroaching upon the role of the federal courts as the final arbiters of federal law.  (ECF No. 516

20   at 56-57.)  This argument, however, relies upon the same false distinction between state and

21   federal collateral review discussed above, and thus also fails for the same reasons.

22      C.  Suspension Clause

23      Petitioner's argument that the Suspension Clause is violated by § 2254(d) rests on the

24   same incorrect underpinning.  (ECF No. 516 at 57-58.)  A law acts to suspend the writ of habeas

25   corpus in violation of the Constitution only where it explicitly bars habeas review.  Demore v.

26   Kim, 538 U.S. 510, 517 (2003).  In fact, the Ninth Circuit has considered, and rejected, the

27   Suspension Clause argument petitioner makes here.  In Crater v. Galaza, 491 F.3d 1119 (9th Cir.

28   2007), the court considered whether the deference due a state court under 28 U.S.C. § 2254(d)(1)

20

1    constituted a suspension of the writ.  The Ninth Circuit held it did not.  First, a suspension of the

2    writ of habeas corpus occurs only when Congress "clearly and unambiguously" removes all

3    federal habeas corpus jurisdiction.  491 F.3d at 1124 n. 5.  The AEDPA does not repeal federal

4    habeas jurisdiction.  The court in Crater also rejected an argument that § 2254(d)(1) "effectively

5    suspends the writ."  Id. at 1124-25.  The court pointed out that altering the standards for granting

6    habeas relief is not the same as suspending the privilege of the writ.  Id. at 1125-26 (citing Felker

7    v. Turpin, 518 U.S. 651 (1996)).[12]  In short, petitioner has made no comprehensible argument that

8    the AEDPA has suspended the writ of habeas corpus in violation of the Suspension Clause.

9          D.  Liberty Interest

10          Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would

11    entitle him to relief," then the state court will issue an order to show cause requiring a response

12    from the state.  Duvall, 9 Cal. 4th at 475.  Issuance of an order to show cause triggers rights to

13    conduct fact-finding in support of claims set out in the petition.  Id. at 475-77.  Here, petitioner

14    creatively asserts that this rule creates a liberty interest in the state habeas procedures.   (ECF No.

15    516 at 75-76.)  Petitioner's assertion in this regard, however, cannot form the basis of a

16    cognizable due process claim.  This is because "an expectation of receiving process is not,

17    without more, a liberty interest protected by the Due Process Clause."  Olim v. Wakinekona, 461

18    U.S. 238, 250 n. 12 (1983).  See also Elliott v. Martinez, 675 F.3d 1241, 1245-46 (10th Cir.

19    2012).

20    III.  Application of 28 U.S.C. § 2254(d) to Petitioner's Evidentiary Hearing Claims and Claim 36

21          This court originally granted petitioner's motion for an evidentiary hearing on the

22    following claims:

23          Claim 2 – Ineffective assistance of counsel due to defense counsel's failure to pursue

24    evidence related to petitioner's family and socio-medical history and his organic, developmental,

25    ////

26    _____

     [12]  Petitioner never mentions the decisions in Denmore, Felker, or Crater in his briefing.  Instead,
27    petitioner relies exclusively on the decision in Boumediene v. Bush, 553 U.S. 723 (2008) in
     which the Supreme Court struck down a statute which specifically denied certain aliens any and
28    all access to a remedy in habeas.

1  psychological and alcohol-related impairments, and failing adequately to prepare and consult with

2  qualified experts about these topics.

3      Claims 5 and 6 – Ineffective assistance based upon defense counsel's alleged failure to

4  challenge the introduction of the prosecution's evidence at trial.

5      Claim 9 – Prosecutorial misconduct based upon for the alleged presentation of false

6  evidence.

7      Claim 36 – As noted above, petitioner's Claim 36 is the subject of a pending motion to

8  expand the record or for an evidentiary hearing.  Therein petitioner argues that California law

9  fails to narrow the class of persons eligible for the death penalty as required by the Eighth

10  Amendment.

11      A.  Sixth Amendment Claims

12          1.  Legal Standards

13      "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

14  effective assistance of counsel.'"  Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005)

15  (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970)).  "This right extends to 'all

16  critical stages of the criminal process,' including capital sentencing."  Id. (citations omitted).  The

17  Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well

18  established.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show

19  that his trial counsel's performance "fell below an objective standard of reasonableness" and that

20  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

21  proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694

22  (1984).

23          a.  Deficient Performance

24      Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

25  failed to meet an objective standard of reasonableness.  Strickland, 466 U.S. at 687.  There is "a

26  'strong presumption' that counsel's representation was within the 'wide range' of reasonable

27  professional assistance."  Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689.)

28  Petitioner must rebut this presumption by demonstrating that his counsel's performance was

1   unreasonable under prevailing professional norms and was not the product of "sound trial

2   strategy." Strickland, 466 U.S. at 688-89.  Judicial scrutiny of defense counsel's performance is

3   "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

4   the time it occurred, without the benefit of hindsight.  Id. at 689.

5          Petitioner argues that the federal habeas court may not "construct strategic defenses [for

6   counsel's conduct] which counsel does not offer."  (ECF No. 516 at 79:22-23.)  In Richter, the

7   Supreme Court recognized that on collateral review the courts may not "indulge in 'post hoc

8   rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's

9   actions."  562 U.S. at 109.  The habeas court may, however, consider objectively reasonable bases

10  for counsel's actions.  Id.  The limitation on that inquiry is whether those bases "contradict" the

11  record of counsel's actions.  Id.  "Strickland . . . calls for an inquiry into the objective

12  reasonableness of counsel's performance, not counsel's subjective state of mind."  Id. (citing

13  Strickland, 466 U.S. at 688).  Finally, the federal habeas court is not required to divine counsel's

14  thinking to determine whether or not what counsel did was reasonable.

15         The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

16  conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

17  simply reasonableness under prevailing professional norms.'"  Wiggins v. Smith, 539 U.S. 510,

18  521 (2003) (quoting Strickland, 466 U.S. at 688).  Nonetheless, "general principles have emerged

19  regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective

20  standard of reasonableness' by which [a court must] assess attorney performance, particularly

21  with respect to the duty to investigate."  Summerlin, 427 F.3d at 629.  Under these general

22  principles, for instance, "strategic choices made after thorough investigation of law and facts

23  relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

24  However,

25              strategic choices made after less than complete investigation are
               reasonable precisely to the extent that reasonable professional
26             judgments support the limitations on investigation.  In other words,
               counsel has a duty to make reasonable investigations or to make a
27             reasonable   decision   that   makes   particular   investigations
               unnecessary.  In any ineffectiveness case, a particular decision not
28             to investigate must be directly assessed for reasonableness in all the

23

circumstances, applying a heavy measure of deference to counsel's judgment.

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91).  See also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"), cert. denied, ___ U.S. ___, 133 S. Ct. 1239 (2013); Reynoso v. Giurbino, 462 F.3d 1099, 1112-1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of an alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

With respect to defense counsel's role in presenting penalty phase mitigating evidence, "[t]he duty to investigate is critically important." Summerlin, 427 F.3d at 630.  As explained by the Ninth Circuit, counsel in a capital case has an affirmative duty to unearth all relevant mitigating information because

> [t]he determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability.

Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999).  This duty on the part of defense counsel to investigate begins prior to trial.  It is well-recognized that competent strategy decisions cannot be made regarding presentation of mitigating evidence without a foundation of knowledge based upon a thorough defense investigation that was completed long before jury selection begins.  Williams v. Taylor, 529 U.S. 362, 395 (2000) (holding that the petitioner received ineffective assistance in connection with the penalty phase of his trial and noting the record established "that counsel did not begin to prepare for that phase of the proceeding until a week before the trial"); Earp v. Ornoski, 431 F.3d 1158, 1175 (9th Cir. 2005) ("The Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions . . . [.]").

24

1    Counsel should attempt to discover "'all reasonably available mitigating evidence and

2  evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  Wiggins,

3  539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in

4  Death Penalty Cases ("ABA Guidelines") 11.4.1(c), p. 93 (1989)) (emphasis in original).  See

5  also Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant

6  mitigating information be unearthed for consideration at the capital sentencing phase.").  Where

7  "'indications in the record' suggest that certain mitigating evidence may be available, those leads

8  must be pursued."  Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting

9  Stankewitz v. Woodford, 365 F.3d 706, 719-720 (2004)); Summerlin, 427 F.3d at 632 (counsel

10  found ineffective for failing to obtain readily available mental health evidence when he had been

11  told by defendant's prior attorney that defendant may be mentally ill); Stankewitz, 365 F.3d at

12  719-722 (counsel found ineffective for failing to thoroughly investigate the defendant's

13  childhood, history of drug abuse and mental health problems notwithstanding the fact that counsel

14  was on notice that such an investigation might yield mitigating evidence); Mayfield v. Woodford,

15  270 F.3d 915, 927-28 (9th Cir. 2001) (counsel found ineffective for failing to consult appropriate

16  medical experts or collect relevant records after "his investigator's limited efforts revealed

17  evidence of diabetes and substance abuse," and for failing to explain to the jury the relevance of

18  the evidence that was presented).  Of course, if defense counsel conducts a reasonable

19  investigation, and nothing put counsel on notice of the existence of certain evidence, counsel

20  cannot be faulted for failing to locate and present such evidence.  Babbit v. Calderon, 151 F.3d

21  1170, 1174 (9th Cir. 1998).  In addition, "a lawyer may make reasonable decisions that render

22  particular investigations unnecessary."  Id.

23    Mitigating evidence counsel should consider includes "medical history, educational

24  history, employment and training history, family and social history, prior adult and juvenile

25  correctional experience, and religious and cultural influences."  Wiggins, 539 U.S. at 524 (citing

26  ABA Guidelines 11.8.6, p. 133 (1988)) (emphasis omitted).  Counsel has a "'duty to investigate

27  and present mitigating evidence of [any] mental impairment.'"  Summerlin, 427 F.3d at 630

28  (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)).  Furthermore, in preparation for

1    the penalty phase, "counsel has an affirmative duty to provide mental health experts with

2    information needed to develop an accurate profile of the defendant's mental health." Caro v.

3    Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002). "The defendant's history of drug and alcohol

4    abuse should also be investigated." Summerlin, 427 F.3d at 630 (citing Jennings, 290 F.3d at

5    1016-17). In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation

6    to present and explain to the jury all available mitigating evidence." Hamilton v. Ayers, 583 F.3d

7    1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539 F.3d 938, 946 (9th Cir. 2008)). See also

8    Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing Hamilton, 583 F.3d at 1113).

9         When determining whether the state court's application of the Strickland standard was

10   reasonable, the federal court must be "doubly" deferential. Richter, 562 U.S. at 105. In this

11   regard, the "standard for judging counsel's representation is a most deferential one" and the

12   reasonableness standards of § 2254(d) are also "highly deferential." Id. Further, because the

13   Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-

14   case determinations" and the "range of reasonable applications is substantial." Id. at 101. See

15   also Premo v. Moore, 562 U.S. 115, 122-23 (2011). As the Supreme Court explained in Richter,

16   "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The

17   question is whether there is any reasonable argument that counsel satisfied Strickland's

18   deferential standard." 562 U.S. at 105.

19                     b.   Prejudice

20        The second prong of the Strickland test requires a petitioner to show that counsel's

21   conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a

22   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

23   would have been different." Id. at 694. A reasonable probability is one "'sufficient to undermine

24   confidence in the outcome.'" Summerlin, 427 F.3d at 640 (quoting Strickland, 466 U.S. at 693).

25   "This does not require a showing that counsel's actions 'more likely than not altered the

26   outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-

27   not standard is slight and matters 'only in the rarest case.'" Richter, 562 U.S. at 112 (quoting

28   ////

                                                      26

1    Strickland, 466 U.S. at 693).  "The likelihood of a different result must be substantial, not just

2    conceivable."  Id.

3        In the capital case context however, "[i]n establishing prejudice under Strickland, it is not

4    necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence

5    would necessarily overcome the aggravating circumstances."  Correll, 539 F.3d at 951-52 (citing

6    Williams, 529 U.S. at 398).  See also Rompilla v. Beard, 545 U.S. 374, 393 (2005) ("[A]lthough

7    we suppose it is possible that [the sentencer] could have heard it all and still have decided on the

8    death penalty, that is not the test.").  Instead, in evaluating prejudice, the court must "compare the

9    evidence that actually was presented to the jury with the evidence that might have been presented

10   had counsel acted differently," Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate

11   whether the difference between what was presented and what could have been presented is

12   sufficient to "undermine confidence in the outcome" of the proceeding, Strickland, 466 U.S. at

13   694.  Prejudice is established in this context if "there is a reasonable probability that at least one

14   juror would have struck a different balance" between life and death.  Wiggins, 539 U.S. at 537.

15       When examining the effect of counsel's failure to unearth and present mitigating evidence

16   at the penalty phase, the Supreme Court has stressed the relevance of evidence of a petitioner's

17   abusive childhood and mental health problems.  It has been recognized that there is a "belief, long

18   held by this society, that defendants who commit criminal acts that are attributable to a

19   disadvantaged background, or to emotional and mental problems, may be less culpable than

20   defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990) (quotation

21   and emphasis omitted).  The Ninth Circuit recently described the Supreme Court's consideration

22   of such evidence:

23           In Wiggins, . . . a capital habeas petitioner's defense counsel failed
             to introduce social history mitigation evidence during the penalty
24           phase, including evidence that "Wiggins experienced severe
             privation and abuse in the first six years of his life while in the
25           custody of his alcoholic, absentee mother [, and that h]e suffered
             physical torment, sexual molestation, and repeated rape during his
26           subsequent years in foster care."  Wiggins, 539 U.S. at 535.  The
             Court pointed out that this is the type of evidence that is "relevant
27           to assessing a defendant's moral culpability," id., and held that the
             failure to introduce this evidence at the penalty phase was
28           prejudicial:  "[H]ad the jury been confronted with this considerable

                                              27

1

mitigating evidence, there is a reasonable probability that it would
have returned with a different sentence." Id. at 536.

2

3    Stankewitz v. Wong, 698 F.3d at 1175.

4         2.   The California Supreme Court's Application of the Strickland Standard Generally

5         Petitioner argues that in his case the California Supreme Court applied the Strickland

6    standard inappropriately in a number of ways that affected its consideration of all of his Sixth

7    Amendment claims.  To satisfy 28 U.S.C. § 2254(d)(1), petitioner must establish that the

8    California Supreme Court's "decision . . . was contrary to, or involved an unreasonable

9    application of, clearly established Federal law, as determined by the Supreme Court of the United

10   States."  Petitioner's argument on this point falls within the first part of the subsection (d)(1)

11   standard.  He argues the California Supreme Court applied a rule "that contradicts the governing

12   law set forth" in Supreme Court cases.  Price v. Vincent, 538 U.S. 634, 640 (2003).

13         a.   Inappropriate Pleading Standard

14        Petitioner's first argument is that the California Supreme Court applied a higher pleading

15   standard in assessing his ineffective assistance of counsel claims than was permitted by the

16   Supreme Court in Strickland.  According to petitioner, the California Supreme Court created a

17   pleading standard in Duvall, 9 Cal. 4th at 474, that directly contravenes a dictate of Strickland

18   that ineffective assistance of counsel claims "be adjudged without a presumption that the trial was

19   fair."  (ECF No. 516 at 85:21-22.)  In Strickland, the Supreme Court held that a Sixth

20   Amendment challenge to counsel's effectiveness is an "attack on the fundamental fairness of the

21   proceeding whose result is being challenged."  466 U.S. at 697.  Therefore, the Court observed,

22   "[t]he principles governing ineffectiveness claims should apply in federal collateral proceedings

23   as they do on direct appeal or in motions for a new trial."  Id.  The Court specifically mentioned

24   the presumption of finality of criminal judgments that is recognized in habeas in stating that "no

25   special standards ought to apply to ineffectiveness claims made in habeas proceedings."  Id. at 97-

26   98.

27        Even assuming the California Supreme Court's presumption of correctness described in

28   Duvall were to run afoul of the United States Supreme Court's holding in Strickland, and even

28

1   assuming, for the sake of argument, that the California Supreme Court must have applied that

2   presumption of correctness in considering petitioner's ineffective assistance of counsel claims,

3   this court may only find § 2254(d)(1) satisfied if the California Supreme Court's decision was

4   "contrary to, or involved an unreasonable application of, clearly established Federal law, as

5   determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  This court

6   cannot find the "rule" petitioner cites as announced in <u>Strickland</u> to be "clearly established" when

7   he cites no post-<u>Strickland</u> Supreme Court or other authority citing that "rule."  Of course, to be

8   "clearly established federal law" the rule must have been "'squarely established by th[e] Court.'"

9   <u>Richter</u>, 562 U.S. at 101 (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009)).

10  Petitioner's entire argument hinges on but a few words plucked from an almost 30-year-old

11  Supreme Court decision which have never since been recognized as formulating a rule.  Further,

12  while the California Supreme Court may have been incorrect in its interpretation of the law, its

13  decision only runs afoul of § 2254(d)(1) if that interpretation also "was so lacking in justification

14  that there was an error well understood and comprehended in existing law beyond any possibility

15  for fairminded disagreement."  <u>Richter</u>, 562 U.S. at 103.  <u>See also</u> <u>Williams</u>, 529 U.S. at 410 ("an

16  unreasonable application of federal law is different from an incorrect application of federal law")

17  (emphasis in original).  Even making all the assumptions regarding the existence of the rule in the

18  state court and its application in this case, this federal habeas court cannot find the California

19  Supreme Court's decision to be so lacking that it runs afoul of § 2254(d)(1).

20                    b.   Improper Prejudice Standard

21          Petitioner next argues that the California Supreme Court applied an incorrect test for

22  determining prejudice stemming from the alleged ineffective assistance of counsel by relying

23  upon the United States Supreme Court's decision in <u>Lockhart v. Fretwell</u>, 506 U.S. 364 (1993), to

24  modify the <u>Strickland</u> standard.  In <u>Fretwell</u>, the Court was confronted with a unique situation.

25  There was no question that the petitioner's trial attorney acted unreasonably in failing to object to

26  consideration of an aggravating factor used to determine the petitioner's.  506 U.S. at 369 n. 1.

27  The issue, however, was whether that failure prejudiced the petitioner.  At the time of trial, the

28  answer to that question was "yes."  <u>Id.</u> at 367.  The Eighth Circuit Court of Appeals had ruled the

1   use of that aggravating factor unconstitutional.  Id.  However, later, after the petitioner sought

2   federal habeas relief, the Court of Appeals overruled its decision and held that reliance on that

3   aggravating factor did not violate the federal constitution.  Id.  Therefore, if the prejudice inquiry

4   was considered as of the time the federal courts rendered their habeas decisions, the answer

5   would have been "no," the petitioner was not prejudiced by his attorney's failure to object.

6   Recognizing that strict application of the Strickland standard under those circumstances would

7   result in "an error in [the petitioner's] favor," the Court looked beyond Strickland's outcome

8   determinative standard and considered whether the failure of petitioner's trial counsel to object

9   rendered the defendant's trial "unreliable or the proceeding fundamentally unfair."  506 U.S. at

10  372.  In that unique context the Court held that the result of Fretwell's sentencing proceeding

11  "was neither unfair nor unreliable."  Id. at 371.  Accordingly, the Court found Fretwell suffered

12  no prejudice as a result of the performance of his counsel.

13          In April 2000, the United States Supreme Court held that a state court erred in finding that

14  the Court's decision in Fretwell modified the standards governing ineffective assistance of

15  counsel claims announced in Strickland.  Williams, 529 U.S. at 391-98.  The Court recognized

16  there may be limited situations in which "it would be unjust to characterize the likelihood of a

17  different outcome as legitimate 'prejudice.'"  Id. at 391-92.  The Court characterized cases such

18  as Fretwell as ones involving an unreasonable action of a trial attorney that did "not deprive the

19  defendant of any substantive or procedural right to which the law entitles him."  Id. at 393 n. 17.

20  The Court concluded that the state court holding that Fretwell modified Strickland "was contrary

21  to, or involved an unreasonable application of, clearly established Federal law."  Id. at 399.

22          Petitioner argues that the California Supreme Court, "both before and after its decision in

23  Mr. Riel's case, had repeatedly relied upon Fretwell when adjudicating ordinary ineffective-

24  assistance claims."  (ECF No. 516 at 87:22-23.)  However, almost every case cited by petitioner

25  in support of that contention pre-dates the United States Supreme Court's April 2000 decision in

26  Williams.  The California Supreme Court's decisions addressing petitioner's ineffective

27  assistance of counsel claims at issue here were rendered in 2001 and 2002, after Williams was

28  decided.  (See ECF No. 516 at 87:23 – 88:9) (citing People v. Earp, 20 Cal. 4th 826, 870 (1999)

1  (citing Fretwell for the prejudice standard and noting that the challenged conduct must have

2  "some effect . . . on the reliability of the trial process"); In re Avena, 12 Cal. 4th 694, 722 & n. 5

3  (1996) (describing the lack of clarity about application of a Fretwell standard and finding no

4  prejudice under either Strickland or Fretwell); In re Harris, 5 Cal. 4th 813, 833 (1993) ("[T]his

5  second prong of the Strickland test is not solely one of outcome determination.  Instead, the

6  question is 'whether counsel's deficient performance renders the result of the trial unreliable or

7  the proceeding fundamentally unfair.'") (quoting Fretwell, 506 U.S. at 372); In re Clark, 5 Cal.

8  4th 750, 766 (1993) (To succeed on an ineffective assistance of counsel claim, a petitioner must

9  show that the attorney's "incompetence . . . resulted in a fundamentally unfair proceeding or an

10  unreliable verdict.").[13]

11      The only post-Williams case cited by petitioner is In re Cox, 30 Cal. 4th 974 (2003).  In

12  Cox, the California Supreme Court did quote the Fretwell standard from its earlier decision in

13  Clark, but did not include a citation to Fretwell in doing so.  30 Cal. 4th at 1016.

14      Respondent counters petitioner's argument by asserting that the California Supreme Court

15  has twice declined to adopt the Fretwell standard.  However, that is not entirely correct either.  In

16  Avena, the California Supreme Court explained that it was "unclear" whether the United States

17  Supreme Court intended Fretwell to "alter or supersede[]" Strickland's prejudice standard or

18  whether the Court in Fretwell intended only to put a "gloss" on the Strickland test for purposes of

19  addressing the unique factual situation presented in Fretwell.  12 Cal. 4th at 722 & n. 5.  Because

20  it was uncertain on that point, the California Supreme Court examined prejudice in Avena under

21  both possible formulations of the test.  Id. at 722, n. 5 and 726 ("petitioner has not demonstrated

22  ////

23

24  [13]  Petitioner also cites the decision in People v. Cain, 10 Cal. 4th 1, 42 n.17 (1995) in support of
his argument on this point.  There, the California Supreme Court mentioned Fretwell in a
25  footnote.  While the court described Fretwell as altering the Strickland standard, it did so in the
context of examining the defendant's unusual argument that his attorney should have "refrain[ed]
26  from frankness and honesty in his or her dealings with the court."  10 Cal. 4th at 42, n.17.  The
California Supreme Court in Cain looked to Fretwell for its limited, and appropriate, use in the
27  situation where strict adherence to the Strickland standard would have provided the defendant a
windfall.
28

1  [his attorney's] inaction prejudiced him under either of the tests laid down in <u>Strickland</u> and

2  <u>Fretwell</u>").

3       Respondent also cites to the decision in <u>In re Neely</u>, 6 Cal. 4th 901 (1993) and correctly

4  notes that the majority opinion in that case relied solely on the <u>Strickland</u> prejudice standard.  In

5  <u>Neely</u> the California Supreme Court found "there is a reasonable probability that, had the tape

6  recording been suppressed, the outcome with regard to the guilt phase of the trial would have

7  been more favorable to petitioner."  6 Cal. 4th at 920.  While the majority opinion in <u>Neely</u> did

8  not mention <u>Fretwell</u>, it is discussed in the concurring opinion.  <u>Id.</u> at 924 (Arabian, J.,

9  concurring).  In his concurrence, Justice Arabian asked whether courts in assessing prejudice

10  should also consider whether "our confidence in the outcome is undermined" by the attorney's

11  error.  <u>Id.</u>  He concluded that any significant change to the <u>Strickland</u> prejudice standard must

12  come first from the United States Supreme Court.  <u>Id.</u>  Recognizing the Supreme Court's decision

13  in <u>Fretwell</u>, Justice Arabian noted that the Court had not yet taken the step of altering the

14  <u>Strickland</u> standard.  <u>Id.</u>[14]

15       When determining whether a state court's decision was contrary to or an unreasonable

16  application of federal law, this court must "presum[e] that state courts know and follow the law."

17  <u>Woods v. Donald</u>, ___U.S.___, ___, 135 S. Ct. 1372, 1376 (2015) (quoting <u>Woodford v.

18  Visciotti</u>, 537 U.S. 19, 24 (2002)).  <u>See</u> <u>also</u> <u>Clark v. Arnold</u>, 769 F.3d 711, 724 (9th Cir. 2014).

19  Of course, petitioner may rebut this presumption, but he has not done so here.  Petitioner has

20  shown only that one time after the United States Supreme Court issued its decision in <u>Williams</u>

21  has the California Supreme Court mentioned the prejudice standard based upon <u>Fretwell</u>.  In the

---

22  [14]  This court's own research reveals a number of California Supreme Court decisions rendered
23  prior to 2001 in which the state court looked solely to <u>Strickland</u> as establishing the standard for
   determining prejudice in connection with ineffective assistance of counsel claims.  The following
24  is only a small sample of the California Supreme Court's cases with appropriate citation to
   <u>Strickland</u>:  <u>People v. Hester</u>, 22 Cal. 4th 290, 297 (2000); <u>People v. Smithey</u>, 20 Cal. 4th 936,
25  986-87, 1012 (1999); <u>People v. Welch</u>, 20 Cal. 4th 701, 743 (1999); <u>People v. Hart</u>, 20 Cal. 4th
   546, 624, 632, 634 (1999); <u>In re Gay</u>, 19 Cal. 4th 771, 827 (1998); <u>People v. Ochoa</u>, 19 Cal. 4th
26  353, 445-46 (1998); <u>People v. Majors</u>, 18 Cal. 4th 385, 403 (1998); <u>People v. Musselwhite</u>, 17
   Cal. 4th 1216, 1260 (1998).  Included in this list is the California Supreme Court's decision on
27  petitioner's appeal.  In its reasoned decision, the court relied upon the appropriate Strickland
   prejudice standard.  <u>People v. Riel</u>, 22 Cal. 4th 1153, 1175-77 (2000).
28

1    vast number of cases decided around the time of the California Supreme Court decisions in

2    petitioner's case, the California Supreme Court properly cited and/or applied the prejudice

3    standard announced in Strickland in addressing ineffective assistance of counsel claims.

4    Moreover, "§2254(d)'s 'highly deferential standard for evaluating state-court rulings'. . . demands

5    that state-court decisions be given the benefit of the doubt." Visciotti, 537 U.S. at 24 (quoting

6    Lindh, 521 U.S. at 333, n. 7).  Here, petitioner's showing is insufficient to convince this court that

7    the California Supreme Court likely applied an incorrect prejudice standard in denying relief with

8    respect to petitioner's ineffective assistance of counsel claims.

9                    c.   Failure to Consider Cumulative Effect of Errors

10            Finally, petitioner argues that the California Supreme Court also failed to consider the

11   effect of his counsel's alleged errors cumulatively.  In advancing this argument, petitioner relies

12   primarily on a single statement in a dissenting opinion indicating that the California Supreme

13   Court majority had, in that case, inappropriately divided one of the petitioner's claims into

14   subparts and then applied timeliness standards to each subpart, rather than to the claim as a

15   whole.  In re Robbins, 18 Cal. 4th 770, 820-21 (1998) (Kennard, J., dissenting).  Petitioner's

16   argument is unpersuasive and in the context of this case unsupported by the authority he cites.  In

17   short, petitioner has provided this court with no basis to find that the California Supreme Court, in

18   this case, engaged in a "practice of diluting a petitioner's prejudice evidence across distinct court-

19   created subclaims."  (ECF No. 516 at 89:19-20.)

20            3.   Ineffective Assistance Due to of Counsel's Failure to Investigate and Present
21                 Evidence of Petitioner's and Osborne's Backgrounds – Claim 2

22            In his Claim 2, petitioner asserts that his trial attorneys were constitutionally ineffective in

23   failing to investigate and present substantial available evidence regarding petitioner's organic,

24   developmental, psychological and alcohol-related impairments, and in failing to prepare and

25   consult with qualified experts about these issues.  Petitioner argues that evidence of his life

26   history would have corroborated petitioner's exculpatory guilt phase testimony and demonstrated

27   the implausibility of Virgal Edwards' incriminating testimony.  According to petitioner, at the

28

                                          33

1  penalty phase of his trial that same evidence would have been important mitigation to support an

2  argument of lingering doubt regarding his guilt and to show petitioner's mental health and other

3  deficiencies.

4  　　　Also in his Claim 2, petitioner argues that his trial counsel failed to investigate and present

5  evidence of Osborne's violent past to impeach Edwards' testimony that petitioner was the leader

6  in the commission of the crimes.

7  　　　　　a.　Reasonableness of Counsel's Conduct

8  　　　　　　　i.　What Trial Counsel did to Prepare

9  　　　In the evidence he proffered to the California Supreme Court and to this court, petitioner

10  makes the following showing regarding trial counsel's preparation for trial.  On November 7,

11  1986, Shasta County Public Defender Frank O'Connor was appointed to represent petitioner in

12  this case.  (RT 2:16-16.)  At some point thereafter, most likely in July or August of 1987, the

13  court appointed private attorney Russell Schwartz to serve as co-counsel on petitioner's behalf.[15]

14  In 1987, O'Connor hired investigator Joseph Berger to work on petitioner's  case. (Dec. 1999

15  Decl. of J. Berger (App. 35 to 1999 State Pet.) at ¶ 2.)  At that time, Mr. Berger had extensive

16  experience investigating special circumstance murder cases.  (Id. at ¶ 1.)   Petitioner

17  recommended that Mr. Berger talk to the following people:  Yvonne Riel (petitioner's mother),

18  Roslyn Walker (petitioner's older sister), Ardell Morgan (school principal), Douglas Strayer

19  (school psychologist), Maury Baker (petitioner's juvenile probation officer), Kenneth Butler

20  (petitioner's adult probation officer), David Cumming (petitioner's parole officer), Sarah Sloat (a

21  psychologist at McNeil Island Prison), Joseph Ross (a civilian work supervisor at McNeil Island

22  Prison), and Tom Ahern (a counselor at Shelton prison).  (Id. at ¶ 5.)  Mr. Berger traveled to

23  ////

24  ////

25  
26  [15]  It is not clear to the undersigned exactly when the state trial court appointed Mr. Schwartz.  In July 1987, Mr. O'Connor requested Schwartz's appointment.  (SCT at 1181-85.) The cited
27  portion of the SCT was sealed by the trial court and was lodged under seal with this court on June 11, 2001.  Other portions of the record lodged with this court under seal are identified herein by
28  the parenthetical "(sealed)" after the record citation.

1    Washington State and interviewed each of these people.[16]  (Id. at ¶¶ 3,5.)  After conducting those

2    interviews, Berger told attorney O'Connor that petitioner's mother had told him the following:

3                    She had a poor recollection of Chap as an infant; she had a nervous
                     breakdown at the time he was born; she wanted to adopt Chap out
4                    when he was born, and told him this when he was about 13; she did
                     not support Chap's schoolwork and did not attend parent-teacher
5                    conferences except when called to the school because of problems;
                     she felt that Chap's problems with the police were due primarily to
6                    her total lack of supervision of him; Chap did not get along well
                     with his father; she did not become aware of his alcoholism until he
7                    was about 16; most of the interest she showed Chap was under
                     negative circumstances, such as when he was in juvenile detention
8                    or prison; Chap was not violent; Chap was shy and withdrawn; she
                     had continual nervous problems during the years Chap was growing
9                    up, and had threatened suicide several times; Chap threatened to
                     commit suicide in September 1986, two months before the charged
10                   crimes; Chap was timid and unable to defend himself; Chap's father
                     thought people involved in Chap's arrest were at fault as opposed to
11                   Chap himself; Chap's cousin, Laurie Burns, might be able to
                     provide information regarding Chap's behavior while intoxicated
12                   and his lack of aggressive behavior; and Chap's father and sister
                     had been in special education classes.
13

14   (Id. at ¶6.)  Investigator Berger stated that he also told defense counsel that it was "evident"

15   petitioner's mother was not being "fully candid."  (Id.)

16           Berger described his interview of petitioner's sister, Roslyn Walker, as primarily

17   involving the visit she received from petitioner, Edwards and Osborne after the commission of the

18   crimes.  (Id. at ¶ 7.)  Walker also told Berger that when petitioner was a child, he had been

19   delayed in the developmental milestones of sitting up, crawling, walking and talking.  (Id.)

20           Berger further
                     informed counsel that, based on my interviews with Mrs. Morgan
21                   and Dr. Strayer, Mr. Riel's alcohol-related criminal behavior was
                     foreseeable given his severe handicap and resulting inability to deal
22                   with the world effectively.  The behavior which the authorities
                     considered a lack of responsibility was to be expected given his
23                   limited communication abilities.  His alcoholism appeared to be a

24   _____

25   [16]  Along with his motion for an evidentiary hearing, petitioner provided this court with copies of
     investigator Berger's notes, which he provided to attorney O'Connor, from his interviews of Dr.
26   Strayer, Ms. Riel, and Ms. Morgan.  (App. 92 to Mtn. for Evi. Hrg. (ECF No. 159-3).)  As this
     court recognized previously, these defense investigator notes were not provided to the state court.
27   (ECF No. 204 at 13:25-26.)  Under the holding of the Supreme Court in Pinholster, then, this
     court may not consider those notes in determining whether petitioner has satisfied the
28   requirements of 28 U.S.C. § 2254(d).

1
2
3

> ramification of his low self-esteem and inability to deal with his
> social environment, and also possibly an inherited trait.  Mr. Riel's
> siblings were, like him, also educationally handicapped and had
> histories of alcohol abuse.

4   (Id. at ¶ 8.)  Berger recommended that attorney O'Connor conduct "IQ and psychological testing

5   of Mr. Riel."  (Id.)  Defense investigator Berger also told O'Connor that he felt "any competent

6   psychologist would probably back up Dr. Strayer's opinion that a man with Mr. Riel's intellectual

7   capability would not be able to plan, formulate, lead, and execute activity such as the robbery and

8   homicide with which Mr. Riel was charged."  (Id. at ¶ 9.)  Berger recalled that petitioner's trial

9   counsel did not ask him to "do any additional life history interviews or to attempt to locate any

10  additional life history witnesses with respect to any of these topics."  (Id. at ¶ 10.)

11        Attorney Schwartz also hired an investigator, Stephen Odell.  (SCT at 1234-1235)

12  (sealed).  The undersigned, however, is unable to find any description of the work performed by

13  Investigator Odell in the record.  An invoice submitted by attorney Schwartz to the trial court

14  reflects that Odell allegedly spent 4.9 hours researching and locating witnesses.  (SCT at 1237)

15  (sealed).

16        In 1988, attorney O'Connor hired psychologist Dr. Daniel Edwards to administer tests to

17  and evaluate petitioner.  (Dec. 30, 1999 Decl. of Dr. Edwards (App. 3 to 1999 State Pet.) at ¶ 2.)

18  In a February 11, 1988 letter to Dr. Edwards, O'Connor stated that he was writing to "confirm the

19  arrangements made with you by my investigator, Robert O. Wharton."[17]  (App. 41 to 1999 State

20  Pet.)  Attorney O'Connor asked Dr. Edwards to "perform on Charles Riel the same tests you

21  performed on Ray Sheffield."  (Id.)  Dr. Edwards recalled that he "did not receive more specific

22  instructions or reference questions from Mr. Riel's counsel."  (Dr. Edwards' Decl. (App. 3) at ¶

23  5.)  At the time he completed his declaration in 1999, Dr. Edwards did not recall the

24  circumstances of Sheffield's case, except that it had also been a capital case.  (Id.)

25        Dr. Edwards stated that he received no information from petitioner's counsel about the

26  crimes for which petitioner was being prosecuted or about petitioner's life history.  (Id. at ¶ 6.)

27

28
_____
[17]  The court finds no other evidence in the record regarding Mr. Wharton's involvement, if any,
in the investigation related to petitioner's defense.

1    However, this lack of information was not unusual according to Dr. Edwards.  He stated that he

2    was frequently retained by attorneys to conduct psychological testing on a "blind basis" because

3    his testing results were then furnished by counsel to "a psychiatrist who prepared an evaluation

4    for counsel which integrated my test results with family history and other relevant information."

5    (Id.)  However, in petitioner's case, Dr. Edwards was not aware whether petitioner's counsel

6    furnished his evaluation to another mental health professional.  (Id.)  Dr. Edwards did not meet

7    with petitioner's counsel or discuss petitioner's case directly with him.  (Id. at ¶ 7.)  Rather,

8    following his administering of the tests to petitioner, Dr. Edwards discussed his results by

9    telephone with defense investigator Wharton.  (Id.)

10           Dr. Edwards prepared a report, which was not provided to the state court considering

11   petitioner's application for habeas relief.  (Id. at ¶ 9.)  Some of Dr. Edwards' findings are

12   contained in his declaration.  First, Dr. Edwards describes therein what he was not asked to do.

13   First, he was not asked to render an opinion about whether petitioner's psychological profile "is

14   consistent with his having taken a leadership role among a group of co-defendants in criminal

15   activity."  (Id. at ¶ 10.)  Second, Dr. Edwards was not asked to opine about petitioner's

16   effectiveness as a witness.  (Id. at ¶ 11.)  Next, Dr. Edwards notes in his declaration that he did

17   find a "hypersensitiv[ity] to failure;" "learning disabilities;" "Dysthymic Disorder, a chronically

18   depressed mood sufficiently severe that it impairs day-to-day functioning;" and that petitioner's

19   alcohol abuse was an attempt to self-medicate his "multiple deficits," including depression and

20   anxiety.  (Id. at ¶¶15-18.)  Dr. Edwards determined that petitioner

21                    also has significant and long-standing personality problems where
                      he tends to, at least when sober, want to be avoidant, dependent,
22                    somewhat schizoid and passive-aggressive.  His relationship to
                      reality is somewhat tenuous, although he is not frankly psychotic.
23                    His ego boundaries probably are somewhat tenuous and may tend
                      to respond to internal stimuli in a manner that normal individuals
24                    do not.

25   (Id. at ¶ 19.)  He further opined that "we would probably find [petitioner] to be withdrawn,

26   avoiding individuals and conflict, and somewhat dependent and at least overtly cooperative with

27   authority."  (Id. at ¶ 20.)

28   ////

1    At the time attorney O'Connor hired Dr. Edwards, petitioner's trial had already begun.

2    (Id. at ¶ 4.)  On February 11, 1988, the date of O'Connor's letter to Dr. Edwards, the proceedings

3    were in the eleventh day of jury selection.  (RT at 800-2522.)  On February 28, 1988, when Dr.

4    Edwards interviewed petitioner, the prosecution case was well underway.  (RT at 3957.)   Dr.

5    Edwards stated that he did not have sufficient time during that interview to have petitioner

6    complete a "self-report test."  (Dr. Edwards' Decl. (App. 3) at ¶ 4.)  Accordingly, he asked

7    defense investigator Wharton to have petitioner complete the test and return it to him.  (Id.)  Dr.

8    Edwards stated that he received the completed test back from Wharton on March 15, 1988.  (Id.)

9    Dr. Edwards sent his report to O'Connor on April 7, 1988, after the conclusion of the guilt phase

10   of petitioner's trial on April 5, 1988.  (RT at 7337.)   The penalty phase of petitioner's trial

11   commenced just shortly thereafter, on April 12, 1988.  (RT at 7570.)

12   According to petitioner, his counsel "consulted no psychiatrist in this case, nor any mental

13   health expert other than Dr. Edwards."  (Mtn. for Evi. Hrg. (ECF No. 158) at 24:1-2.)  That

14   representation is supported by attorney O'Connor's accounting of all his costs in this case.  (SCT

15   1238-1240 (lodged herein under seal on June 11, 2001).)  However, the undersigned is unable to

16   find in the state court record a similar final accounting from attorney Schwartz.

17   Nonetheless, at this stage of the proceedings petitioner has shown that petitioner's trial

18   counsel did intend to present some mental health testimony.  As discussed above, defense

19   investigator Berger interviewed Dr. Douglas Strayer.  Berger told attorney O'Connor that Dr.

20   Strayer had opined that "a man with Mr. Riel's intellectual capability would not be able to plan,

21   formulate, lead, and execute activity such as the robbery and homicide with which Mr. Riel was

22   charged."  (Berger Decl. (App. 35) at ¶ 9.)  However, it is not clear from the record before this

23   court how much, if any, interaction attorneys O'Connor and/or Schwartz had with Dr. Strayer.

24   The defense planned to put Dr. Strayer on as its first witness.  (RT 5639:10-18, 5641:12-

25   14.)  It was planned that defense counsel Schwartz would examine Dr. Strayer.  (RT 5640:1-4.)

26   The prosecutor objected to Dr. Strayer's testimony as irrelevant.  (RT 5641:25-28.)  Attorney

27   Schwartz informed the judge that Dr. Strayer was a school psychologist who had conducted

28   intelligence and psychological tests on petitioner in 1976, when petitioner was fourteen years old.

38

1   (RT 5641:12-23.)  The defense sought to present Dr. Strayer's testimony to show that petitioner

2   lacked the skills and ability to plan, lead, and carry out the "type of operation that Mr. Edwards

3   would have us believe that he did."  (RT 5642:25-28.)  The prosecutor argued that if the proffered

4   testimony was admitted, then he should be permitted to introduce evidence of petitioner's prior

5   criminal activity from the early 1980's which showed planning on petitioner's part.  (RT 5643:5-

6   22.)  The trial judge agreed.  (RT 5643:26 – 5645:6.)

7        After hearing in camera testimony from Dr. Strayer and hearing argument about the

8   relevance of Dr. Strayer's testimony and the general type of evidence that might be admitted

9   during cross-examination, the trial judge concluded that if Dr. Strayer testified regarding

10  petitioner's lack of mental ability to plan or lead, then the prosecutor would be entitled to cross-

11  examine the doctor about petitioner's prior actions that arguably showed an ability to plan or lead.

12  (RT 5674-5679.)  Defense counsel asked the court to require the prosecutor to make an offer of

13  proof about what sort of evidence he might seek to question Dr. Strayer about on cross-

14  examination.  (RT 5678:8-10.)  Defense counsel Schwartz also expressed concern that the

15  prosecutor could ask questions from which the jury could infer the existence of prior criminal

16  activity.  (RT 5678:27 – 5679:3.)  However, the trial judge refused to order the prosecutor to

17  provide a proffer at that time, but instead made it clear that if the prosecutor intended to question

18  Dr. Strayer about petitioner's prior criminal activity, then he was required to raise it outside the

19  jury's presence.  (RT 5676:14-19, 5678:11-16.)  In light of that ruling, defense counsel reluctantly

20  withdrew Dr. Strayer as a defense witness.  (RT 5678:3-6, 5679:9-10.)

21                    ii.    What the Defense Presented at the Guilt Phase

22        In his very brief opening statement to the jury at the guilt phase of petitioner's trial,

23  defense counsel O'Connor simply listed the witnesses he would call and summarized the form,

24  but very little of the substance, of their expected trial testimony.   For example, O'Connor told the

25  jury only that Sergeant Schaller would testify to, among other things, conversations he had with

26  the victim's wife about "certain things that were occurring at the truck stop."  (RT 5680:8-17.)

27  While attorney O'Connor to the jury that indicated some of the testimony they would hear would

28  go to Virgal Edwards' credibility, he told them little about why that was so.

39

1          (a)   Guilt Phase Defense Witnesses

2          The evidence presented by the defense at trial focused on three points – impeaching

3  Edwards' credibility, showing that Osborne was the likely leader of the group and allowing

4  petitioner to tell his story of the events.  Below, the undersigned summarizes the bulk of the

5  testimony presented by the defense at the guilt phase of petitioner's trial.[18]

6          The first defense witness called during the guilt phase of petitioner's trial was Sergeant

7  Schaller.  (RT at 5682.)  He testified that Mrs. Middleton told him her husband asked her not to

8  come by the truck stop because Osborne was a "rough character."  (RT at 5687:1-17.)  He also

9  testified to a conversation another officer had had with Ricky Peterson in which Peterson

10  indicated the "skinny curly haired" man had asked Peterson for a pistol.  (RT at 5694:7-20.)  This

11  was an apparent attempt to rebut Peterson's direct testimony that Osborne and either petitioner or

12  Edwards (the testimony varied) had asked for a gun.  Next, the defense called Officer Kerwood

13  who testified that shortly after midnight on November 4, 1986, he was at a mini mart in Vacaville

14  and saw two men he believed were "casing the place."  (RT at 5698-5702.)  He later identified the

15  men as Osborne and Edwards.  (RT at 5709:24-27.)

16          The defense then called Thomas Schneider, who knew Virgal Edwards when the two were

17  incarcerated together at the Shasta County Jail for three months.  (RT at 5726-5727.)   Schneider

18  testified that he felt Edwards was a "pathological liar."  (RT at 5732:10-11.)  Schneider testified

19  that Edwards had once told him that he, Edwards, stabbed Middleton one time and later told

20  Schneider that he had stabbed Middleton twice.  (RT at 5733:11-15.)  Andrew Francis, a resident

21  of Mt. Shasta, testified that he was in a bar on the evening of November 2, 1986, where he saw

22  Osborne, Edwards and petitioner.  (RT at 5741-5742.)  At one point, Francis left the bar with

23  Osborne and Edwards to find crank.  (RT at 5744-5745.)  Francis described petitioner as being

24  "mellow," "drunk" and "quiet" on the night in question.  (RT at 5746:12-19, 5748:8.)  Rick

25  Sterling, who was also at the same bar that night, similarly testified on behalf of the defense that

26  ////

27

28  [18]  The evidence presented at trial regarding Osborne's history of violence is set out in more detail
   in the following section of these findings and recommendations.

1  petitioner appeared to be "upset or tired or something" and "didn't say hardly nothing at all."

2  (RT at 5797.)

3      Deputy Ashmun was called as a witness by the defense and testified that when he

4  interviewed the Petersons, Melinda Peterson told him Osborne was the only person who asked for

5  a gun.  (RT at 5760:14-16.)  Deputy Ashmun further testified that although Melinda Peterson told

6  him she thought petitioner, Edwards and Osborne intended to rob someone, she did not hear them

7  say that specifically.  (RT at 5790:4-11.)  Dennis Taber then testified that he was a friend of both

8  petitioner and Edwards.  (RT at 5767:21-25.)  Taber testified that Edwards was in the habit of

9  wearing a knife in a sheath on his belt.  (RT at 5774:27 – 5775:19.)  He also testified that

10  Edwards lied to his girlfriend and her mother about having a job out of town, and told him he had

11  stolen money from his girlfriend.  (RT at 5771-5776; 5784-5785.)   Sergeant Nielsen later was

12  called as a witness by the defense and testified about his interview with Taber during which Taber

13  told him a similar story.  (RT at 5930-5933.)

14      Detective Bishop testified that he interviewed one of petitioner's cell mates, Wayne

15  Green.  (RT 5928:2-7.)  Green stated that petitioner told him one of his buddies killed "the guy

16  at the truck stop" and petitioner and another guy "moved the body out of the way."  (RT at

17  5929:8-19.)

18      After presenting the testimony summarized above, defense counsel O'Connor then

19  announced that he intended to call petitioner's co-defendant, John Osborne, to the stand.  (RT at

20  5933:23-24.)  After locating Osborne's attorney, the court heard in camera argument and allowed

21  attorney O'Connor to question Osborne in camera to determine whether the proposed inquiry

22  sought relevant, admissible evidence and whether Osborne would refuse to answer the questions

23  by asserting his Fifth Amendment privilege or otherwise.  (RT at 5933-5965.)  After it became

24  clear that the trial judge would find Osborne's assertion of his Fifth Amendment privilege in

25  response to all questions O'Connor intended to ask appropriate, the parties stipulated that

26  Osborne would appear before the jury only to be identified and to show jurors his two tattoos.

27  (RT at 5967:14-28.)  The parties also stipulated at that time to the identification of Osborne in

28  certain pictures taken in early November 1986.  (RT 5967:24 – 5968:4.)

1    The defense next called Wes Coley as a witness.  (RT at 5977-5978.)  Coley testified that

2    Osborne had asked to borrow his gun.  (RT at 5978:11-22.)  Coley agreed that he had told people

3    he would lock up his guns if Osborne had been drinking because of an incident that occurred in

4    Washington State involving Osborne.  (RT at 5979:15 – 5980:1.)  According to Coley, at one

5    point on the night of November 2, 1986, Osborne and Edwards came by Coley's house and told

6    Coley they had left petitioner in the bar.  (RT at 5980:2-14.)

7    The defense also called Virgal Edwards as a guilt phase witness.  (RT at 5986.)  Attorney

8    Schwartz questioned Edwards about the deal he made with prosecutors in exchange for his

9    testimony and about his lack of truthfulness to police officers and to his own attorney.  (RT at

10   5987-5993; 6013-6014)  With respect to Edwards' plea deal, attorney Schwartz made sure the

11   jury was aware that Edwards' agreement was not final until he had completed his testimony.  (RT

12   at 5993:10 – 5994:7.)  Attorney Schwartz questioned Edwards extensively about the falsity of

13   many of the statements Edwards had made to police.  The defense played the tape of one of

14   Edwards' statements to law enforcement, stopping the tape frequently to question Edwards about

15   the version of events he had given to the police that he had since changed.  (RT at 6047-6065,

16   6075-6145.)

17   Schwartz also attempted to show that Edwards was being untruthful by questioning him

18   regarding conflicts between his version of events and the testimony of others.  When confronted

19   with each of these conflicts, Edwards insisted that the other witness were lying.  Attorney

20   Schwartz had a long list of such conflicts, among them were:  (1) Edwards testified that petitioner

21   purchased crack from Ellen Howard in Vacaville but Ellen Howard testified that it was Osborne

22   who had purchased the crack cocaine.  (RT at 5994:23 – 5995:12.)  (2) Edwards testified that

23   petitioner used crank that day but Howard testified that petitioner did not do so.  (RT at 5995:13-

24   17, 6029:19-28.)  (3) Edwards testified that Andy Francis had a "run-in" with petitioner at the bar

25   but Francis testified that he had had a conflict with Edwards, not with petitioner.  (RT at 6003:20

26   – 6004:9.)  (4) Edwards denied leaving the bar with Osborne that night, despite the testimony of

27   both Francis and Coley to the contrary.  (RT at 6004:15 – 6005:10.)  (5) Edwards denied that any

28   of the trio left and returned to the bar that night, contrary to the testimony of the bartender.  (RT

1   at 6005:11-21.)   (6) Edwards denied wearing his knife much of the time, contrary to the

2   testimony of several witnesses, and denied wearing it in the bar on the night in question, also

3   contrary to the testimony of the bartender.  (RT at 6008:18 – 6010:7.)  (7) Edwards denied being

4   at a Vacaville mini-mart shortly after midnight on November 4, 1986, contrary to Officer

5   Kerwood's testimony.  (RT at 6011:27 – 6013:4.)  (8) Edwards had testified that after petitioner

6   took victim Middleton's wallet, he hit Mr. Middleton "pretty much of the time;" however,

7   testimony given earlier in petitioner's trial established that Mr. Middleton's wallet was found in

8   his back pocket.  (RT at 6014:28 – 6015:11.)  (9) Edwards testified that he did not change his

9   clothes after the commission of the crimes, contrary to the testimony of petitioner's sister, Candy

10   Cobb, and Ellen Howard.  (RT at 6018:1-16.)

11          In his testimony, Edwards also described his 1981 robbery conviction.  In that regard, he

12   testified he was only an accessory even though he told police he "did the whole thing."  (RT at

13   6005:22 – 6007:9.)

14          In addition to Edwards' direct testimony rendered during the defense guilt phase case,

15   defense counsel had also extensively cross-examined Edwards when he was called as a witness

16   during the prosecution's case.  (RT at 3499-3628, 3713-3718.)  Some of that cross-examination

17   focused on the same conflicts between Edwards' trial testimony and the testimony of other

18   witnesses.  In addition, defense counsel questioned Edwards' at length regarding his plea

19   agreement with the prosecution, his prior crimes and his testimony regarding the commission of

20   the crime in question.

21          The next defense witness was Blanchard Foster, the landlord of the apartment house

22   where Osborne lived with Pam Silkwood.  (RT at 6071.)   Mr. Foster stated that he had in the past

23   called the police at least three or four times due to Osborne's noisy behavior.  (RT at 6072:6-17.)

24   He asked Silkwood and Osborne to move out of the apartment house, and paid Silkwood $250 to

25   do so, because of Osborne's behavior.  (RT 6074:8-24.)  Sergeant Jarrett then testified.  (RT at

26   6223.)  He prepared a report after talking with the doctor who performed the autopsy on Mr.

27   Middleton.  (RT at 6223:19-28.)   First, the autopsy doctor informed Jarrett that the blunt force

28   wound to Mr. Middleton's head "would not have caused death."  (RT at 6224:5-14.)  Second,

1    Jarrett testified that both Eileen Ada and her mother told him they were missing things of value

2    and believed Edwards had taken them.  (RT at 6224:15 – 6226:1.)

3            Petitioner was the last defense witness to testify at the guilt phase of his trial.  (RT at

4    6236.)  Petitioner testified to some details regarding Edwards' relationship with Eileen Ada that

5    contradicted the trial testimony of Edwards.  (RT at 6237:12 – 6238:27.)  Petitioner then testified

6    about the events at issue.  (RT at 6238-6261.)  He testified that on the day of the crime, he and

7    Edwards drove in Edwards' car from Klamath Falls to Weed to visit Osborne.  They went to

8    Rambo's Truck Stop to wait for Osborne to get off work.  They were there for about five hours

9    during which time, petitioner drank a lot of beer and was "pretty drunk" by the time Osborne was

10   off.  (RT at 6241:11.)

11           After Osborne got off work, the three drove to a couple of houses of Osborne's friends to

12   try and buy crank.  At both stops, petitioner drank more.  (RT at 6246:20-23.)  After they visited

13   Rick Peterson's house, the trio stopped at a bar after dark and petitioner drank more beer.  (RT at

14   6247.)  At least twice, Osborne and Edwards left the bar.  (RT at 6247:25 – 6248:1.)  Petitioner

15   left the bar after it closed with another man to go to a different bar.  However, the police arrested

16   the other man and petitioner returned to the first bar.  He did not find Osborne and Edwards there,

17   so he set out on foot to look for Osborne's house.  (RT at 6248 – 6250.)  Petitioner was drunk.

18   (RT 6250:13-14.)  Osborne and Edwards drove up in Edwards' car and picked him up.  They

19   drove to Wes Coley's house, where they had more to drink.  (RT at 6250:24 – 6251:9.)

20           Petitioner testified that he did not recall getting back in the car or driving anywhere after

21   being at Coley's house.  (RT at 6251:10-19.)  The next thing he remembered was Edwards'

22   waking him up and telling him to help Osborne move a body.  (RT at 6251:22 – 6252:11.)

23   Petitioner testified that he got out of the car, saw Osborne standing near a body lying in the road

24   and helped Osborne move the body off the side of the road.  (RT at 6252:15 – 6253:6.)  He

25   remembered then getting back in the car, but did not recall anything else until he woke up in

26   Vacaville.  (RT at 6253:7-12.)  Petitioner testified that he did not recall any conversations that

27   day about anyone wanting a gun or about a robbery. (RT at 6253:19-25.)

28   ////

1    Petitioner also denied hitting or stabbing Mr. Middleton.  (RT at 6254:22-28.)  He

2    admitted that he told his sister there was a man in a coma.  (RT at 6257:4-17.)  He testified that

3    Osborne gave him that information.  (Id.)  According to petitioner's testimony, after the three

4    arrived at Osborne's grandfather's house, Osborne brought up the idea that they should form a

5    "blood brotherhood" to promise they would not tell anyone about what happened with Mr.

6    Middleton.  (RT at 6258:25 – 6260:15.)

7    During his testimony petitioner acknowledged that he had suffered two prior felony

8    convictions for burglary.  (RT at 6260:21 – 6261:10.)  According to petitioner, both involved

9    stealing alcohol from a business.  Petitioner described himself as "a drunk."  (RT at 6261:15.)

10    On cross-examination, petitioner admitted that he may have told a police officer he

11    committed one of the burglaries to steal money.  (RT at 6264:23 – 6265:11.)  He denied buying or

12    taking crank at Ellen Howard's house after the crime.  (RT at 6270.)  The prosecutor's cross-

13    examination exposed conflicts in petitioner's testimony.  For instance, contrary to his testimony

14    on direct examination that Osborne told him Mr. Middleton was in a coma, on cross-examination

15    petitioner testified that after Edwards woke him up to help move the body, Osborne told him he

16    had killed the man.  (RT at 6280:4-8.)  However, petitioner stated that he could not recall any

17    more details about that conversation because he was drunk.  (RT at 6280:11-17.)  Petitioner

18    contradicted himself again later during his testimony when he testified that he could not recall

19    what anyone said once Edwards woke him up.  (RT at 6337:20-24.)  Petitioner testified that when

20    he drinks, he sometimes blacks out and he doesn't "have good rememberance."  (RT at 6280:21 –

21    6281:17.)  Petitioner testified he did not remember any of the conversation at the Petersons', but

22    also testified that they only asked Rick Peterson for crank.  (RT at 6285:15-19; 6295:25-26.)  On

23    cross-examination, petitioner also added more details to his version of the events in question.  He

24    recalled that when he helped move Mr. Middleton's body off the side of the road, he tripped and

25    "fell down the bank and the body went down the bank."  (RT at 6287:25-27.)  Petitioner testified

26    that the first time he saw a knife after the crime was when Osborne pulled it out of Edwards' tool

27    box which was in the trunk of his car.  (RT at 6293:16 - 6294:5.)

28    ////

1    A number of people testified at petitioner's trial that Osborne appeared to be the leader of

2 the group of three both before and after the crimes.  Bartender Saundra Sterling testified that

3 when the trio was at the California Club the night of the crimes, Osborne appeared to be "in

4 control."  (RT at 5057-58; 5086-87; 5102:16-24.)  Candy Cobb, whose home the trio visited after

5 the crimes, testified that Osborne did all the talking after petitioner told his sister there was a man

6 "in a coma."  (RT at 4794:6-7; 4805:23 – 4806:10.)  Cobb agreed that it appeared that Osborne

7 was "running the store, giving the orders."  (RT at 4823:18-21; 4810:12-20 (Osborne "ran

8 everything").)

9                              (b)  Guilt Phase Testimony re Osborne's History of Violence

10    As described above, some testimony was adduced during the defense guilt phase case

11 regarding Osborne's history of violence.  Wes Coley testified he would lock up his guns if

12 Osborne had been drinking and he alluded to an "incident" that had occurred in Washington

13 State.  Pam Silkwood's landlord testified that he asked Silkwood to move out based on Osborne's

14 behavior.  In addition, numerous witnesses testified during the prosecution's case-in-chief

15 regarding Osborne's violent nature.

16    When Edwards testified that he had seen Osborne drink on a number of occasions but had

17 never seen him violent, petitioner's counsel asked several questions to make sure the jury was

18 aware Osborne had killed his girlfriend.  "You knew he was drinking at the time that he blew his

19 girlfriend away; right?" (RT at 3601:8-9.)  Edwards stated that he had "heard several stories on

20 that so I really couldn't say." (RT at 3601:10-11.)  Petitioner's counsel then asked if somebody

21 told Edwards that Osborne had been drinking at the time "he killed his girlfriend with a shotgun"

22 would that change Edwards' opinion of Osborne, to which Edwards said he had not seen Osborne

23 engage in violence while drinking. (RT at 3601:23-27.)  Defense counsel asked, "And is the same

24 true when he's under the influence of crank?"  Edwards denied seeing Osborne under the

25 influence of crank, except after the Middleton murder.  (RT at 3602:2-5.)

26    Wes Coley's former live-in girlfriend, Irene Poehler, also testified during the guilt phase

27 of petitioner's trial.  (RT at 4537-4538.)  She stated that Osborne and his girlfriend Pam Silkwood

28 lived with Coley and Poehler for a while. (RT at 4538.)  According to Poehler, Osborne and

1    Silkwood fought a lot.  (RT at 4601:16-23.)  Poehler recalled Osborne's foot being "messed up"

2    the morning that Edwards and petitioner arrived.  (RT at 4543:5-11.)  Osborne told her that he

3    had kicked the coffee table during a fight with Silkwood.  (RT at 4542:24-25, 4601:27 – 4602:1.)

4    The following defense cross-examination of Poehler regarding the fights between Osborne and

5    Silkwood became an exchange about Osborne shooting and killing his former girlfriend:

6            [DEFENSE COUNSEL:] And Pam usually lost?

7            [POEHLER:] Always.

8            [DEFENSE COUNSEL:] Not this time?

9            [POEHLER:] I don't know. He's the one that got hurt out of it.

10           [DEFENSE COUNSEL:] Well, this time he kicked the table instead
11           of Pam; right?

12           [POEHLER:] Yeah.

13           [DEFENSE COUNSEL:] And you in your direct examination said
             that you were kind of scared of [Osborne]?

14           [POEHLER:] Yeah, because of what he did to the girl up in Seattle.

15           [DEFENSE COUNSEL:] Were you up in Seattle with him at that
16           time?

17           [POEHLER:] I was there.

18           [DEFENSE COUNSEL:] What do you mean you were there?

19           [POEHLER:] I was there when it happened. It was in my front
             yard.

20           [DEFENSE COUNSEL:] And this is where he shot his girlfriend?

21           [POEHLER:] Yes, sir.

22           [DEFENSE COUNSEL:] That kind of upset you a bit?

23           [POEHLER:] It freaked me out because I was only what, fourteen
24           first time I had seen death.

25           [DEFENSE COUNSEL:] You were Wes' girlfriend at that time?

26           [POEHLER:] Yes, sir.

27           [DEFENSE COUNSEL:] Living with Wes?

28           [POEHLER:] Yes.

47

1      [DEFENSE COUNSEL:] And [Osborne] was living with you?

2      [POEHLER:] Yes.

3      [DEFENSE COUNSEL:] And [Osborne]'s girlfriend was living
       with you?

4
       [POEHLER:] Yes.

5
       [DEFENSE COUNSEL:] So the two of you were friends?

6
       [POEHLER:] Me and Babsey.

7
       [DEFENSE COUNSEL:] That was her name?

8
       [POEHLER:] Her nickname. Her real name was Barbara Smith.

9
       [DEFENSE COUNSEL:] So the two of you were friends.

10
       [POEHLER:] Yeah.

11
       [DEFENSE COUNSEL:] And was [Osborne] the type of person
12     that got drunk and violent then, too?

13     [POEHLER:] Yes. Jail, they met in jail. That's how they met
       because he was arrested for stolen car.

14
       [DEFENSE COUNSEL:] Okay. Now, you mentioned that on direct
15     examination that Wes wouldn't loan him a gun?

16     [POEHLER:] That's right because he knows how [Osborne] is
       when he's drunk.

17
       [DEFENSE COUNSEL:] All right. In fact, Wes would lock the
18     guns up whenever [Osborne] got drunk?

19     [POEHLER:] Most definitely.

20     [DEFENSE COUNSEL:] Where would he lock them up?

21     [POEHLER:] Tool boxes with a master padlock.

22     [DEFENSE COUNSEL:] Tool boxes?

23     [POEHLER:] Tool boxes. These great big tool boxes, roll away tool
       boxes.

24

25  (RT at 4601:22 – 4603:18.)

26          Poehler also testified that Osborne and petitioner spoke to Coley about a gun, "They

27  wanted to borrow the 22 … when [Osborne] is drunk [Coley] will not give [Osborne] a gun.  I

28  know [Osborne].  You don't want him to be around a gun."  (RT at 4611:20-23.)  According to

                                         48

1    Poehler, Coley told Osborne he did not need a gun and would get into trouble.  (RT at 4611:25-

2    26.)  Coley himself testified that Osborne asked him for a gun one afternoon around the time of

3    Middleton's death.  (RT at 5978:11-15; 5981:19-20.)  Later, Melinda Peterson called Poehler

4    saying Osborne had been asking her husband, Rick Peterson, for a gun.  (RT at 4614:23 –

5    4615:8.)  Rick Peterson also testified at petitioner's trial that Osborne asked him for a gun.  (RT

6    at 4251:15-16; 4252:3-16.)  Melinda Peterson testified that she overheard her husband on the

7    phone and after he hung up he told her it had been Osborne asking for a gun.  (RT at 5514:8-28.)

8    Melinda Peterson testified that when the trio was at her home later that evening, both Osborne

9    and petitioner asked Rick for a gun.  (RT at 5484:3-14.)  According to Poehler's testimony,

10   Melinda told her she felt that if Osborne was going to get into trouble, Silkwood should be told.

11   (RT at 4617:4-7.)

12             [DEFENSE COUNSEL:] And then when [Coley] heard about that
             he said, oh, no, what type of trouble [Osborne] is going to get in
13            now?

14            [POEHLER:] He said, "Oh, shit, I hope [Osborne] don't get in no
             damn trouble."  He was concerned of [Osborne] getting in trouble
15            because he knows how [Osborne] is when he's drunk. When
             [Osborne] gets drunk he's really violent such as wanting to kick my
16            neighbor's head over the fence.

17            [DEFENSE COUNSEL:] Kick your neighbor's head over the
             fence?
18
             [POEHLER:] See, the cops were always coming to our house there
19            in Weed because of [Osborne]. Always.

20            [DEFENSE COUNSEL:] Fair enough. Not a good neighbor?

21            [POEHLER:] Not a good neighbor, no.

22            . . .

23            [DEFENSE COUNSEL:] And back on [Osborne]. Pam and
             [Osborne] lived with you and Wes, right?
24
             [POEHLER:] For awhile.
25
             [DEFENSE COUNSEL:] And some of these fights that you have
26            talked about, you ultimately saw [Osborne] hitting on Pam?

27            [POEHLER:] All the time for no reason. Sometimes just being
             drunk.
28

1    [DEFENSE COUNSEL:] Get a little booze in him?

2    [POEHLER:] And he would get very violent, yeah.

3    (RT at 4617: 20 – 4618:5; 4621:8-16.)

4    While Poehler had never observed Osborne use crank, she testified that Silkwood

5    confided that she was "pissed" at Osborne because Silkwood had found a brand new syringe.

6    (RT at 4576:6-8.)

7    Silkwood testified at petitioner's trial that Osborne was her live-in boyfriend from

8    December 1985 until November 1986.  (RT at 4636:5-7, 4667:1-4.)  She had known Osborne to

9    shoot speed, and they fought about it.  (RT at 4652:14-17.)  Silkwood could tell when Osborne

10    was under the influence of speed.  (RT at 4653:3-5.)  According to Silkwood, Osborne was

11    different on speed, he would move constantly, could not sit still, and talked a lot.  (RT at 4694:27

12    – 4695:16.)  By November 1986, Osborne was using speed more than once a week.  (RT at

13    4696:5-10.)  Silkwood testified that Osborne sometimes combined speed and alcohol.  (RT at

14    4695:17-24.)  She saw Osborne drink on a regular basis.  (RT at 4667:5-9.) Silkwood testified

15    that when Osborne was sober, he was a good man to be around.  (RT at 4667:15-16.)  However,

16    when he drank, his personality changed "from day to night."  (RT at 4667:17-20.)

17    During his cross-examination of Silkwood, petitioner's counsel elicited the following:

18    [DEFENSE COUNSEL:] Okay. What would he be like when he
     was drinking?

19

20    [SILKWOOD:] Real violent.

21    [DEFENSE COUNSEL:] And I take it you became somewhat of a
     punching bag for him?

22    [SILKWOOD:] Yes.

23    [DEFENSE COUNSEL:] And there was one time when you and
     another friend and he were trying to put together a waterbed, do you
24    remember that incident?

25    [SILKWOOD:] Yes.

26    [DEFENSE COUNSEL:] And he kicked you in the ribs?

27    [SILKWOOD:] Yes.

28    ////

50

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[DEFENSE COUNSEL:] And would it be fair to say that that was for nothing?

[SILKWOOD:] Yes.[19]

[DEFENSE COUNSEL:] And were there times when you would have an argument, a verbal dispute or you would say something to him and he would hit you or kick you?

[SILKWOOD:] Yes.

[DEFENSE COUNSEL:] And was that - - was that the normal, was it more normal for him to be hitting or kicking you than for him to be kicking the table instead of kicking you?

[SILKWOOD:] Yes.

[DEFENSE COUNSEL:] So that was a rare occasion that he would take out his anger on an inanimate object instead of you?

[SILKWOOD:] Yes.

[DEFENSE COUNSEL:] And sometimes during these fights would you try to defend yourself?

[SILKWOOD:] Yes.

[DEFENSE COUNSEL:] And I take it you ended up losing most of those?

[SILKWOOD:] Yes.

[DEFENSE COUNSEL:] Do you have any opinion - - I'm not asking for an exact figure - - do you have any opinion as to the number of different times in which [Osborne] was drinking and struck you or hurt you physically?

[SILKWOOD:] 150, 200.

[DEFENSE COUNSEL:] Okay. Every other day, something like that?

[SILKWOOD:] Every time he drank.

[DEFENSE COUNSEL:] Every time?

[SILKWOOD:] Uh-huh.

[DEFENSE COUNSEL:] And did you become more wary of him when he was drinking after these - - after you got beat up say the first 50 times?

---

[19]   Later during her testimony, Silkwood said that Osborne used speed and drank before the "waterbed incident."  (RT at 4708:13-27.)

1    [SILKWOOD:] Yeah. I was scared to death.

2    [DEFENSE COUNSEL:] And would you try to temper your
     remarks to not smart off?

3

4    [SILKWOOD:] No.

     [DEFENSE COUNSEL:] So your mouth would continually get you
5    beat up by Ozzie?

6    [SILKWOOD:] Yes.

7    [DEFENSE COUNSEL:] Did he ever threaten you with a weapon?

8    [SILKWOOD:] Yes.

9    [DEFENSE COUNSEL:] And was that on one occasion or more
     than one?

10

     [SILKWOOD:] One.
11

     [DEFENSE COUNSEL:] And that weapon was a rifle?
12

     [SILKWOOD:] Yes.
13

     [DEFENSE COUNSEL:] And what - - what caused that to happen?
14

15   [SILKWOOD:] I had received a letter in the mail from my baby's
     father.

16   (RT at 4667:21 – 4669:19.)

17        Silkwood went on to explain during her testimony that Osborne was "real jealous" and

18   that she answered the letter from the father of her child, which was sealed on a table in the

19   bedroom.  (RT at 4669-4670.)  She testified:

20   [SILKWOOD:] I had went to work and just forgot about the letter;
     and while I was at work, [Osborne] got drunk and read the letter.
21

22   [DEFENSE COUNSEL:] Opened up the mail and read it?

23   [SILKWOOD:] Read it and didn't like it.

24   [DEFENSE COUNSEL:] So when you came home the fight was
     on?

25   [SILKWOOD:] Yes.

26   [DEFENSE COUNSEL:] And what did he do?

27   [SILKWOOD:] Kick my ass.

28   ////

1    [DEFENSE COUNSEL:] And did he turn up the radio at some point?

2

3    [SILKWOOD:] Yes. He closed our bedroom door and the bedroom window and turned the radio up and I was real scared.

4    [DEFENSE COUNSEL:] Then he got the rifle?

5    [SILKWOOD:] Well, I had went to the bathroom. He did let me out to go to the bathroom, and I came back in the room and it was sitting at the corner of the room.

6

7    [DEFENSE COUNSEL:] And it hadn't been setting in the corner of the room before that?

8

    [SILKWOOD:] No.

9

    [DEFENSE COUNSEL:] Did he ever pick it up?

10

    [SILKWOOD:] No.

11

    [DEFENSE COUNSEL:] Just let you see it was there?

12

    [SILKWOOD:] Yes.

13

    [DEFENSE COUNSEL:] Did he make some comment now - - and

14    I wasn't there, so I can't quote it had exactly - -

15    [SILKWOOD:] I can.

16    [DEFENSE COUNSEL:] Huh?

17    [SILKWOOD:] I can.

18    [DEFENSE COUNSEL:] Be my guest, ma'am.

19    [SILKWOOD:] He told me if it wasn't for my daughter I would be one dead bitch. That was his exact words.

20

21    [DEFENSE COUNSEL:] And was there any physical violence associated with that particular incident?

22    [SILKWOOD:] No. I don't think so. Just it seemed like he wanted to scare me, you know.

23

24    [DEFENSE COUNSEL:] It worked pretty good, didn't it?

    [SILKWOOD:] Yeah. And we were up all night arguing about that.

25

26    [DEFENSE COUNSEL:] And that was a common occurrence that you would get into these kinds of arguments with him?

27    [SILKWOOD:] Yes.

28    *////*

1    [DEFENSE COUNSEL:] And every other day, just to pick a figure,
     you would get punched or kicked or beat up by him?

2
     [SILKWOOD:] Yes.

3

4    (RT at 4671:10 – 4671:23.)

5           Silkwood testified that she and Osborne moved out of the "Red Coach" apartments in

6    August of 1986:

7    [DEFENSE COUNSEL:] Was there a reason that you moved out of
     the Red Coach apartments?

8
     [SILKWOOD:] Yes.

9
     [DEFENSE COUNSEL:] And was that reason that - - did it have

10   something to do with Ozzie's, or [Osborne]'s, behavior?

11   [SILKWOOD:] Yes.

12   [DEFENSE COUNSEL:] And let me just guess. Was he out yelling
     and screaming and - -

13
     [SILKWOOD:] Yes.

14
     [DEFENSE COUNSEL:] Getting into fights with the neighbors?

15
     [SILKWOOD:] Yes, all hours of the morning.

16
     [DEFENSE COUNSEL:] Cops were being called out?

17
     [SILKWOOD:] Yes.

18
     [DEFENSE COUNSEL:] You were getting beat up?

19
     [SILKWOOD:] Yes.

20
     [DEFENSE COUNSEL:] Business as usual for Ozzie?

21
     [SILKWOOD:] Yes.

22
     [DEFENSE COUNSEL:] [Osborne], excuse me. So you were asked

23   to leave?

24   [SILKWOOD:] He paid me to leave.

25   [DEFENSE COUNSEL:] The manager?

26   [SILKWOOD:] Yes.

27   (RT at 4696:26 – 4697:19.)

28   ////

1      According to trial testimony the "Red Coach" apartment manager did not want Rick

2    Peterson around either, since Peterson hung out with Osborne a lot when they lived there.  (RT at

3    4698:1-17.)  Silkwood also disapproved of Osborne associating with Peterson.  (RT at 4698:18-

4    20.)

5           [DEFENSE COUNSEL:] And that was because he would go out
           and get loaded and come home and beat you up?
6
           [SILKWOOD:] Yes.
7
           [DEFENSE COUNSEL:] That was a pretty good reason.
8
           [SILKWOOD:] I thought so.
9

10   (RT at 4698:21-25.)

11         Officer Ron Klinger, of the Weed Police Department, testified that he knew Osborne

12   through the performance of his official duties.  (RT at 4425:18-23.)  Defense counsel's

13   examination of Officer Klinger included the following exchange:

14         [DEFENSE COUNSEL] You'd had problems with John Osborne in
           connection with the consumption of alcohol before.
15
           [OFFICER KLINGER:] Yes.  That was involved in part of the
16         problem.

17         [DEFENSE COUNSEL:] Okay.  The sheriff of Siskiyou County
           right now is a fellow by the name of Bird.
18
           [OFFICER KLINGER:] Yes, it is.
19
           [DEFENSE COUNSEL:] And at that time he was what?
20
           [OFFICER KLINGER:] He was the chief of Weed police
21         department.

22         [DEFENSE COUNSEL:] Okay.  And you had had prior contact
           with Mr. Osborne in connection with Mr. Osborne expressing some
23         threat against Chief Bird?

24         [OFFICER KLINGER:] Yes, I remember that.

25         [DEFENSE COUNSEL:] He offered to rearrange the chief's
           anatomy somehow.
26
           [OFFICER KLINGER:] I'm not sure if that was said.  He threatened
27         to kill him.  That's all I know about it.

28   ////

1  [DEFENSE COUNSEL:] Okay. And that was in connection with
   the use of alcohol too, is it?

2

3  [OFFICER KLINGER:] I don't remember if that was - -he had- -he
   had beat his girlfriend, both occasions, that I had arrested him.

4  [DEFENSE COUNSEL:] All right.

5  [OFFICER KLINGER:] There was alcohol involved.

6  [DEFENSE COUNSEL:] Okay. So the times in which you arrested
   him he had consumed alcohol, lost his cool, got violent, beat up his

7  girlfriend?

8  [OFFICER KLINGER:] Yes.

9  [DEFENSE COUNSEL:] And you knew of the other incident
   where he threatened Chief Bird.

10

11 [OFFICER KLINGER:] I know of the incident when he threatened
   the chief, but I don't know if that was a different incident or one of
   the two that I had mentioned.

12

13 [DEFENSE COUNSEL:] All right. Have you had other contacts
   with Mr. Osborne?

14 [OFFICER KLINGER:] Yes.

15 [DEFENSE COUNSEL:] Negative ones?

16 [OFFICER KLINGER:] Yes.

17 [DEFENSE COUNSEL:] What type?

18 [OFFICER KLINGER:] We'd responded before - - before out to
   Wes Coley's residence, I guess which is also [Osborne's]. He was

19 staying with him, and there had been an incident where a couple of
   neighbors called in and said [Osborne] was yelling and screaming

20 in the street and making threats to people and he was under the
   influence of alcohol, and we responded out there.

21
   [DEFENSE COUNSEL:] Calmed it down on that occasion?
22
   [OFFICER KLINGER:] I believe we made an arrest that day too.
23

24 (RT at 4425:14 – 4427:28.)[20]

25      Other trial witnesses also described Osborne's violent character. Osborne's relatives Tari

26 and Aaron Stockman, who he saw in the Fairfield area after the murder of Mr. Middleton, had not

27 ─────────────────────

28 [20] Officer Larry Schaller was also questioned at petitioner's trial about Osborne threatening "to
   kill Chief Bird," to which he said, "Police chief of Weed, yes, sir." (RT at 5687:19-22.)

1    seen Osborne in years until shortly before the murder.  (RT at 5030:2-13, 5038:25-27.)  Mrs.

2    Stockman explained that the lack of contact with Osborne had to do with his killing his girlfriend.

3    (RT at 5038:16-24.)  Mr. Stockman agreed that Osborne was obnoxious and aggressive when he

4    drank saying, "Yeah. I'd just as soon not be around people like that."  (RT at 5047:2-15.)  There

5    was testimony admitted at the trial indicating that Mr. Middleton's wife had told police that she

6    used to visit her husband at work, but Mr. Middleton told her not to come anymore because of

7    Osborne.  (RT at 5686:28 – 5687:17.)

8           Virgal Edwards testified at petitioner's trial that, after the crimes were committed,

9    Osborne told him not to worry about it because, "I know how to beat murder raps."  (RT at

10   3560:11-14.)  Edwards understood that Osborne was referring to the killing of his former

11   girlfriend.  (RT at 3560:15-16.)

12                          (c) Guilt Phase Closing Argument

13          Attorneys Schwartz and O'Connor both gave closing arguments on behalf of petitioner at

14   the conclusion of the guilt phase of the trial.  They stressed the following themes:

15          (1)  Virgal Edwards was not a credible witness because he had admitted lying and much

16   of his testimony was impeached by the testimony of other witnesses who had no motive to lie.

17          (2)  Aside from Edwards' testimony, the evidence admitted at trial did not support the

18   prosecution's case.

19                 (a)  Melinda Peterson and Rick Peterson's testimony that petitioner asked for a gun

20   was not credible.  They both changed their stories to identify petitioner as the one asking for a

21   gun after they received a call from John Osborne following his arrest.

22                 (b)  The beer can with petitioner's fingerprint which was found in the truck stop

23   office did not necessarily show that petitioner had entered the office.  It showed only that at some

24   point, when they were passing around beers, petitioner touched that can.

25                 (c)  Pam Silkwood admitted on cross-examination that she neither saw nor heard

26   petitioner on the phone so could not know what his conversation involved.

27          (3)  John Osborne was the leader of the group and the most likely killer of Mr. Middleton.

28   ////

1          (a)  Osborne had a motive to kill Mr. Middleton because Middleton could identify

2    him.

3          (b)  Osborne had a history of engaging in serious violence – shooting his girlfriend

4    in the face; beating Pam Silkwood at least 150 times; threatening to shoot the Chief of Police.

5    His violence was associated with his alcohol use.  Silkwood's landlord paid her to move out so he

6    could be rid of Osborne.  Osborne boasted he had beaten a murder rap.

7          (c)  A number of witnesses gave uncontested testimony that Osborne asked them

8    for a gun.

9          (d)  Both Candy Cobb and Roslyn Walker testified that Osborne took the lead in

10   describing what happened after petitioner told his sister there was a man in a coma.

11        (4)  Osborne and Edwards decided to pin the crime on petitioner.  Osborne and Edwards

12   were seen without petitioner several times both before and after the crime.  Pam Silkwood

13   testified that their stories, told to her after she picked them up in Fairfield, sounded rehearsed.

14        (5)  Petitioner is an alcoholic who drank an enormous amount of alcohol in the hours prior

15   to the crimes.  A number of people who saw the trio testified that petitioner seemed quiet and

16   tired.

17        After a brief overview of each co-defendant's criminal history, attorney Schwartz

18   concluded:

19                    Two men with a history of violence and one sneaky thief.  Who
                  is the most logical leader in this group?  Who is the most logical
20                person to have been intimidated by the others.  Two stick together.
                  Chap always seems to be the third man out even before the murder.
21

22   (RT at 6912:15-20.)

23                    iii.    What the Defense Presented at the Penalty Phase

24        In the defense opening statement at the penalty phase, attorney Schwartz simply told the

25   jury that they would hear from two defense witnesses, Ardell Morgan, who would "be able to

26   give you some insight into Mr. Riel, his development, what kind of a person he was at that time,"

27   and Joseph Ross, an employee of the Washington State Corrections Department who "had the

28   opportunity of knowing all three of the defendants in this case" and could "give you a bit of

                                                        58

1   perspective on who these individuals are and specifically who Charles Riel is." (RT at 7572:1-

2   10.)

3           Ardell Morgan testified at the penalty phase of petitioner's trial that she was the director

4   of the Seattle Seguin School, a special education school in Washington State. (RT at 7573:20-21,

5   7575:23-26.) Petitioner attended that school from fall 1977 to spring 1978. (RT at 7576:10-11,

6   7580:28.) According to Ms. Morgan, petitioner attended the school for eight months.[21] (RT at

7   7603:17-18.) She testified that although petitioner was fifteen years old at the time, he was

8   working at only a fourth and fifth grade level. (RT at 7590:4-15.) Ms. Morgan testified that

9   petitioner "didn't cause any trouble and nobody caused him any trouble." (RT at 7579:5-6.)

10  According to Ms. Morgan, she felt petitioner "definitely had some learning disability," but that he

11  "was bright." (RT at 7579:7-8, 7619:16.) Morgan testified that she would pick up petitioner

12  from the ferry terminal, take him to her house to get a lunch because he did not bring one and

13  drive him to school each day. (RT at 7579:10-18.) She also noted that because she was the

14  school principal she "seldom saw him in action" except during gym time. (RT at 7579:27 –

15  7580:1.) However, she felt he "participated well" and "was very gentle" and helpful with the

16  younger children at the school. (RT at 7580:2-23.) During her testimony Morgan expressed her

17  sadness about the lack of earlier intervention to help address petitioner's speech problems. (RT at

18  7583:9-11.) Morgan testified that she felt petitioner needed to learn to deal with conflict instead

19  of walking away. (RT at 7583:11-15.) Morgan described petitioner as passive in her testimony.

20  (RT at 7585:3-23.) According to Morgan, petitioner would "go along," and she felt he was not

21  "the kind that would think it all up." (RT at 7585:20-23.) Morgan also testified that she believed

22  petitioner did not have support at home. (RT at 7589:9-10.)

23          On cross-examination by the prosecution, Ms. Morgan mentioned that she was surprised

24  that the defense investigator had interviewed her because she did not know petitioner very long

25  _____

26  [21]  Petitioner contends that this is incorrect. The trial record and exhibits submitted with the state
    court habeas petition show that petitioner attended the school for approximately four months.

27  (See ECF No. 516 at 110 n. 52.) It is worth noting, however, that the jury would have understood
    from Ms. Morgan that her contact with petitioner was longer than that. The discrepancy is

28  primarily relevant to show counsel's lack of investigation into petitioner's past.

1    and could testify to only that "at that moment and space and time as a young man he was a nice

2    young man." (RT at 7614:21-24, 7615:20-22.)

3           The second, and last, witness called by the defense at the penalty phase of petitioner's trial

4    was Joseph Ross.  His testimony was quite brief and can be summarized as follows.  Mr. Ross

5    was a supervisor with the Washington State Department of Corrections.  (RT at 7631:6-9.)  While

6    petitioner was incarcerated in Washington, he worked for Mr. Ross as a plumber.  (RT at

7    7631:18-27.)  According to Ross, petitioner was a "good worker" who caused no problems.  (RT

8    at 7632:19-23.)  Mr. Ross also opined that petitioner would not be a problem if he was sentenced

9    to life.  (RT at 7633:5-11.)  Mr. Ross testified that he was also familiar with John Osborne.  (RT

10   at 7633:12-14.)  According to Ross, while incarcerated in Washington Osborne was a "more or

11   less continuous" "problem."  (RT at 7633:15-18.)

12          The defense closing argument to the jury at the conclusion of the penalty phase of

13   petitioner's trial focused on the potential disparity in punishment between the three men who had

14   participated in the commission of the crimes.  (RT at 7695 - 7698.)  Petitioner's counsel also

15   discussed the felony-murder rule as the basis for the first degree murder conviction so that he

16   could continue the guilt phase emphasis on the theory of the defense that it was Osborne who was

17   the leader of the group and the likely actual perpetrator of the murder of Mr. Middleton.  (RT at

18   7696-97.)  Defense counsel briefly mentioned the fact that petitioner had little parental support as

19   evidenced by his parents' failure to pay for his schooling and his lack of home lunches, money or

20   appropriate clothing while attending the Seguin School.  (RT at 7698; 7735:1-8.)  Finally, defense

21   counsel argued that petitioner was not the worst of the worst.  (RT at 7703 – 7704.)

22          In the defense penalty phase rebuttal argument, attorney Schwartz told the jury the

23   defense decided not to call petitioner's family members as witnesses at the penalty phase of the

24   trial.  (RT at 7733:5-11.)  He explained that the jury could understand "some of the reasons we

25   decided not [to] do that because of some information you received about the type of life that Chap

26   had in his home.  That's a terrible thing in and of itself."  (RT at 7733:11-15.)  Attorney Schwartz

27   then discussed some of the sentencing factors to be considered by the jury.  (RT at 7741 - 7743.)

28   Finally, petitioner's counsel launched into an extended discussion of the Bible in response to the

1  prosecutor's reference to the Bible in the prosecution's closing argument to the jury.  Attorney

2  Schwartz talked about the Bible's focus on forgiveness and mercy.  (RT at 7744-50, 7752-53.)

3  He closed by comparing violent prior crimes committed by Edwards and Osborne with

4  petitioner's prior record involving the commission of only non-violent crimes.  And petitioner's

5  counsel again stressed the potential disparity in the sentences the three could receive.  In this

6  regard, attorney Schwartz pointed out how quickly Edwards could be released from prison based

7  on his plea agreement, and he argued that Osborne could very well be sentenced to something less

8  than death.  (RT at 7750-51.)

9                    iv.    Discussion of the Reasonableness of Counsel's Conduct

10          The legal standards for consideration of a claim of ineffective assistance of counsel are set

11  out in detail above.  Simply put, the standard is one of objective reasonableness, with deference

12  given to counsel's strategic decisions.  However, labeling a decision "strategic" does not

13  automatically render it reasonable.  Counsel's actions can only be considered reasonable strategy

14  if they were made after a reasonably complete investigation.  Wiggins v. Smith, 539 U.S. 510,

15  521 (2003) (quoting Strickland, 466 U.S. at 690-91); see also Thomas v. Chappell, 678 F.3d

16  1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered

17  tactical if he had "sufficient information with which to make an informed decision"), cert. denied,

18  ___ U.S. ___, 133 S. Ct. 1239 (2013); Reynoso v. Giurbino, 462 F.3d 1099, 1112-1115 (9th Cir.

19  2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money

20  cannot be considered strategic where counsel did not investigate this avenue of impeachment);

21  Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and

22  rejection of mental health defense was not a reasonable strategy where counsel failed to

23  investigate possible mental defenses).

24          Defense counsel's duty to investigate is particularly important in preparing for the penalty

25  phase of a prosecution involving a potential death sentence.  Summerlin v. Schriro, 427 F.3d 623,

26  630 (9th Cir. 2005).  In such a setting, defense counsel should attempt to discover "'all reasonably

27  available mitigating evidence and evidence to rebut any aggravating evidence that may be

28  introduced by the prosecutor.'"  Wiggins, 539 U.S. at 524 (quoting ABA Guidelines for the

1    Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(c),

2    p. 93 (1989)) (emphasis in original).  Mitigating evidence defense counsel should consider

3    includes "medical history, educational history, employment and training history, family and

4    social history, prior adult and juvenile correctional experience, and religious and cultural

5    influences."  Id.  Defense counsel also has a "'duty to investigate and present mitigating evidence

6    of [any] mental impairment'" and substance abuse.  Summerlin, 427 F.3d at 630 (quoting Bean v.

7    Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998) and citing Jennings, 290 F.3d at 1016-17)).

8         This court also recognizes that when determining whether the state court's application of

9    the Strickland standard was reasonable under § 2254(d), the federal court must be "doubly"

10   deferential.  Richter, 562 U.S. at 105.  The "standard for judging counsel's representation is a

11   most deferential one" and the reasonableness standards of § 2254(d) are also "highly deferential."

12   Id.  Applying these standards and for the reasons set forth below, the undersigned finds that

13   petitioner has made a prima facie showing that his trial attorneys acted unreasonably in

14   investigating and presenting evidence at both the guilt and penalty phases of petitioner's trial.

15   Further, the undersigned can discern no reasonable basis for the California Supreme Court to have

16   held otherwise.

17        Throughout the guilt and penalty phases of petitioner's trial, the defense focused on

18   impeaching Virgal Edwards, showing that Osborne was a violent man and the more likely leader

19   of the trio and demonstrating that petitioner was thoroughly drunk so as to support his own

20   testimony that he slept through the killing.  At the penalty phase of petitioner's trial, the defense

21   also raised, but introduced practically no evidence to support, an argument that petitioner had a

22   difficult childhood.  The trial record before this court indicates that defense counsel was effective

23   in impeaching Edwards by demonstrating the many likely falsities in his trial testimony.

24   However, that's where defense counsel's arguable successes end.  Petitioner's version of events

25   presented through his own testimony was inherently suspect because he had every reason to lie.

26   Moreover, petitioner's version of events presented to the jury was, on its face, difficult to

27   swallow.  The idea that petitioner:  (1) recalled where the trio had been that night and what had

28   occurred until shortly before the commission of the crimes;  (2) recalled being awakened and

62

1   moving Mr. Middleton's body; and (3) then fell right back asleep, was destined to be a tough sell

2   under the best of circumstances.  Knowing this, defense counsel needed to support as completely

3   as possible the defense themes of Osborne's violent past and dominance and of petitioner's

4   alcohol use and passive personality type.  Petitioner has shown at this stage of the proceedings

5   that defense counsel's  investigation into these areas was, inadequate.  Not surprisingly then, the

6   evidence presented by the defense to support these critical aspects of the overall defense theory

7   was inadequate as well.

8           It appears that counsel did little to investigate Osborne's violent past.  For example, it

9   does not appear that petitioner's counsel sought or obtained records reflecting Osborne's criminal

10   history.  Nor did they conduct a thorough investigation of the most damning evidence of

11   Osborne's violence, his shooting of his girlfriend in Washington State.  The testimony petitioner's

12   counsel managed to adduce at trial regarding Osborne's violent past was only that which

13   happened to be obtained from the witnesses who had already been called to testify with respect to

14   the commission of the crimes for which petitioner was standing trial.  To support the defense

15   theory that it was Osborne who was the most violent member of the trio and the most likely

16   leader, defense counsel clearly needed to have looked into every corner of Osborne's past.

17           Even more importantly with respect to the guilt phase case, defense counsel missed the

18   opportunity to support the argument that petitioner lacked the ability to either plan and/or take a

19   leadership role in the commission of the crimes.  Petitioner has established that defense

20   investigator Berger told petitioner's counsel that Dr. Strayer, the school psychologist, had

21   examined petitioner when he was fourteen years old and believed that petitioner lacked the

22   intellectual capability to plan and lead the crimes.  Clearly Dr. Strayer's potential testimony had

23   many weaknesses that were apparent prior to the commencement of petitioner's trial.  Dr.

24   Strayer's testimony would likely have carried little weight with the jury because he had had

25   limited contact with petitioner and had last examined him ten years before the commission of the

26   crimes at issue.  However, for all of these same reasons defense counsel had every reason to seek

27   and obtain a contemporaneous mental health/intellectual functioning examination of petitioner.

28   ////

1    In fact, petitioner's counsel was advised to do exactly that and to seek such an

2    examination.  Defense investigator Berger has declared that he recommended to attorney

3    O'Connor that he conduct "IQ and psychological testing of Mr. Riel."  (Berger Decl. (App. 35) at

4    ¶ 8.)   Investigator Berger has also stated that he told attorney O'Connor that he felt "any

5    competent psychologist would probably back up Dr. Strayer's opinion that a man with Mr. Riel's

6    intellectual capability would not be able to plan, formulate, lead, and execute activity such as the

7    robbery and homicide with which Mr. Riel was charged."  (Id. at ¶ 9.)

8    Despite the reasonableness of investigator Berger's advice to counsel, petitioner has

9    shown that defense counsel failed to hire a mental health expert in time to assist with the guilt

10   phase of petitioner's trial.  As noted above, the evidence proffered shows that Dr. Edwards was

11   not hired until the guilt phase of the trial was already underway, did not even interview petitioner

12   until well after the prosecution had begun presenting evidence and did not receive the last of

13   petitioner's test results until March 15, 1988.  The only contact apparent from the record between

14   Dr. Edwards and petitioner's attorneys regarding Dr. Edwards' findings was a report Dr. Edwards

15   stated that he sent to attorney O'Connor on April 7, 1988, after the guilt phase concluded and just

16   days before the beginning of the penalty phase of petitioner's trial.  Moreover, there is no

17   indication in the record before this court that defense counsel ever discussed Dr. Edwards'

18   findings with him prior to petitioner's guilt phase testimony on March 24, 1988 (RT at 6236 et

19   seq.) or prior to the March 17, 1988 in camera discussions with the trial judge about whether or

20   not Dr. Strayer would testify and, if so, what scope of cross-examination would be allowed (RT at

21   5641 et seq.).

22   Respondent focuses on what respondent characterizes as defense counsel's "strategic"

23   decision not to call Dr. Strayer as a witness.  The record does support the notion that defense

24   counsel's strategy was to keep the focus on Osborne and Edwards as the career criminals and

25   primary perpetrators of the crimes.  In this regard, defense counsels' comments during the in

26   camera discussion of the permissible scope of the potential cross-examination of Dr. Strayer

27   makes it clear that they were uncertain what evidence the prosecution might attempt to introduce

28   to suggest that petitioner did in fact have the ability to plan and carry out a crime.  However,

64

1    defense counsels' decision not to call a mental health expert as a defense witness cannot be

2    considered strategic because petitioner has shown that it was based on a less than adequate

3    investigation.  First, petitioner's counsel should have been aware of their client's encounters with

4    law enforcement and what they involved.  Second, if petitioner's counsel had conducted a pre-

5    trial mental health evaluation of their client, they would not have been left with the choice of

6    relying on Dr. Strayer's ten-year-old evaluation of petitioner, which quite possibly carried with it

7    the potential for impeachment with petitioner's juvenile record, or nothing at all.

8           Finally, respondent's argument that petitioner's trial counsel did not make the decision

9    about whether or not petitioner would testify until after the decision not to call Dr. Strayer as a

10   witness is also unpersuasive.  Assuming that to be the case, defense counsels' decision does not

11   reflect sound trial strategy.  Respondent does not explain why defense counsel should not have

12   been able to make the determination of whether petitioner would testify in his own defense much

13   earlier.  Had they done so, they would not have had to be concerned that Dr. Strayer could be

14   impeached with petitioner's prior convictions.

15          There is also no indication in the record before this court that petitioner's counsel pursued

16   any investigation of the other issues raised with them by defense investigator Berger.  Those

17   issues appeared to call out for such investigation and would have been highly relevant to creating

18   a case at both phases of petitioner's trial – petitioner's lifetime of alcohol abuse and his low

19   intellectual functioning.  Nor does the evidence show that trial counsel directed investigator

20   Berger to conduct more than the most limited investigation into petitioner's background.  With

21   respect to family and friends, the record reflects that Berger spoke to only petitioner's mother and

22   older sister Roslyn.  Investigator  Berger himself made clear that he believed even those two

23   interviews to have been inadequate.  Specifically, investigator Berger told trial counsel that he felt

24   petitioner's mother was not being candid and that he had only spoken to Roslyn primarily about

25   petitioner's post-crime visit to her.  Moreover, investigator Berger recommended to counsel a

26   specific course of investigation in pursuit of evidence to support the defense theme that petitioner

27   had not been the leader in the commission of the charged crimes.  Petitioner's mother told Berger

28   that petitioner's "cousin, Laurie Burns, might be able to provide information regarding Chap's

1   behavior while intoxicated and his lack of aggressive behavior." (Berger Decl. (App. 35) at ¶6.)

2   Yet, no further defense investigation was directed or conducted.

3          The only other two people investigator Berger apparently interviewed about petitioner's

4   family and social history were Ardell Morgan, the principal of the school petitioner attended for

5   less than a full school year, and Dr. Strayer, the psychologist at that school.  Indeed, at the penalty

6   phase of petitioner's trial, Morgan testified that she was surprised to be asked to testify because

7   she had known petitioner for such a limited period of time.   As discussed above, Dr. Strayer's

8   potential testimony suffered similar problems.

9          Just because the jury may have disbelieved Edwards did not mean that they believed

10  petitioner's testimony.  Any reasonable defense attorney would have conducted investigation in

11  an attempt to support the defense's guilt phase themes regarding the backgrounds of Osborne and

12  petitioner.  Further, petitioner has presented evidence showing that the defense investigation

13  conducted was not even remotely sufficient to satisfy counsel's duty to have the information

14  necessary to make sound, informed decisions about how to show the jury that petitioner's "moral

15  culpability" for the charged crimes was less than his legal culpability.  See Porter v. McCollum,

16  558 U.S 30, 41 (2009) (Mitigation should "humanize [the defendant] or allow [the jury] to

17  accurately gauge his moral culpability.")

18         The Ninth Circuit Court of Appeals has held that "when 'tantalizing indications in the

19  record' suggest that certain mitigating evidence may be available, those leads must be pursued."

20  Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365

21  F.3d 706, 719-20 (9th Cir. 2004)).  Here, petitioner shows that his trial counsel had more than

22  merely "tantalizing indications" of potential mitigation evidence before them.  Investigator

23  Berger suggested numerous avenues for further investigation of potential mitigating evidence.

24  From the record before the California Supreme Court and this federal habeas court, it can be

25  concluded  that petitioner's counsel simply ignored those suggestions.  Courts examining similar

26  failures on the part of defense counsel have found that counsel acted unreasonably within the

27  meaning of Strickland.  As in Summerlin, in this case defense counsel was aware that petitioner

28  had mental health issues based on Dr. Strayer's opinion and petitioner's history of substance

1    abuse and alcohol consumption on the day of the crime, but failed to conduct any timely

2    investigation of petitioner's mental health.  See Summerlin, 427 F.3d at 632.  Moreover,

3    petitioner's counsel had an "affirmative duty" to provide a mental health expert "with information

4    to develop an accurate profile of the defendant's mental health."  Caro v. Woodford, 280 F.3d

5    1247, 1254-55 (9th Cir. 2002) (citing Wallace v. Stewart, 184 F.3d 1112, 1119 (9th Cir. 1999)).

6    Here, the record before this court shows that defense counsel did not provide Dr. Edwards with

7    any information about either petitioner himself or the crimes he was charged with committing.

8          Case law is also clear that counsel acts unreasonably by relying on argument, as opposed

9    to evidence.  See Wiggins v. Smith, 539 U.S. 510, 526 (2003).  Here, his counsel attempted to

10   argue petitioner could not have been the leader of the group, but failed to support that argument

11   with anything but a showing that Osborne had a violent history.  At the penalty phase, defense

12   counsel merely argued that petitioner had learning challenges and a difficult childhood, but failed

13   to support these arguments with anything but isolated evidence of his learning problems and only

14   minimal and indirect evidence of his social and family background.

15         The standards governing defense counsel's conduct and performance were "clearly

16   established" at the time of petitioner's trial in 1988.  The United States Supreme Court noted in

17   Wiggins that it has "long referred" to the American Bar Association's ("ABA") standards for

18   criminal defense work "as 'guides to determining what is reasonable.'"  539 U.S. at 524 (quoting

19   Strickland, 466 U.S. at 688 and citing Williams, 529 U.S. at 396).  See also Rompilla v. Beard,

20   545 U.S. 374, 387 & n. 7 (2005) (quoting Wiggins, 539 U.S. at 524).  In Williams, the Supreme

21   Court referred to the 1980 version of the ABA standards in determining defense counsel's duty to

22   investigate in preparation for a capital case penalty phase.  529 U.S. at 396.  Those standards had

23   been in place well before petitioner's trial commenced.

24         In Porter, the Court considered the reasonableness of counsel's conduct in preparing for a

25   penalty phase which was conducted in 1988, the year of petitioner's trial in this case.  558 U.S. at

26   32. In Porter, the penalty phase defense consisted only of the testimony of one witness and

27   amounted to "inconsistent testimony about [petitioner] Porter's behavior when intoxicated and

28   testimony that Porter had a good relationship with his son."  558 U.S. at 32.  The Supreme Court

67

1    first noted that, "[i]t is unquestioned that under the prevailing professional norms at the time of

2    Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's

3    background.'"  Id. at 39 (quoting Williams, 529 U.S. at 396).  The Court concluded that defense

4    counsel's conduct in preparing for the penalty phase was unreasonable, explaining:

5                    [Counsel] ignored pertinent avenues for investigation of which he
                    should have been aware.  The court-ordered competency
6                    evaluations, for example, collectively reported Porter's very few
                    years of regular school, his military service and wounds sustained
7                    in combat, and his father's "over-disciplin[e]."  Record 902–906.
                    As an explanation, counsel described Porter as fatalistic and
8                    uncooperative.  But he acknowledged that although Porter
                    instructed him not to speak with Porter's ex-wife or son, Porter did
9                    not give him any other instructions limiting the witnesses he could
                    interview.
10

11   Id. at 40.

12          At the time of petitioner's trial in 1988, there can be no question that standards for

13   reasonable attorney conduct required investigation into potential support for known defenses and

14   a far more thorough investigation of petitioner's background than was conducted by attorneys

15   O'Connor and Schwartz.  Cf., Porter, 558 U.S. at 39.  Petitioner has made a substantial showing

16   that this is not a case in which defense counsel drew a reasonable line because "they [had] good

17   reason to think further investigation would be a waste."  Rompilla, 545 U.S. at 383 (citations

18   omitted).

19          It is also the case here that trial counsel's apparent failure to conduct the investigation

20   necessary to support the guilt phase and penalty phase defenses cannot be "rationalized on any

21   tactical ground."  Stankewitz v. Wong, 698 F.3d 1163, 1172-73 (9th Cir. 2012).   In short,

22   petitioner made a prima facie showing that his trial attorneys acted unreasonably and

23   ////

24   ////

25   ////

26   ////

27   ////

28   ////

68

1    ineffectively.  The California Supreme Court could not reasonably have held otherwise based

2    upon the record in this case.[22]

3                              b.  Prejudice

4          To demonstrate what the penalty phase defense could have been had his trial counsel

5    acted reasonably, petitioner proffers evidence of his social and family history, his mental health

6    history, his alcoholism and drug abuse, and evidence of Osborne's capacity for violence.

7                       i.      Evidence that Could have been Presented

8                          (a)  Social and Family History

9          Petitioner presented the state court with the declarations of numerous witnesses who, had

10   they been contacted, would have been able to testify about petitioner's social and family history.

11   Petitioner's background and cognitive impairments are also described in the declarations of Drs.

12   Pettis and Froming, Appendices 1 and 2 to the 1999 State Habeas Petition.[23]  The social and

13   family history evidence is summarized below in this section.  Evidence petitioner submitted

14   regarding his problems with alcohol abuse and his mental impairments is described in separate

15   sections below.

16         Petitioner was born into a family with an extensive history of substance abuse and

17   intellectual limitations on both sides.  In addition, petitioner's mother's side of the family showed

18   symptoms of depression.  Petitioner's father, Al Riel, grew up with an alcoholic father who

19   regularly beat him, his mother and his brother.  (Feb. 21, 1998 Decl. of Charles ("Charlie") Riel

20   (petitioner's uncle) (App. 5 to 1999 State Pet.) at ¶¶ 7, 10.)  Al Riel dropped out of school in the

21   10th grade.  (Id. at ¶ 16.)  Many people in petitioner's mother's, Yvonne "Vonnie" Southard

22   _____

23   [22]  Petitioner also argues that, for various reasons, the California Supreme Court made an
     unreasonable determination of the facts under § 2254(d)(2).  For example, petitioner contends that
     the California Supreme Court's failure to fund a "standard-of-practice" or "Strickland" expert

24   was unreasonable.  Because the undersigned finds that, whether based upon an unreasonable
     construction of the law or the facts, the California Supreme Court could not have determined

25   counsel acted reasonably, the undersigned need not determine whether the state court's funding
     decision implicated concerns under § 2254(d)(2).

26

27   [23]  Petitioner also appended the Pettis and Froming declarations to his motion for an evidentiary
     hearing in this court.  (ECF No. 159.)  For ease of reference, the court cites to their electronic

28   filing numbers herein.

                                         69

Riel's, family also had problems with alcohol.  (Apr. 15, 1995 Decl. of Josephine Southard (petitioner's maternal grandmother) (App. 4 to 1999 State Pet.) at ¶¶ 3, 5 and 6.)  Vonnie Riel's sister, Mary, died at age 53 of "Sepsis," "Cirrhosis," and "Chronic Alcoholism."  (Cert. of Death for Mary Rice (App. 48 to 1999 State Pet.).)  Vonnie Riel's mother suffered from depression.  (J. Southard Decl. (App. 4) at  ¶¶ 8, 9.)  When she was 17 years old, Vonnie ran away from home to marry Al Riel.  (Id. at ¶ 11.)

Vonnie became depressed immediately after petitioner, her third child, was born.  (Id. at ¶ 13.)  Petitioner lived with his grandparents for the first four months of his life.  (Id.)  According to his siblings, his mother later told him she had wanted to give petitioner up for adoption when he was born.  (Jan. 15, 1999 Decl. of Roslyn Walker (petitioner's sister) (App. 8 to 1999 State Pet.) at ¶ 42; Feb. 2, 1998 Decl. of Thomas Riel (petitioner's brother) (App. 7 to 1999 State Pet.) at ¶ 20. )  Roslyn took care of petitioner after he was born because "Mom cried a lot and stayed in her room."  (Id. at ¶ 43.)  Rosyln also recalled that later her mother "took tranquilizers" and "seemed depressed."  (Id. at ¶ 22.)

Petitioner's parents "fought every day," screaming and yelling at each other and throwing things.  (R. Walker Decl. (App. 8) at ¶ 25; T. Riel Decl. (App. 7) at ¶ 7; Aug. 25, 1998 Decl. of David Bailey (App. 20 to 1999 State Pet.) at ¶ 2.)  They both spanked and hit the children, sometimes with belts, switches, or kitchen implements; and sometimes for no apparent reason.  (R. Walker Decl. (App. 8) at ¶¶ 27-31; T. Riel Decl. (App. 7) at ¶¶ 8, 9.)  Petitioner's childhood friend Brett Kee recalled petitioner showing him welts where his father had beaten him.  (Oct. 28, 1998 Decl. of Brett Kee (App. 13 to 1999 State Pet.) at ¶ 12.)  Petitioner's grandmother recalled that Al "screamed constantly at Vonnie and the children."  (J. Southard Decl. (App. 4) at ¶ 15; see also Feb. 3, 1998 Decl. of Shannon Rivera-Sartore (App. 15 to 1999 State Pet.) at ¶¶ 13, 15; Oct. 27, 1997 Decl. of Peggy Ajax (App. 14 to 1999 State Pet.) at ¶ 6.)  "He was especially mean to [petitioner]; I think he was harder on [petitioner] than on either of his other children."  (Id.)  According to Roslyn, petitioner did not speak to his father until he was about five years old.  (R. Walker Decl. (App. 8) at ¶ 44.)  "As soon as Dad walked into the house, he stopped talking."  (Id.)

1   The family moved frequently and sometimes lived in very poor conditions.  (R. Walker

2   Decl. (App. 8) at ¶¶ 14, 15, 19, 20.)  Petitioner and his siblings all had problems in school.[24]

3   Rosyln had psychological testing in school and was labeled "dull normal."  (Oct. 28, 1968 Psych.

4   Rpt. of Roslyn Riel (App. 48 to 1999 State Pet.).)  She dropped out of school in the 11th grade.

5   (R. Walker Decl. (App. 8) at ¶ 37.)  Tom was placed in special education classes when he was a

6   young teen.  (T. Riel Decl. (App. 7) at ¶ 36.)  He dropped out of school when he was 17.  (Id. at ¶

7   37.)  Petitioner struggled in school.  (Nov. 5, 1997 Juanita Martin Decl. (App. 12 to 1999 State

8   Pet.) at ¶ 11.)  In 1971 when petitioner was nine years old, testing at school showed that he had an

9   IQ of 76.  (Petitioner's School Records (App. 37 to 1999 State Pet.).)  Wayne Munn, a leader for

10  a church-affiliated boys' group in which petitioner participated, stated that petitioner and his

11  brother "seemed extremely distracted and unable to sit still and concentrate and focus in the

12  Sunday School class, much more so than other boys their age.  They seemed always on edge,

13  ready to react to anything.  You almost wanted to give them tranquilizers."  (Oct. 23, 1997 Decl.

14  of Wayne Munn (App. 11 to 1999 State Pet.) at ¶ 2.)

15      David Cummings, petitioner's parole officer in Washington State declared that petitioner

16  was "one of the least intelligent clients I supervised.  I don't think he could plan a trip to

17  Bremerton and back to his home in Kingston."  (Oct. 7, 1998 Decl. of David Cummings (App. 23

18  to 1999 State Pet.) at ¶ 7.)

19      A number of people, who knew petitioner in different contexts, would have testified that

20  petitioner was a follower, not a leader.  (J. Southard Decl. (App. 4) at ¶ 26; J. Martin Decl. (App.

21  12) at ¶ 12; S. Rivera-Sartore Decl. (App. 15) at ¶ 4; D. Bailey Decl. (App. 20) at ¶ 7; L. Dutton

22  Decl. (App. 16) at ¶ 13; Jan. 13, 1999 Decl. of Randy Newman (App. 21 to 1999 State Pet.) at ¶

23  10; B. Kee Decl. (App. 13) at ¶¶ 5, 6; Feb. 3, 1998 Decl. of David DeChand (App. 22 to 1999

24  State Pet.) at ¶ 6; May 20, 1999 Decl. of Bertha Fleming (App. 18 to 1999 State Pet.) at ¶ 4; Jan.

25

26  [24] Dr. Pettis described in some detail petitioner's siblings' educational, psychological and
    substance abuse problems in his declaration.  (ECF No. 159-1 at 36-42.)  In summary, Roslyn

27  Walker often feels depressed, has been suicidal and had a nervous breakdown in 1984 or 1985.
    (R. Walker Decl. (App. 8) at ¶¶ 74-82.)  Her brother Tom "beats his wife" and had other instances

28  of violence.  (Id. at ¶¶ 95, 96.)

1    31, 1998 Decl. of Paul Naslund (App. 24 to 1999 State Pet.) at ¶ 3; P. Ajax Decl. (App. 14) at ¶¶

2    14, 16.)  He often "got blamed for lots of stuff that he didn't do." (R. Walker Decl. (App. 8) at ¶

3    54; see also P. Ajax Decl. (App. 14) at ¶ 17.)  Wayne Munn, the church youth leader, described

4    petitioner as always "eager to please other people, so he was easily influenced and manipulated."

5    (W. Munn Decl. (App. 11) at  ¶ 8.)  Petitioner's mother's cousin, Lael Richards, said people

6    called petitioner "Chump" because he was "naïve and gullible."  (Feb. 8, 1999 Decl. of Lael

7    Richards (App. 25 to 1999 State Pet.) at ¶ 7.)   Former parole officer Cummings stated that he

8    does not "believe [petitioner] has the intellectual ability or the personality style to be able to lead

9    anyone anywhere."  (D. Cummings Decl. (App. 23) at ¶ 7.)

10          Petitioner was also considered to be sensitive about the death of animals and many

11   mentioned that he was not violent and could not stand the sight of blood.  (R. Walker Decl. (App.

12   8) at ¶¶ 57, 58; J. Southard Decl. (App. 4) at ¶¶ 24, 25; C. Riel Decl. (App. 5) at ¶ 35; S. Rivera-

13   Sartore Decl. (App. 15) at ¶ 11; D. Bailey Decl. (App. 20) at ¶ 8.)  Tom Riel stated that petitioner

14   would walk away rather than get into a fight when he was upset.  (T. Riel Decl. (App. 7) at ¶ 44;

15   see also R. Newman Decl. (App. 21) at ¶12.)  Shannon Rivera-Sartore felt that it was "hard to get

16   [petitioner] to fight back.  Quite often that was because [petitioner] was too drunk to defend

17   himself."  (S. Rivera-Sartore Decl. (App. 15) at ¶ 9.)  Petitioner was described as "quiet," "shy,"

18   "passive" and "submissive."  (R. Walker Decl. (App. 8) at ¶ 53; L. Richards Decl. (App 25) at ¶

19   7; D. Bailey Decl. (App. 20) at ¶ 8; P. Ajax Decl. (App. 14) at ¶ 14.)  Roslyn knew Virgal

20   Edwards.  (R. Walker Decl. (App. 8) at ¶ 101.)  She felt Edwards was "like a brother" to

21   petitioner.  (Id. at ¶ 105.)  Roslyn found petitioner to be "mellow and quiet and passive," while

22   Edwards was "more outspoken and high-strung."  (Id.)

23          Petitioner also presented the state court with evidence about his prior criminal activity.

24   Dr. Pettis described that background in his declaration.  Petitioner was first arrested at age 13 for

25   siphoning gas.  (Pettis Decl. (ECF No. 159-1) at ¶ 99.)  When he was 15 or 16 years old, he was

26   arrested for burglarizing a store at night to steal wine and candy.  (Id.)  When he was 17, he and a

27   ////

28   ////

1   friend[25] had been drinking, hot-wired a truck and drove it until it ran out of gas.  (Id. at ¶ 100.)

2   Then, they found a car in a café parking lot with the keys in the ignition.  (Id.)  Petitioner drove

3   that car until the police started pursuing them.  (Id.)  Both boys got out of the car and attempted to

4   run away.  (Id.)  Petitioner admitted his involvement in the offenses and was sentenced in juvenile

5   court to probation, community service, limited confinement, and alcohol counseling.  (Id.)  While

6   awaiting sentencing, petitioner was arrested for drunk driving.  (Id.)  Three weeks after his

7   sentencing, petitioner was cited for possession of alcohol in violation of his probation, resulting in

8   ten additional days of confinement being imposed.  (Id.)

9        Later that year, petitioner was driving while drunk in a friend's father's car and hit a tree.

10  (Id. at ¶ 101.)  A 1985 pre-parole report notes that petitioner did not suffer the full consequences

11  of many things because his parents often intervened and attempted to protect him.  (Pre Parole

12  Inv. Rpt. of the Wash. Dept. of Corrections (App. 42 to 1999 State Pet.).)   About two years later,

13  in 1981, petitioner, then 19 years old, and a friend broke into a liquor store and stole several

14  bottles of liquor.  (Id. at ¶ 105.)  Petitioner's brother Tom was outside waiting in the car.  (Id.)

15  Petitioner pled guilty to second-degree burglary and was given a three-year deferred sentence

16  with probation conditions including 30 days in jail.  (Id.)  Alcohol treatment and GED classes

17  were conditions of petitioner's probation, but he did not follow through by performing those

18  conditions.  (Id. at ¶ 106.)  In 1982, petitioner was arrested twice for drunk driving.  (Id.)  He was

19  also arrested for failing to appear for a review hearing in a paternity action brought by his former

20  girlfriend.  (Id.)

21        Later in 1982, petitioner and a friend broke into a closed restaurant and stole liquor and

22  money.  (Id. at ¶ 108.)  Petitioner's friend told officers that petitioner had admitted three other

23  recent burglaries.  (Id. at ¶ 109.)  Petitioner was charged with four counts of burglary.  He pled

24  guilty to the burglary of the restaurant on the condition that the other charges be dropped.  (Id.)

25  He was sentenced to ten years in state prison for that burglary and, based on the revocation of his

26  ////

27  _____

28  [25]  Petitioner's friend had numerous prior arrests, including burglary and auto theft.  (Pettis Decl.
     (ECF No. 159-1) at ¶ 100.)

1   probation for the prior burglary, was given a concurrent ten-year prison sentence for that case.

2   (Id.)

3        Petitioner entered the Washington state prison system in late 1982.  (Id. at ¶ 123.)  At one

4   point, he and other inmates attended AA meetings outside the facility.  (Id. at ¶ 124.)  On one of

5   these trips, petitioner and another inmate visited a woman friend rather than attending AA.  (Id.)

6   The next day, petitioner and the other inmate were arrested in Oregon in a stolen truck.  (Id.)

7   About a year later, petitioner was caught leaving a work release facility with several other

8   inmates to get alcohol at a nearby store.  (Id. at ¶ 126.)

9        Petitioner was paroled in 1985.  (Id. at ¶ 128.)  He spent the first month of his parole in an

10   alcohol treatment facility.  (Id.)  However, as described below, petitioner's sister and several

11   friends stated that petitioner began drinking again immediately thereafter.

12        In early 1986, petitioner was returned to prison for thirty days for violating his parole.  (Id.

13   at ¶ 135.)  According to Dr. Pettis, petitioner "came to the defense of a woman who was being

14   harassed in a bar, then drove to Roslyn's home in Klamath Falls, Oregon with the woman and a

15   rifle, resulting in violations for drinking, possession of a firearm and leaving the state without

16   permission."  (Id.)

17           (b)  Mental Health

18        Dr. Pettis opined that petitioner suffers from Dysthymic Disorder, Alcohol Dependence,

19   organic brain damage, learning disorders and symptoms consistent with Post-Traumatic Stress

20   Order.  (Dr. Pettis Decl. (ECF No. 159-1) at ¶ 142.)  Dr. Pettis found that petitioner's alcohol

21   abuse and "chaotic and dysfunctional" environment in which he was raised, among other things,

22   "contribute to the organic brain damage and subsequent cognitive difficulties that [petitioner] has

23   endured his entire life."  (Id. at ¶ 148.)  The pervasive verbal and physical assaults petitioner

24   suffered and witnessed growing up, his parents' neglect and their chaotic household lead Dr.

25   Pettis to conclude that petitioner suffers from PTSD and depression.  (Id. at ¶¶ 155-157.)  Dr.

26   Pettis found petitioner's substance abuse "played a central role in his developmental problems."

27   (Id. at ¶ 158.)  Dr. Pettis also notes that petitioner's legal problems occurred during periods of

28   intoxication.  (Id. at ¶ 159.)

1     According to Dr. Pettis, Dr. Froming's testing showed organic impairments in the frontal

2  lobe of petitioner's brain, which is responsible for executive functions like planning and problem

3  solving.  (Id.)  Dr. Pettis found these results to be consistent with reports that petitioner was

4  passive and "where in his haste to 'belong' and please others, [petitioner] was unable to make

5  independent decisions and weigh risks and outcomes of his participation."  (Id.)  Further, the

6  emotional neglect petitioner suffered as a child left him "starved for affection and approval."  (Id.

7  at ¶ 160.)

8     Dr. Pettis also reported the results of his mental status examination of petitioner.  He

9  found petitioner to be "passive and deferential."  (Id. at ¶ 164.)  Neuropsychological testing

10  administered by Dr. Froming revealed the same.  (Froming Decl. (ECF No. 159-2) at ¶¶ 35, 40.)

11  In addition, Dr. Froming found petitioner's brain impairment to be in the "moderate range of

12  severity."  (Id. at ¶ 24.)  Petitioner has a "substantial memory disorder for the events, chronology,

13  and participation of the various characters during the crime."  (Id. at ¶ 39.)  His "ability to plan,

14  organize, and initiate a plan of action is significantly impaired.  Rather, his impairments in

15  cognitive functioning mark him as a person that is unusually easy to manipulate and lead. . . .

16  [Petitioner] was lacking in both the ability and the temperament to plan or organize activities or to

17  assume a leadership role among his peers."  (Id. at ¶ 40.)

18     Dr. Pettis concluded by explaining his diagnoses.  Dysthymic Disorder is a "long-term,

19  chronic, depressed mood."  (Pettis Decl. (ECF No. 159-1) at ¶ 165.)  Petitioner's PTSD caused

20  him to avoid conflict and self-medicate with alcohol.  Petitioner's impaired judgment due to his

21  neurocognitive impairments "made it difficult to weigh the risks, benefits, and outcomes of his

22  involvement" in criminal behavior.  (Id. at ¶ 168.)  Dr. Pettis could have testified that "it is

23  inconsistent with [petitioner's] character and development to have organized and/or provided

24  leadership in the events of November 2, 1986."  (Id. at ¶ 169.)  He further opined that "any

25  reasonably competent medical professional would have advised [petitioner's] counsel against

26  having [petitioner] testify at trial."  (Id. at ¶ 170.)  Dr. Pettis was also of the opinion that

27  petitioner's memory impairments made his recollection suspect and it is likely he attempted to fill

28  in the gaps as suggested by others.  According to Dr. Pettis, these impairments would have

1   affected petitioner's ability to participate in his defense and should have been used to challenge

2   the inference that petitioner adopted admissions made by his co-defendants.  (Id. at ¶¶172, 173.)

3   Dr. Froming reached similar conclusions.  (Froming Decl. (ECF No. 159-2) at ¶¶ 41, 42.)

4                              (c)  <u>Alcoholism and Drug Abuse</u>

5          Related to petitioner's mental health, and relevant to petitioner's guilt phase testimony

6   that he was sleeping during the robbery and kidnapping, is petitioner's history of alcohol abuse.

7   Dr. Pettis opined that petitioner's alcohol abuse was severe and that petitioner abused alcohol to

8   self-medicate for dysthymic disorder and post-traumatic stress disorder.  (Pettis Decl. (ECF No.

9   159-1) at ¶¶ 158, 165, 166.)  Petitioner has presented declarations from a number of people who

10  could have testified at trial as to his history of substance abuse.

11         Roslyn Walker could have testified that petitioner started drinking at a very young age and

12  started smoking marijuana when he was twelve years old.  (R. Walker Decl. (App. 8) at ¶ 60.)

13  Petitioner did not get violent when he drank.  (Id.)  Tom Riel stated that by the time petitioner

14  was twenty, "it took lots of alcohol to make him drunk."  (T. Riel Decl. (App. 7) at ¶ 41.)  "When

15  [petitioner] was drunk, he passed out and it was impossible to wake him up.  That happened lots

16  of times. . . .  I used to light firecrackers and throw them next to his bed and he still didn't wake

17  up."  (Id.)

18         David Bailey, one of petitioner's "best friends" during petitioner's teen years, stated

19  bluntly that petitioner "was a drunk."  (D. Bailey Decl. (App. 20) at ¶ 6.)  "Every time I saw him

20  since he was 14 years old, he was drinking.  He drank until he passed out . . . .  When [petitioner]

21  was drunk, he wasn't real bright; he seemed almost brain dead."  (Id.)  Petitioner's friend and

22  former sister-in-law Shannon (Forsman) Rivera-Sartore stated that petitioner drank heavily when

23  he was an older teen, "almost constantly."  (S. Rivera-Sartore Decl. (App. 15) at ¶ 2.)  Petitioner's

24  girlfriend Lori Dutton, with whom he lived for about two years, recalled that petitioner "drank

25  anything that was available, including NyQuil . . . .  Drinking was a way of life for him."  (L.

26  Dutton Decl. (App. 16) at ¶ 9.)  Petitioner was "never violent" when he drank and would "pass

27  out."  (Id.; see also P. Woodall Decl. (App. 17) at ¶¶ 9, 11; R. Newman Decl. (App. 21) at ¶¶ 5, 6,

28  8; D. DeChand Decl. (App. 22) at ¶¶ 4, 5.)  Bertha Fleming states that petitioner "drank until the

                                          76

1    beer ran out or until he passed out." (B. Fleming Decl. (App. 18) at ¶ 8.) According to another

2    teenage friend, Pam Woodall, petitioner often "blacked out and after he woke up he couldn't

3    remember what he'd done." (P. Woodall Decl. (App. 17) at ¶ 9; see also B. Fleming Decl. (App.

4    18) at ¶ 9.)

5           After he was released from imprisonment at McNeil Island, petitioner started drinking

6    every day. (R. Walker Decl. (App. 8) at ¶ 100; D. Bailey Decl. (App. 20) at ¶ 10.) Petitioner's

7    friend Randy Newman saw petitioner at a bar the day he was released from prison. (R. Newman

8    Decl. (App. 21) at ¶ 14.) Newman recalled that later petitioner "was still pretty much the same as

9    he had always been: real mellow, and drinking heavily. The pattern was just the same as it had

10   been a few years before. He drank a few beers and then passed out." (Id.)

11          In the summer of 1986, petitioner began using methamphetamine. (Dr. Pettis Decl. (App.

12   159-1) at ¶ 139.)

13          In addition to petitioner's family's history of alcohol abuse, petitioner's siblings also

14   became substance abusers. Roslyn has struggled with drug abuse and addiction much of her life.

15   (Id. at ¶¶ 90, 91.) Tom Riel "became an alcoholic and a drug addict." (Id. at ¶ 94.) When he

16   was in the army, Tom's "drinking got in the way" of doing his job. (T. Riel Decl. (App. 7) at ¶

17   39.)

18                          (d)   Evidence re Osborne's Capacity for Violence

19          As described above, petitioner's counsel adduced limited testimony at trial regarding

20   Osborne's shooting of his girlfriend in 1980. The primary witness to testify at trial was Irene

21   Poehler, who was present at the time of that shooting. With his state habeas petition, petitioner

22   presented a declaration from Poehler describing Osborne's abuse of his girlfriend and the crime in

23   greater detail:

24                  I was also present when John Osborne shot his girlfriend Barbara
                    Smith. Barbara's nickname was "Babs." Babs was very young
25                  when she met John, probably in her late teens or early twenties.
                    She was very nice and pretty and really deserved better. Babs and
26                  John met in jail. John frequently abused Babs. The night Babs was
                    killed, Babs and John had been arguing. John was very drunk.
27                  John accused her of having been with another man. He got mad at
                    her because of this and shot Babs in the face with a shotgun. The
28                  shotgun blast blew her chin and skull off. I remember him saying

                                                    77

1
2

> something like "let the bitch cry," when she begged him not to do it.  Later I heard that he said that Babs had to be killed because she had cheated on him.  I know that Babs did nothing to deserve to die.

3  (Nov. 9, 1999 Decl. of Irene Poehler (App. 31 to 1999 State Hab. Pet.) at ¶ 6.)

4        Poehler described other incidents of Osborne's violence.  She recalled one occasion when

5  Osborne "smashed a man in the face with his fist, just because he did not like the look of him."

6  (Id. at ¶ 5.)  He also "raped a girl on one occasion when he was drunk."  (Id.)  Poehler also

7  described Osborne's use of methamphetamine.  (Id. at ¶ 8.)  She stated that Osborne had been on

8  a "methamphetamine run" in the days before Mr. Middleton was killed.  (Id. at ¶ 9.)  She said

9  Osborne had also been drinking a lot during that time, had not slept and "was edgy and angry."

10  (Id.)  She described an incident a day or so before Mr. Middleton's murder in which Osborne

11  broke his toe when he kicked a coffee table during a fight with his girlfriend Pam Silkwood.  (Id.)

12  Poehler also stated that she was aware Osborne was short on money during that time.  (Id. at ¶

13  10.)  Finally, Poehler stated in her declaration that she was never interviewed by petitioner's trial

14  attorneys prior to petitioner's trial.  (Id. at ¶ 12.)

15        Petitioner also presented the state court with Osborne's police and prison records.  Those

16  records included investigative reports from the shooting of Barbara ("Babbs") Smith, including a

17  transcript of a police interview with Osborne shortly after he was arrested for the shooting, and

18  statements from Irene Poehler, Wes Coley and James Berndt.   (App. 51 to 1999 State Pet. at pp.

19  22-H-8 to 22-H-35.[26])  Those records also reflected that Irene Poehler had changed her story to

20  the police regarding the shooting numerous times.  (Id. at pp. 22-H-92 to 22-H-93.)  In the written

21  statement she provided, she told police the following about what happened the night Osborne

22  killed Smith:

23
24
25
26

> JOHN [Osborne] was drunk when he got home.  We played cards for a while in the house.  Then JOHN got a gun and was going over to ERNIE and CORKY'S, across the street.  The gun he had was long, and took big bullets.  He was showing off his gun to ERNIE.  When he got back, he was pissed off at BABBS.  He told her to go outside, and he, JOHN, and BABBS went outside.  JOHN was carrying the gun and kind of booted BABBS out the door.  He

27
28

---

[26]  Portions of Appendix 51 contain handwritten page numbers in the bottom right corner.  These are cited herein where possible.

1
2
3
4
5
6

> went outside after her.  She was mad because JOHN was drunk and had the gun.  When they got outside they went over toward the old green car in the yard.  She said, "John, knock it off."  I saw them both struggling with the gun.  Then I heard one loud shot.  Then he fell to his knees outside and then got up and threw the gun on the ground.  JOHN came in the house saying "I didn't mean to do it."  He was puking and crying.  JOHN said something like "Let the bitch cry."  After the shot, I couldn't see BABBS because it was too dark.  JOHN said, "I blew her away," and "There's nothing left of her head."

7
8

(Id. at pp. 22-H-27 to 22-H-28.)  Poehler stated that afterwards everyone "was panicky" and they left the house.  (Id. at 22-H-28.)

9
10
11
12
13
14
15

The records submitted also show that Osborne was convicted of first degree manslaughter in connection with Smith's shooting.  (Id.)[27]  In a memorandum to the sentencing judge and the Board of Prison Terms and Paroles, the prosecutor described the events culminating in Smith's death.  According to the prosecutor, Osborne was intoxicated that evening and had been showing several people a new gun he had purchased.  Osborne fired his gun into the air at one point.  He returned to Wes Coley's house where he, Ms. Smith and Ms. Poehler had been residing.  The four of them were in the residence, as well as James Berendt.  (Id. at p. 33-B-17,18.)

16
17
18
19
20
21
22

> [Osborne] had been intoxicated and continued consuming liquor.  An argument ensued between [Osborne] and the victim.  [Osborne] pointed the shotgun at the victim and shouted, "Bitch, get outside."  The victim began crying and repeated several times, "What did I do?"  [Osborne] ordered the victim to shut up and subsequently kicked her out of the door of the residence.  The victim ran from the residence.  The witnesses inside the residence heard the victim state, "John, knock it off."  The victim continued crying while pleading with [Osborne] to put the gun away; however, [Osborne] stated, "Let the bitch cry."  [Osborne] fired one round, striking the victim in the head and blowing away the upper right portion of her head, killing her instantly.  [Osborne] returned to the residence crying, repeating several times, "It was an accident."

23
24
25
26

(Id. at 33-B-18.)  In a 1984 Criminal History Summary, Osborne's criminal record shows only a 1975 arrest for breaking and entering, for which he received a one-year deferred sentence, and an arrest for arson, which charge was dismissed for lack of sufficient evidence.  (Id. at 33-B-7.)  The record before the state court does show several police visits in 1986 to Pam Silkwood's apartment

27
28

---

[27]  Unfortunately, there is no consecutive pagination in Appendix 51.  The referred to document, and many others, are simply part of the extensive mix of documents included in that appendix.

79

1  in Weed to investigate complaints that Osborne was loudly arguing with Silkwood.  (Id.)  Some

2  of those interactions with police resulted in arrests.  Osborne's prison records also show

3  numerous disciplinary write-ups involving drugs and alcohol and one for assaulting a correctional

4  officer.  (Id.)

5      The records petitioner provided support the connection between Osborne's acts of

6  violence and his abuse of alcohol.  The killing of Barbara Smith and Osborne's other prior run-ins

7  with law enforcement appear to have been fueled by alcohol and possibly drugs.  In fact, a prison

8  psychological report dated February 1984 noted that Osborne's crimes were related to alcohol

9  consumption and concluded that "Mr. Osborne, while under the influence of intoxicating

10  beverages, should be considered extremely dangerous."  (App. 62 (sealed[28]) to 1999 State Pet. at

11  3.)  The examining psychologist also diagnosed Osborne with anti-social personality disorder.

12  (Id. at 2.)

13          ii.      Discussion of Prejudice

14      Petitioner can only succeed on a claim of ineffective assistance of counsel if he shows that

15  counsel's actions prejudiced him.  Under Strickland, to establish prejudice petitioner must show a

16  reasonable possibility that, absent counsel's errors, the result of the proceedings would have been

17  different.  The undersigned must therefore examine how counsel's errors affected petitioner with

18  respect to each decision made by the jury:  petitioner's guilt of first degree murder, guilt of the

19  special circumstances, and death verdict.  For purposes of the present examination of petitioner's

20  claims under § 2254(d), the question is whether the California Supreme Court unreasonably held

21  that petitioner failed to make a prima facie showing that his trial counsel's conduct prejudiced

22  him with respect to each of those verdicts.

23          (a)  Prejudice at the Guilt Phase

24      As described above in the discussion of the reasonableness of his trial attorneys' conduct,

25  petitioner has presented substantial evidence that there were three areas where his counsel

26  unreasonably failed to investigate and present evidence to show:  (1) Osborne's history of

27

---

28  [28]  While the psychological report was submitted under seal, this statement from the psychologist was quoted in the publicly filed pleadings in state court.

1    alcohol-fueled violence; (2) petitioner had long-standing problems with alcohol and often passed

2    out when drunk; and (3) petitioner was not violent when drunk and was considered by many who

3    knew him as a follower, not a leader.  Petitioner also briefly argues that had his trial counsel more

4    fully investigated his mental impairments, they would have had more persuasive grounds upon

5    which to challenge the use of Osborne and Edwards' statements as adoptive admissions, would

6    have challenged petitioner's competence to assist his attorneys and stand trial and would not have

7    had petitioner testify at the guilt phase of his trial.  The undersigned finds that, considering the

8    failures of trial counsel discussed here and the other guilt phase trial errors discussed below, it

9    would not have been unreasonable for the California Supreme Court to find that petitioner failed

10   to make a prima facie showing that the cumulative impact of those errors did not affect the guilt

11   phase verdict.

12        With respect to the additional evidence available to the defense regarding Osborne's

13   history of violence, that evidence would not necessarily have supported petitioner's current

14   argument.  From the evidence presented at petitioner's trial, the jury was left with the impression,

15   stressed by the defense, that John Osborne simply shot his girlfriend in the face when he was

16   drunk.  Irene Poehler's testimony was short, but powerful.  However, her statement to the police

17   contained in the records petitioner supplied to the California Supreme Court show that Osborne

18   and the victim were struggling for the gun, the gun went off and Osborne immediately expressed

19   dismay and grief about the shooting.  The defense at petitioner's trial attempted to show that

20   Osborne became extremely violent when he had been drinking and was abusive, in the case of

21   Barbara Smith abusive to an extreme, with the women in his life.  The addition of Poehler's

22   inconsistent story to police would have given the jury the impressions that the Smith shooting

23   may have been an accident and that Osborne was remorseful, neither of which supported the

24   defense's attempt to portray Osborne as violent and abusive.

25        The evidence to support petitioner's story would have been helpful to show petitioner did

26   fall into an alcohol-induced sleep at some point on the night of Mr. Middleton's killing.  In

27   addition, as petitioner argues, it would have supported his counsel's challenge to the trial court's

28   admission of statements made by Osborne and Edwards.  The statements at issue here involved

1    the testimony of Candy Cobb and Roslyn Walker.  Cobb testified at trial that after petitioner told

2    them there was "a man in a coma," she started to question him about what he meant.  This

3    conversation occurred when the three men, Cobb and Walker were sitting in the living room of

4    Cobb and Walker's house after the crimes.  According to Cobb's testimony, in response to her

5    questions to petitioner, Osborne "did all the talking."  (RT at 4794:6-7.)  Petitioner "never

6    answered."  (Id.)  Osborne stated that "the man owed him money," that "there were no

7    witnesses," and that "he can't pin it on him – them."  (RT at 4793:26 – 4796:1.)  According to her

8    testimony, Cobb then asked petitioner how they knew there were no witnesses, and Osborne

9    replied that "he had come up from behind the guy, and I believe he said he hit him."  (RT at

10   4796:7-9.)  On cross-examination, Cobb further stated that Osborne said "they robbed the guy."

11   (RT at 4821:25.)  On re-direct, Cobb confirmed that Osborne said "they" not "he" committed the

12   robbery.  (RT at 4838:17-27.)  Cobb also testified that when Osborne said no one could pin the

13   crime on them, Edwards responded that someone could "because he had just bought tires for the

14   car and they can get tire prints and that he was going to burn the car."  (RT at 4796:11-14.)

15          The trial court admitted these hearsay statements under exceptions for either adoptive

16   admissions, to the extent Osborne used the word "they," or declarations against penal interest, to

17   the extent he used the word "he."  (RT at 4779:16-24.)   The California Supreme Court

18   considered this issue on appeal and upheld the trial court's rulings.  22 Cal. 4th at 1188-89.  Even

19   had the trial court had excluded this evidence; it would not impact the undersigned's analysis of

20   the effect of counsel's conduct in the guilt phase of petitioner's trial.  The most damning aspect of

21   Cobb's testimony was that petitioner told her "they had gotten fucked up and there was a man in a

22   coma."  As described below, others testified that petitioner was involved in planning a robbery.

23   Nothing in Osborne or Edwards' statements implicated petitioner specifically in the murder.  In

24   fact, some of that testimony would appear to have benefitted petitioner's defense.  Cobb's

25   description of Osborne's statements indicated that Osborne, himself, struck Mr. Middleton.

26          Petitioner also argues that, had his counsel more fully investigated petitioner's mental

27   abilities, counsel would have sought to have petitioner declared incompetent to stand trial.  (ECF

28   No. 516 at 118-19.)   However, petitioner has made an insufficient showing that he would have

1    been found incompetent to stand trial had his counsel done so.  Petitioner states that his "actual

2    incompetency to stand trial is asserted and explained in paragraph 172 of Dr. Pettis' declaration,

3    Appendix 1."  (Id. at 119:14-16.)   Petitioner also references paragraph 39 of Dr. Froming's

4    declaration.  (Id.)

5         The standard for incompetence is whether "at the time of trial [the defendant] lacked

6    either sufficient ability to consult with his lawyer with a reasonable degree of rational

7    understanding, or a rational and factual understanding of the proceedings against him." Williams

8    v. Woodford, 384 F.3d 567, 608 (9th Cir. 2002) (citing Dusky v. United States, 362 U.S. 402

9    (1960)).  Dr. Pettis stated that petitioner's "memory deficits and other neurocognitive

10   impairments, as well as his suggestible, acquiescent personality and psychological makeup would

11   have impaired his ability to assist his counsel in a rational and helpful manner."  Pettis opined that

12   petitioner's issues "call into question" his abilities to assist counsel.  (Pettis Decl. (ECF No. 159-

13   1) at ¶ 172.)  Dr. Pettis's opinion that petitioner's ability to assist counsel was impaired is not an

14   opinion that petitioner was unable to assist counsel "with a reasonable degree of rational

15   understanding."

16        The cited paragraph from Dr. Froming's declaration simply provides that petitioner had an

17   "inability to assist counsel."  (Froming Decl. (ECF No. 159-2) at ¶ 39.)  Dr. Froming's statement

18   is conclusory, and does not appear to rely on any accounts from petitioner's trial attorneys or

19   from any others who were interacting with him at the time of trial.  Dr. Froming examined

20   petitioner in 1999, eleven years after petitioner's trial.  Courts have considered such post-trial

21   psychiatric conclusions with suspicion.  See Davis v. Woodford, 384 F.3d 628, 647 (9th Cir.

22   2004); Douglas v. Woodford, 316 F.3d 1079, 1094 (9th Cir. 2003).  Petitioner has cited no

23   contemporaneous opinions, lay or otherwise, that indicate his incompetence.  Petitioner did not

24   make a sufficient showing of success on this aspect of his ineffective assistance of counsel claim

25   to constitute a prima facie showing of a Sixth Amendment violation for trial counsel's failure to

26   seek a ruling that petitioner was incompetent.  The California Supreme Court would have been

27   reasonable to reject it on that basis.

28   ////

83

Finally, petitioner argues in brief fashion that had his trial counsel known the nature of his mental impairments, they would not have put him on the stand to testify at his trial.  (ECF No. 516 at 16:3-7.)  Besides petitioner's conclusory statement that his trial testimony was a "disaster," petitioner makes no attempt to analyze why the guilt phase verdict returned would have been different had he elected not to testify.   Petitioner has similarly failed to show how mental health experts' testimony explaining to the jury why petitioner testified as he did would have affected the outcome of the guilt phase of his trial.  The California Supreme Court would not have been unreasonable in concluding that petitioner had failed to make a prima facie showing of prejudice stemming from any unreasonable conduct on the part of counsel in calling petitioner to testify at his trial.

While petitioner denied asking anyone for a gun or being involved in any robbery planning, there was evidence before the jury tending to show that he was involved.  Even if the jurors disbelieved Virgal Edwards, which the undersigned finds they would have had every reason to do given the overwhelming impeachment of Edwards' testimony, there was other evidence before them that jurors could reasonably have considered believable.  First, Rick Peterson's testimony indicated petitioner's involvement.  While the defense made much of the fact that Peterson first told police that Edwards, not petitioner, made the phone call asking Peterson for a gun and changed that story after talking with Osborne, the fact is that Peterson testified at petitioner's preliminary hearing and at trial that his statements to police and his preliminary hearing testimony were true, that Osborne and petitioner asked for a gun during the phone call and they both asked again for a gun when they visited the Peterson's home that night.  Edwards, who did not ask for a gun, stated that it did not matter because he had a knife.

The second piece of evidence before the jury which supported a finding of petitioner's involvement in the planning of the crime, was Irene Poehler's testimony that Osborne asked for a gun and the others "were all there agreeing upon it."  Finally, Pamela Silkwood testified that the three showed up at her house about 1:30 a.m. and Osborne handed the phone to petitioner who used it for a couple minutes.  The timing of this incident coincides with the phone call received by Rick Peterson in which, he testified, petitioner asked for a gun.  The California Supreme Court

84

1    held that petitioner's jury could well have disbelieved both Edwards and petitioner's testimony

2    because the evidence showed that the trio "were generally together and apparently mutually

3    cooperating before the crime, during the crime, and after the crime." 22 Cal. 4th at 1182.  With

4    respect to the robbery planning, the undersigned agrees that there was evidence before the jury

5    independent of Edwards' testimony to show petitioner intended to rob the truck stop.

6            It should be noted that there was also evidence in the trial record of another robbery.

7    Virgal Edwards testified that when the trio left the California Club bar that night, he and Osborne

8    walked out first.  He thought petitioner was behind them.  When petitioner did not follow them

9    out, he and Osborne drove around to the back of the bar.  There, they saw that petitioner "had this

10   man pinned up in the corner talking about he'd take his truck."  (RT at 3315-3316.)  Edwards and

11   Osborne told petitioner there were police officers in the area.  They returned to the car and

12   petitioner came running out after them.  (RT at 3317.)  Melinda Peterson testified that when the

13   three men first came by her home, they had a conversation about being at the California Club and

14   petitioner said "they were going to roll somebody, and that they had gone outside and had seen

15   some police officers and got scared and they – they came to my house."  (RT at 5481:23 –

16   5482:6.)

17           The district judge previously assigned to this case held that petitioner had shown a need

18   for an evidentiary hearing with respect to his guilt phase ineffective assistance of counsel claims

19   because the evidence he sought to present would have been relevant to the question of whether

20   trial counsel had erred in failing to show that the robbery petitioner planned was not part of a

21   continuous transaction that ended in the murder of Mr. Middleton.  (ECF No. 212 at 4-6.)

22   However, petitioner raised this argument that another robbery may have been planned for the first

23   time in his objections to the previously assigned magistrate judge's ruling on the motion for an

24   evidentiary hearing.  (ECF No. 208.)  Petitioner never made this "other robbery" argument to the

25   state court.[29]  The issue at the present juncture is whether there was any reasonable basis for the

26   ────────────────────────
     [29]  This court requested the parties provide information about the effect, if any, on this § 2254(d)

27   analysis of the district judge's 2009 holding that petitioner made a sufficient showing of guilt
     phase prejudice to justify an evidentiary hearing on his ineffective assistance of counsel claims.

28   (ECF No. 543.)  While petitioner's response is convoluted, he concedes that that he did not raise

California Supreme Court to have found petitioner did not suffer prejudice from the guilt phase

error.  That is a very different question from the one addressed by the previously assigned district

judge.[30]  Because the issue that petitioner may have been involved in planning a robbery of the

California Club, not the truck stop, was not raised in state court, the California Supreme Court

had no reason to consider it.

    Jurors at petitioner's trial could have found petitioner guilty under the felony-murder rule

so long as they found he intended to aid in the commission of a robbery.  With respect to aiding

and abetting, jurors were instructed:

> One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable consequences of any act that he knowingly and intentionally aided or encouraged.  It is for you, the jury, to determine whether the defendant is guilty of the crime allegedly contemplated, and if so, whether the crime charged was a natural and probable consequence of the criminal act knowingly and intentionally encouraged.
>
> A person aids and abets the commission of the crime when he or she with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of the committing, encouraging or facilitating the commission of the offense by act or advice aids, promotes, encourages or instigates the commission of the crime.
>
> A person who aids and abets the commission of the crime need not be personally present at the scene of the crime.  On the other hand, the mere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

(RT at 7062:9-28.)  Petitioner's jury was further instructed that the crime of robbery requires

specific intent to deprive a person of his property and that petitioner's intoxication at the time of

_____

the issue of the nexus between the underlying felony and the murder of Mr. Middleton in state court.  (ECF No. 544 at 3.)  Petitioner's assertion that he had no reason to make this argument before the California Supreme Court is specious.  If, at the time of trial, California law required the showing of a causal and temporal nexus between the underlying felony and the murder for non-triggerman felony/murder liability, then petitioner had every reason to point out to the state court the potential lack of a nexus between robbery planning and the murder.

[30]  To the extent the previously assigned district judge held that petitioner made a sufficient showing of prejudice at the guilt phase aside from petitioner's argument about the nexus required for felony/murder liability, that decision is not dispositive of the questions posed under § 2254(d).

1   the offense could be considered in determining whether he had such specific intent.[31]  (RT at

2   7070:6-8, 7065:14-17.)  With respect to the felony-murder rule, the jury was instructed:

3   
> If a human being is killed by any one of several persons
> engaged in the perpetration of or attempt to perpetrate the crime of
4   > robbery, all persons who either directly and actively commit the act
> constituting such crime or who with knowledge of the unlawful
5   > purpose of the perpetrator of the crime and with the intent or
> purpose of committing, encouraging or facilitating the commission
6   > of the offense aid, promote, encourage or instigate by act or advice
> its commission are guilty of murder in the first degree, whether the
7   > killing is intentional, unintentional or accidental.

8   (RT at 7075:13-22.)

9        The evidence presented at his trial showed petitioner involved in attempts to obtain a

10  weapon and that the robbery of the truck stop was carried out by one, two or all three men.  The

11  California Supreme Court could reasonably have determined that petitioner's involvement in the

12  planning was sufficient to demonstrate he aided in the robbery.  Petitioner's testimony at trial

13  showed he could remember what happened during the evening prior to the crime, defeating an

14  argument that he was in such an alcohol-induced fog that he could not have known what was

15  going on.  This federal habeas court cannot conclude that no reasonable jurist could have found

16  that evidence defeated petitioner's prima facie showing of prejudice based upon ineffective

17  assistance of counsel at the guilt phase of his trial.  Accordingly, the undersigned recommends

18  that federal habeas relief be denied as to petitioner's claim 2 with respect to the guilt phase.

19                    (b) Prejudice in the Special Circumstances Determination

20        Petitioner's jury was given the following instruction regarding the special circumstance of

21  murder in the commission of a robbery:

22  ////

23

24  _____

[31]  Petitioner briefly mentions that his counsel's failure to investigate more fully how alcohol

25  affected petitioner in turn caused counsel to fail to properly support an argument that petitioner
could not have had the specific intent to commit robbery or murder.  With respect to the robbery

26  planning, this argument is not persuasive.  At trial, petitioner was able to recall with a fair amount
of specificity most of what happened before and after the crimes in question, including where the

27  trio went and who they saw.  The defense could not have it both ways – they could either put on
petitioner's testimony or argue that he was so drunk he could not have formed specific intent to

28  aid in the robbery planning.

1   To find that the special circumstance referred to in these
2   instructions as murder in the commission of a robbery is true, it
    must be proved:

3   One, that the murder was committed while the defendant
    was engaged in or was an accomplice in the commission of
4   a robbery, or that the murder was committed during the
    immediate flight after the commission of a robbery by the
5   defendant or to which the defendant was an accomplice;

6   And number two, that the defendant intended to kill a
    human being or intended to aid another in the killing of a
7   human being;

8   And number three, that the murder was committed in order
    to carry out or advance the commission of the crime of
9   robbery or to facilitate the escape therefrom or to avoid
    detection.

10
    In other words, the special circumstance referred to in these
11  instructions is not established if the robbery was merely incidental
    to the commission of the murder.

12

13  (RT at 7082:7-25.)

14      The weaknesses in petitioner's argument that he suffered prejudice at the guilt phase of

15  his trial, however, are absent from his argument that his counsel's conduct prejudiced him in the

16  special circumstance determination.  As discussed above, the defense substantially impeached

17  Virgal Edwards at trial.  And, while the California Supreme Court reasonably could have

18  concluded that there was sufficient other evidence that petitioner was involved in planning the

19  robbery, there was no such similar evidence that petitioner intended to kill Mr. Middleton.  As

20  petitioner points out, the testimony of a mental health professional at the guilt phase would have

21  been further support for a finding that petitioner was not involved in killing Mr. Middleton.  As

22  set out in Dr. Pettis's declaration, both testing and petitioner's history showed he "was and is a

23  passive person."  (Pettis Decl. (ECF 159-1) at ¶ 159.)   Dr. Pettis examined petitioner's criminal

24  history and noted that petitioner was always involved with others who "influenced his

25  participation."  (Id.)  Dr. Froming added that petitioner's "legal entanglements always occurred

26  in the context of heavy drinking and alcohol dependence."  (Froming Decl. (ECF No. 159-2) at ¶

27  21.)

28  ////

88

1    While petitioner's jury certainly could have disbelieved his story, that does not necessarily

2    mean that, had they had more information about the effects of alcohol on petitioner, petitioner's

3    "follower personality" and Osborne's "leader" personality, that they would not have formed at

4    least a reasonable doubt that petitioner intended to kill Mr. Middleton.

5    Respondent makes only one very brief argument about the effect of trial counsel's conduct

6    on the special circumstance determination.  In this regard, in a footnote, respondent states:

> Evidence of petitioner's family and mental health history would not
> have changed the outcome as to the special circumstance
> determination during the guilt phase because petitioner's theory
> was that he was asleep in the car.  Thus, any evidence that he was
> the "weaker link" or could not form the intent to kill was not
> consistent with the theory of the case – that petitioner was not
> involved in the crime.  Reasonable jurists could find that defense
> counsel chose tactically to not pursue inconsistent positions in order
> to maintain credibility with the jury should there be a penalty phase.
> See Florida v. Nixon, 543 U.S. 175, 192 (2004) ("[I]n a capital
> case, counsel must consider in conjunction both the guilt and
> penalty phases in determining how best to proceed").

14   (ECF No. 530 at 78 n. 30.)  Respondent's argument on this point is puzzling in several respects.

15   Petitioner does not argue that evidence of his family and mental health history was the only

16   evidence his counsel failed to present at his trial.  Rather, evidence of petitioner's alcohol abuse

17   and its effects on him as well as evidence of his "follower" type personality would have served to

18   support his version that he slept through the commission of the crimes.  Moreover, this sort of

19   evidence supported the defense's arguments that Osborne was the group's leader, not petitioner.

20   Respondent's argument also ignores the fact, mentioned above, that the jury did not have to pick

21   between the version of events provided by Edwards and petitioner.  Rather, the jury could have

22   very well disbelieved both men.  That does not mean, however, that additional evidence would

23   not have influenced the jury's determination of whether petitioner intended to kill Mr. Middleton.

24   As has been discussed above, making out a prima facie case of prejudice is not the same

25   as proving prejudice.  There is no question that petitioner has shown that his trial counsel failed to

26   investigate and present substantial evidence to support the defense themes.  There is also no

27   question that petitioner made a sufficient showing before the state court that he had a viable claim

28   of prejudice in the special circumstance determination due to his counsel's failures, particularly

89

1  when considered in tandem with petitioner's claim, discussed below, of ineffective assistance of

2  counsel regarding the beer can evidence.  The undersigned finds that petitioner has satisfied the

3  requirements of 28 U.S.C. § 2254(d) with respect to the jury's special circumstance verdict.

4  <div align="center">(c)  Prejudice in the Penalty Phase</div>

5  To assess prejudice at the penalty phase, this court "consider[s] 'the totality of the

6  available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas

7  proceeding"—and "reweig[hs] it against the evidence in aggravation." Porter v. McCollum, 558

8  U.S 30, 41 (2009) (quoting Williams, 529 U.S. at 397–398).

9  The defense case at the penalty phase of petitioner's trial was woefully inadequate.  The

10  evidence proffered by petitioner demonstrates that his trial attorneys conducted little investigation

11  and that lack of investigation and preparation clearly showed.  Only two witnesses testified at the

12  penalty phase of petitioner's trial.  Both knew petitioner for very limited periods of time.  Indeed,

13  witness Ardell Morgan even testified that she was surprised to have been called to testify given

14  her brief relationship with petitioner.

15  Against that backdrop, petitioner has presented both substantial and significant mitigating

16  evidence.  Petitioner has shown:

17  • He was born into a family with a history of substance abuse, depression and limited

18  intellectual functioning – struggles that affected petitioner as well.

19  • He had a troubled childhood marked by physical violence and emotional abuse that he and

20  his siblings suffered at the hands of his parents.

21  • He sought approval from others so desperately that he was easily influenced and

22  manipulated by peers.

23  • He drank large quantities of alcohol, beginning at an unusually young age, to self-

24  medicate for depression and the symptoms of post-traumatic stress disorder.

25  • Numerous people who knew petitioner observed that he lacked both the intellectual ability

26  and the temperament to engage in planning, organizing and leading.  Mental health

27  professionals confirm that petitioner lacks these abilities.

28  ////

<div align="center">90</div>

- Many times before the night of November 2-3, 1986, petitioner had been passed out in the back seat of a car after heavy drinking.

As petitioner points out, the evidence of his life history and impairments was relevant to, at a minimum, the following statutory sentencing factors set forth in California Penal Code §190.3, on which the jury was instructed:  "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding;" "(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;" "(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person;" "(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication;" "(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor;" and "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he was on trial."  (CT at 667-68.)

Petitioner has presented this court and the California Supreme Court with evidence that would have supported the penalty phase defense theory of lingering doubt.  He has also presented evidence of "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability."  Wiggins v. Smith, 539 U.S. 510, 535 (2003).  The Supreme Court considers evidence of a defendant's "background and character" highly relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributed to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds in Atkins v. Virginia, 536 U.S. 304 (2002).  Courts are clear:  an important purpose of a penalty phase defense is helping a jury understand how the defendant came to be sitting before them.  See

////

91

1  <u>Porter</u>, 558 U.S at 41 (Mitigation should "humanize [the defendant] or allow [the jury] to

2  accurately gauge his moral culpability.")

3       Here, petitioner's trial attorneys made only the weakest attempt to present evidence to

4  allow the jury to judge petitioner's moral culpability.   Instead, after the brief evidentiary

5  presentation, defense counsel focused on arguing lingering doubt about petitioner's guilt and on

6  the disparity in sentencing among the three perpetrators.  Petitioner's attorneys recognized the

7  importance of the sort of humanizing mitigating evidence they failed to present.  As evidence of

8  that recognition, during his portion of the defense closing argument, attorney O'Connor stated:

9            Now, think about that little boy who is waiting to catch the
10       ferry.  That nice lady testified yesterday from the special ed school.
         that was Chap Riel at age fifteen.  He had maybe the reading skills
11       of a ten year old.  He showed up every day to take the ferry,
         because his parents either couldn't be bothered, or wouldn't take
12       him, and he had to depend on the kindness of this woman.  They
         sent him there almost every day without a lunch packed.  He didn't
13       have a coat.

14            They didn't give him the money to come home on the ferry.
         He had to borrow money for that.  And they wouldn't watch over
15       him to just to [sic] see whether he would do his home work.

16            Now, that doesn't excuse the crime that was committed.
         But it does give you some idea of the background that this
17       defendant is coming from.  Possibly he's retarded, possibly he's
         not. But clearly he was retarded, if not by mental process, by social
18       retardation.  So that he was far behind his peers at the time he went
         to that school.  And his parents did not have the desire, enough
19       interest in him to pay the tuition at the special school that could
         have straightened his life out considerably.

20            Is it any wonder, ladies and gentlemen, that he lapsed into
         alcohol abuse?  Is it any wonder that he ended up in state prison
21       where he met the likes of Virgal Edwards and John Osborne?  And,
         to some extent, is it any wonder that he became involved in this
22       kind of a situation where he sits before you now.

23  (RT at 7698:11 – 7699:13.)

24       Attorney Schwartz attempted to argue to petitioner's jury that the lack of evidence of a

25  typical childhood illustrated petitioner's hardships.

26            Normal procedure at [the] penalty phase would be to try and
         flood you with evidence.  Play to the tear ducts, play the violins.
27       Put mother on.  Talk about the little boy and his Teddy Bear.  Put
         father on and talk about the fishing trips.  Brothers and sisters
28       relatives on and on.

92

1
2
3

> We decided not to do that.  Maybe you can figure out some of the reasons we decided not [to] do that because of some information you received about the type of life that Chap had in his home. That's a terrible thing in and of itself.

4    (RT at 7733:5-15.)  Attorney Schwartz then discussed Mrs. Morgan's testimony.  He argued that

5    the defense called her to testify because she "mothered" petitioner and because she provided

6    "some insights" into him.  Schwartz attempted to counter the prosecutor's argument that

7    petitioner possessed the intelligence to carry out the robbery, kidnapping and murder of Mr.

8    Middleton.  The prosecutor based that argument, in part, on Mrs. Morgan's testimony that she felt

9    petitioner was "bright."  Attorney Schwartz explained that Morgan testified that despite

10   petitioner's many learning disabilities, she felt he had potential.  (RT at 7736-39.)

11         There is no question in the undersigned's mind that petitioner has set out far more than a

12   prima facie case that he suffered prejudice at the penalty phase of his trial as a result of his

13   counsel's ineffective performance.  The only remaining question for this court is whether any

14   reasonable jurist could have held otherwise.  The aggravating factors were few.  Petitioner did not

15   have a history of violence.  Cf. Wiggins, 539 U.S. at 537.  His two non-violent convictions for

16   burglaries of closed businesses were the only aggravating factors besides the crime itself.  While

17   that crime was indeed brutal, petitioner does not have the sort of "record of violent conduct that

18   could have been used to offset [his] powerful mitigating narrative."  Id.  Petitioner presented the

19   California Supreme Court with volumes of mitigating potential testimony, all of which would

20   have supported the themes defense counsel alluded to in their penalty phase arguments to the

21   jury, but utterly failed to support with available evidence.

22         To succeed on an ineffective assistance of counsel claim, petitioner would have to show a

23   "reasonable probability that at least one juror would have struck a different balance" had the jury

24   heard the evidence counsel failed to investigate and present.  By finding petitioner failed to make

25   even a prima facie showing of prejudice, the California Supreme Court did not give petitioner the

26   opportunity to succeed on this claim.  The undersigned can comprehend no reasonable basis for

27   doing so and therefore recommends that the court find petitioner has satisfied § 2254(d) with

28   respect to the penalty phase aspects of his claim 2.

4. <u>Ineffective Assistance of Counsel re Challenges to Evidence – Claims 5 & 6</u>

In his claims 5 and 6, petitioner alleges ineffective assistance of his trial attorneys based upon their failure to challenge the introduction of evidence at his trial.  Petitioner's claim 5 involves evidence regarding the location of a beer can with petitioner's fingerprints on it which was found at the crime scene. The beer can evidence was important because officers testified at trial that it was found inside the truck stop cashier's office.  Petitioner testified that he was asleep while at the truck stop and did not go inside the office.  In his claim 9, discussed in the following section below, petitioner has alleged prosecutorial misconduct in the presentation of false evidence regarding the location of the beer cans.

Petitioner's claim 6 involves evidence of the victim's blood on petitioner's pants. The prosecutor presented that evidence to show petitioner was involved in the assault on the victim. Petitioner argues that his counsel should have had the pants analyzed to show that the blood stains were not consistent with a direct spatter during the assault but more likely occurred when the pants brushed against another object stained with blood.  This latter argument would have supported petitioner's testimony that he was awakened only after the killing to help dispose of the victim's body.

As discussed above, defense counsel conduct will be considered reasonable when it is the result of sound strategy.  However,

> "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment."

<u>Wiggins</u>, 539 U.S. at 521 (quoting <u>Strickland</u>, 466 U.S. at 690-91).  <u>See also</u> <u>Thomas v. Chappell</u>, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"), <u>cert. denied</u>, ___ U.S. ___, 133 S. Ct. 1239 (2013); <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1112-1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of

94

1  reward money cannot be considered strategic where counsel did not investigate this avenue of

2  impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of

3  alibi defense and rejection of mental health defense not reasonable strategy where counsel failed

4  to investigate possible mental defenses).  Further, the trial strategy must be "sound."  In Hart v.

5  Gomez, 174 F.3d 1067 (9th Cir. 1999), the court considered whether defense counsel's failure to

6  investigate and present evidence that would have corroborated a defense witness's testimony was

7  reasonable.  Mr. Hart was convicted of molesting his daughter.  His daughter testified at trial that

8  Hart molested her only during visits to a ranch and only when he was unaccompanied by another

9  adult.  During investigation, Hart's attorney learned that Hart's girlfriend had accompanied Hart

10  every time he had visited the ranch.  In addition, the girlfriend had "extensive and detailed

11  records" such as credit card receipts to prove that contention.  At trial, defense counsel simply put

12  on the girlfriend's testimony without attempting to introduce any of the corroborating physical

13  evidence.  Under those circumstances the Ninth Circuit Court of Appeals found it

14  "inconceivable" that, after deciding to put on the girlfriend's testimony, defense counsel made a

15  strategic decision to withhold corroborating documentary evidence.  174 F.3d at 1071.

16  <center>a.  Beer Cans</center>

17  Here, the location of the crushed beer can with petitioner's fingerprints on it was critically

18  important.  Before the jury the prosecution stressed evidence showing that the crushed beer can

19  was found in the cashier's office to corroborate Edwards' testimony that petitioner and Osborne

20  were the ones to enter the office, commit the robbery and kidnap Mr. Middleton.  Recognizing

21  that Edwards' testimony might not be entirely believable, the prosecutor also argued to the jury

22  that the physical evidence alone implicated petitioner in the commission of the crimes.  (RT at

23  6749:16-19.)  Edwards' testimony contradicted petitioner's that he fell asleep and did not enter

24  the cashier's office or participate in the robbery.[32]  The location of the beer can bearing

---

[32]  Petitioner points out that the California Supreme Court noted the presence of beer cans with
petitioner's fingerprints.  (ECF No. 516 at 18:19-21.)  However, that court did not specify that the
beer can was found inside the cashier's office.  See People v. Riel, 22 Cal. 4th 1153, 1172 (2000)
("Beer cans found at the truck stop contained defendant's and Osborne's fingerprints. . . .")  The
testimony at trial showed that petitioner had been at the truck stop earlier in the day and had
consumed beer while he was there.  Petitioner's citation to the California Supreme Court opinion

<center>95</center>

1    petitioner's fingerprints was particularly important to support the prosecution's argument,

2    necessary to the special circumstance finding, that petitioner intended the murder of Mr.

3    Middleton.  If petitioner was the one, or one of the ones, to enter the cashier's office, then the jury

4    could have reasonably inferred that he was involved not just in planning a robbery but in

5    perpetrating the robbery and the kidnapping and would have been stronger evidence that

6    petitioner also participated in the murder.

7            Petitioner argues that counsel failed to challenge the location of the beer can which was

8    determined to have his fingerprints on it.  Primarily, he points to evidence that the police officers'

9    collection of the cans was haphazard and unreliable.

10                                    i.        Background

11           The beer cans were collected by Deputy Morey.  (RT 4111:9-10.)  He had arrived at the

12   truck stop early the morning of November 3, 1986 in response to a call about the missing truck

13   stop attendant.  (RT at 4102-04.)  Later that day, after Mr. Middleton's body was found, Morey

14   returned to the truck stop and he and Sergeant Schaller searched the area around the truck stop

15   and took photos.  (RT at 4106:2-4; 4133.)  After photos were taken, Morey picked up five beer

16   cans and presented them to Robert Dolliver, a fingerprint examiner from the California

17   Department of Justice.  (RT at 4106:2-4; 4111:11-17.)  In his direct testimony at petitioner's trial,

18   Morey identified the number 1 marked on a diagram of the cashier's office as the location of a

19   crushed beer can he collected.  (RT at 4108:7-14.)  In his testimony, Morey consistently identified

20   the crushed can as the one he found in the cashier's office.  (RT at 4115:5-12; 4130:25-27.)

21   Morey also identified the crushed can as the one he found in the cashier's office in the report he

22   apparently made from his handwritten notes.  (RT at 4139-40.)  That typed report was provided to

23   the California Supreme Court as appendix 56.  Therein, Morey stated that, "A crush [sic]

24   MILWAUKEE'S BEST beer can was found on a shelf in the cashier's office across from the cash

25   register." (App. 56 to 1999 State Pet.)  In Morey's presence, Dolliver labeled the cans with letters

26   _____

27   does not necessarily show that court relied upon the presence of the beer can in the truck stop
     office when affirming petitioner's conviction and sentence.  In fact, the only place the California
     Supreme Court opinion mentioned the beer cans was in its recitation of the facts introduced at

28   trial.

1   "A" through "E," wrote his initials on them, and gave them back to Morey.  (RT at 4112:18-23;

2   4114:15-19; 5451; App. 56.)   The can labeled "B" was the crushed can.  (RT at 4115:5-12.)

3   None of the other cans were crushed.  One can, labeled "C," had prints from both Osborne and

4   petitioner.  (App. 56; RT 4482:2-6.)

5          Dolliver lifted latent fingerprints from the cans, and compared those lifts to fingerprints of

6   the suspects, the victim and others.  (Dolliver Rpt., App. 56.)  On a Milwaukee's Best beer can

7   labeled "B," Dolliver testified that the found an impression of petitioner's left index finger.  (RT

8   at 4481:27 – 4482:1.)

9          There is no question that petitioner's trial counsel recognized the importance of the beer

10  can evidence.  At trial, defense counsel attempted to minimize the importance of that evidence in

11  his closing argument to the jury as follows:

12              The important thing that he [Robert Dolliver, the Justice Dept.
                fingerprint expert] had to testify to was he found beer can –
13              fingerprints on beer cans.  One of the fingerprints happened to be
                Chap's fingerprint.  And it was found open [sic] a beer can in the
14              shelf area near where the cash register was.  What does that mean?
                That means that at some time in the probably near past, Chap had
15              had his hand on that beer can.  And that after Chap had his hand on
                the beer can, the beer can got to the shelf near the cash register.  So
16              what does that mean?  Not much.

17              Chap, John, Virgal, everybody, they were getting the beer out.
                People were handing beer cans around.  And at some point Chap
18              touched that beer can.  Somebody else could have too.  Because we
                know that everybody touching a beer can doesn't leave their
19              fingerprints on it.  Because we have Tolley telling us that he picked
                up a beer can that was – and threw it away.  And that same beer can
20              was dusted for fingerprints, and his weren't found on it.

21              Who took that beer can in there?  I don't know.  I submit it was
                probably John Osborne.  We don't have any evidence that anybody
22              at the time the robbery was going down took a beer can into that
                area.  And it's illogical to think that they would, really.
23

24  (RT at 6849-6850.)  In rebuttal, the prosecution stressed to the jury that the "beer can that had the

25  defendant's fingerprints was brought in by the person that went in to get the money."  (RT at

26  7031.)

27  ////

28  ////

97

ii.     Petitioner's Claim

Petitioner argues that his defense counsel should have challenged the beer can evidence on the grounds that it was not reliably processed.  Petitioner has presented evidence showing numerous inconsistencies and problems with the photographs, sketches and identification of evidence.  In doing so, petitioner has made a substantial showing that that the crime scene was not processed in a reliable way.  While the defense could have chipped away at law enforcement's processing of the crime scene, one challenge to the evidence stands out.  According to petitioner, photographs taken by deputies of the cashier's office do not show a crushed beer can.  Deputy Morey testified that "before things were moved, so to speak or collected" he and Sergeant Schaller took photographs.  (RT at 4105:26 – 4106:4.)  Petitioner provided copies of some of those photographs in appendix 56 to his 1999 State Petition.  Those copies are barely legible.  However, respondent does not contest petitioner's description of the photos.  The undersigned therefore assumes, for purposes of determining whether petitioner has made out a prima facie case for relief, that the photos reflect shelving in the cashier's office and do not depict a crushed beer can at that location.[33]

Petitioner's argument suffers two drawbacks.  First, there was no question that only one of the beer cans recovered by officers was crushed and Morey consistently identified that crushed can as being found in the cashier's office.  Morey's typed report contains that information.  Petitioner argues Morey's typed report should be considered suspect because Morey's hand-written notes do not include the location of the crushed can.  However, Morey's consistency on this point, and the likelihood that he might be able to recall the location of the distinctive crushed can, would have weakened attempts to challenge Morey's memory and/or credibility.

////

_____

[33]  As appendix 95 to his motion for an evidentiary hearing, petitioner also provided the court with an enlarged copy of one of the crime scene photos.  According to petitioner, that enlarged photo shows a crushed beer can at the back of the building.  Because petitioner did not inform the California Supreme Court that the crushed beer can appeared in a photo of the back of the building nor provided the California Supreme Court with this enlarged photo, the undersigned finds that, under the holding of the Supreme Court in Pinholster, such evidence cannot be considered at this juncture.

1        Respondent stresses another problem with petitioner's argument on this issue.

2    Respondent points out that the defense had good reason not to raise a doubt about Morey's

3    credibility.  Rick Peterson's testimony that petitioner called him to ask for a gun was one of the

4    linchpins to show petitioner intended to at least commit a robbery that night.  As discussed in

5    detail above, because Edwards was soundly impeached by the defense, the jury would have had to

6    believe other testimony showing that petitioner was involved in planning a robbery and/or a

7    kidnapping.  The defense stressed Peterson's lack of credibility.  Some of the best evidence that

8    Peterson was untruthful was the fact that during an initial interview, Peterson told Deputy Morey

9    that "the skinny one," whom everyone agreed would have been Edwards, made the phone call

10   asking for a gun.  To challenge Peterson's trial testimony, it was important that the jury believe

11   Morey had carefully recorded what Peterson told him.  The defense stressed Morey's attention to

12   detail and efforts to write down correctly what Peterson had told him.  (RT at 5472-73.)

13       While respondent's argument has some merit, on closer examination it does not hold up.

14   Respondent's argument ignores the fact that while Peterson's testimony indicated petitioner

15   participated in the planning, the beer can showed participation in the robbery and, because it both

16   contradicted petitioner's version of events and involved petitioner in the robbery and kidnapping,

17   made the inference that petitioner intended to kill Mr. Middleton much stronger.  A reasonable

18   attorney would have focused his or her efforts on the evidence that would have had the most

19   impact.  The prosecutor at trial recognized the critical importance of the beer can evidence.

20   When telling the jury that it could find petitioner guilty even if it disbelieved Edwards, the

21   prosecutor focused on the following things:  (1) the testimony of others that petitioner was

22   involved in asking for a gun; (2) the blood stains on petitioner's clothes; (3) the victim's wounds;

23   and (4) the beer can in the cashier's office with petitioner's fingerprint on it.  (RT at 7021-7033.)

24   Impeaching Rick Peterson regarding the phone call was only partly helpful since Peterson had

25   also told officers that petitioner had asked for a gun when the trio visited the Peterson's home and

26   both Melissa Peterson and Irene Poehler testified about petitioner's participation in the search for

27   a gun.  On the other hand, showing that the crushed beer can bearing petitioner's fingerprints was

28   ////

1    not found in the cashier's office could have affected the jury's consideration of petitioner's

2    participation in the commission of the crimes that night.

3        In addition to his counsel's failure to challenge Morey's credibility regarding the location

4    of the crushed beer can, petitioner also argues that his counsel should have challenged the beer

5    can evidence on other grounds.  First, petitioner argues that his counsel should have raised a

6    doubt about the prosecutor's argument that the person holding that beer can walked into the

7    cashier's office while drinking beer, crushed the can and set it on a shelf.  (RT at 7031-32.)  That

8    argument could have been undermined by showing that petitioner is right-handed, and by arguing

9    that had petitioner just cut his left index finger in the blood brother oath, as Edwards testified,

10   then he probably would not have used his left hand to crush the can.  (RT at 3497-98, 3391-92;

11   see App. 2 to 1999 State Pet. at ¶ 22.)  Second, petitioner contends that defense counsel should

12   have used the example of the can found to have both Osborne's and petitioner's prints in support

13   of his argument that a fingerprint on a beer can does not necessarily identify who was holding the

14   can at the time it was set down.[34]

15       Considering the importance of the beer can evidence, the undersigned finds that petitioner

16   made out a prima facie case for relief on his claim that his trial counsel acted unreasonably by

17   failing to challenge Morey's identification of the crushed beer can as being found in the cashier's

18

19   _____

     [34]  Petitioner also argues that his counsel should have more carefully questioned fingerprint expert
     Dolliver about the location of the beer cans.  According to petitioner, the trial record shows that

20   counsel had not spoken to Dolliver before he testified.  (RT at 4490.)  Had they done so,
     petitioner argues, defense counsel would have discovered that Dolliver thought all the beer cans

21   had been found behind the truck stop.  Petitioner's only proof that Dolliver would have so
     testified is a declaration from Dolliver's colleague, Martin Collins, that in 1992, almost four years

22   after petitioner's trial, Dolliver told Collins that all the beer cans had been found behind the
     building.  (See Collins Decl. (App. 30 to 1999 State Pet.) at ¶¶ 2-4.)  Dolliver did not collect the

23   beer cans.  It is not clear that, at the time of trial, Dolliver would have testified in a way that
     would have contradicted Morey's testimony that the crushed can was found in the cashier's

24   office.  Further, petitioner's argument that Deputy Delgado's testimony would have provided
     corroboration of his argument on this point is based on nothing more than Delgado's testimony

25   that he "seem[ed] to recall a beer can" was recovered from behind the building.  (RT at 5240-
     5242.)   That testimony does nothing to show the crushed can was found behind the building.

26   Petitioner has not made a credible showing that counsel erred in questioning Dolliver at trial or
     that there is a reasonable probability the result of the proceedings would have been different had

27   he prepared and questioned witness Dolliver differently.

28

1    office and by failing to support with evidence the argument that the presence of the beer can there

2    did not mean petitioner had entered the office.  The further question, however, is whether

3    petitioner has made a prima facie showing of prejudice stemming from his counsels' failure in

4    that regard.  For the reasons discussed above that other evidence implicated petitioner in the

5    robbery, this court finds petitioner had made an inadequate showing of guilt phase prejudice.

6    However, the same is not true for the special circumstance and penalty phase determinations.  The

7    prejudice inquiry regarding defense counsel's failures with respect to the beer can evidence

8    cannot be analyzed without consideration of the undersigned's other findings of error with respect

9    to those determinations.

10         The undersigned has concluded above that petitioner had made out a prima facie case of

11   prejudice from the numerous errors of his counsel in failing to investigate and present evidence to

12   undercut Edwards' story that petitioner lead the group in killing Mr. Middleton and to support

13   penalty phase themes of lingering doubt and that petitioner's social and family background

14   mitigated his crimes.  When defense counsel's deficient performance with respect to the beer can

15   evidence are considered cumulatively with the effect of counsel's other errors, there is no

16   question that petitioner has made a prima facie showing of prejudice and that, for the reasons

17   discussed above, the California Supreme Court unreasonably rejected this claim.

18                          b.  Blood

19         Petitioner argues in his claim 6 that his attorneys failed to investigate and present evidence

20   showing that the blood on petitioner's pants and shoes was consistent with petitioner's version of

21   events.  According to petitioner, the prosecutor argued that the blood on the lower leg of his

22   pants and on the uppers and soles of his boots showed that petitioner's participation in the events

23   leading to Mr. Middleton's death was not limited to helping Osborne move the body.

24         However, the prosecutor's argument on that point at trial was not as specific as petitioner

25   suggests.  Rather, the prosecutor generally argued that the blood on petitioner's pants and boots

26   was "absolutely inconsistent with the defendant's description of what happened."  (RT at 6752:3-

27   8.)  The prosecutor did not explain why that was so.  Petitioner's other citations to the

28   prosecutor's argument simply reflect his overbroad statement to the jury that petitioner's "story is

101

1   not supported by the physical evidence." (RT at 6792:16-17.)   In the last portion of the

2   prosecutor's argument cited by petitioner, the prosecutor asked the jury how the blood got on

3   petitioner's pants and boots if petitioner's story of how he and Osborne carried the victim to the

4   side of the road was true.  (RT at 7024:4-10.)  The only expert to testify regarding the blood stains

5   was Dr. Stuart, the pathologist who conducted the autopsy.  Dr. Stuart testified that it was "very

6   likely" the person or persons who stabbed Mr. Middleton would have ended up with blood on

7   their hands or clothing.  (RT at 3176:15-28.)  However, Dr. Stuart had not examined petitioner's

8   clothing.

9          Petitioner argues that his counsel's failure to investigate the blood evidence was

10   prejudicial because, had they done so, they would have discovered that the stains were consistent

11   with a secondary transfer, or smear, from either contact with the victim's body or contact with

12   another surface.  Petitioner presented the California Supreme Court with a declaration from a

13   criminalist in which the criminalist opined that the stains appeared to be smears.  (Morton Decl.

14   (App. 29 to 1999 State Pet.).)   The primary problem with petitioner's argument is that evidence

15   that the blood on petitioner's pants resulted from a smear would have been consistent with the

16   testimony of both Edwards and petitioner that petitioner fell down the embankment with the body

17   as he helped move it.  It would not have been unreasonable for the California Supreme Court to

18   find petitioner had failed to make a prima facie showing either that his counsel was unreasonable

19   in failing to challenge the blood evidence or that petitioner was prejudiced from any such failure.

20   Because petitioner has not overcome the § 2254(d) hurdle with respect to his claim 6, federal

21   habeas relief should be denied with respect to that claim.

22          B.   Prosecutorial Misconduct re Beer Can Evidence – Claim 9

23          In his claim 9, petitioner argues the prosecutor knew that Deputy Morey testified falsely

24   about documenting the location of beer can "B," about seeing the beer can in the crime scene

25   photo and about having a "list" identifying the location of each beer can.

26          A conviction obtained through the use of false evidence violates a defendant's due process

27   rights.  Napue v. Illinois, 360 U.S. 264, 269 (1959).  This is true whether the prosecutor knew the

28   evidence was false or should have known it was false.  United States v. Agurs, 427 U.S. 97, 103

1    (1976).  The false evidence must have been material.  The question is whether "the false

2    testimony could not in any reasonable likelihood have affected the judgment of the jury."  Napue,

3    360 U.S. at 271; Giglio v. United States, 405 U.S. 150, 154 (1972).  According to petitioner, this

4    standard equates to the harmless-beyond-a-reasonable-doubt standard of Chapman v. California,

5    386 U.S. 18, 24 (1967) and respondent bears the burden of proving the error did not affect the

6    verdict, Chapman, 387 U.S. at 24.[35]

7        The initial question is whether the prosecutor knew or should have known Officer

8    Morey's testimony was false.  Petitioner argues that the following testimony and evidence

9    presented to support Morey's testimony was false or misleading and, apparently, should have

10   caused the prosecutor to be aware that Morey testified falsely at petitioner's trial:  (1) that he saw

11   a beer can in a picture; (2) that the crime scene sketch, people's exhibit 3 at trial, represented the

12   true location of the crushed beer can; (3) that he had a "list" of the beer cans' locations.[36]

13       None of the points made by petitioner demonstrate either that Deputy Morey in fact

14   testified falsely at trial or that the prosecutor knew or should have known he was doing so.  As

15   _____

16   [35]  Petitioner claims that respondent agrees with this characterization of the governing legal
     standard.

17

18   [36]  Petitioner again states that fingerprint expert Dolliver told a colleague four years after trial that
     all the beer cans were found in the back of the building and again implies that Deputy Delgado

19   testified to the same thing.  Dolliver's statement to a colleague four years after trial does not show
     the prosecutor knew or should have known Morey's testimony was false.  Further, and as

20   discussed above in note 25, Delgado did not testify that all beer cans were found in the rear of the
     building.  Petitioner's statement that the crushed beer can was found "near the dimes as Dolliver

21   and Delgado said" is not well taken.  (ECF No. 516 at 128:15-16.)  Petitioner also makes the
     puzzling statement that a photograph showed "a second beer can near the one mentioned by

22   Deputy Delgado."  (ECF No. 535 at 66:13-14.)  Petitioner references paragraphs 222 and 223 of
     the state petition for this assertion.  Those paragraphs do not support petitioner's statement about

23   two beer cans.  Paragraph 222 is petitioner's argument that the photograph of the cashier's office
     showed no beer cans.  Paragraph 223 recounts Deputy Morey's testimony that he first saw one

24   beer can in a picture of the back of the truck stop and then said he was not sure.  In fact, the point
     of paragraph 223 is showing that the prosecutor "incorrectly and misleadingly" stated that two

25   beer cans were visible in those photos.  It appears that petitioner is following up on the argument
     made in his opening brief that a substantially enlarged copy of one photograph shows a second,

26   crushed beer can at the back of the truck stop.  However, petitioner admits that this enlarged
     exhibit, and thus this argument, was not presented to the state court.  Under Pinholster, this court

27   may not consider it for purposes of analyzing petitioner's claim under 28 U.S.C. § 2254(d).

28

1    discussed above, petitioner has made a sufficient showing that his own counsel erred when they

2    failed to use reasonable means to discredit Morey's trial testimony regarding the beer can.

3    However, that is not the same as making a showing that the prosecutor knew or should have

4    known Morey's testimony was false.  First, petitioner states that Morey incorrectly stated he

5    could see a beer can in a photograph of the back of the truck stop.  Morey did testify that he could

6    see a can in photograph 69-S.  (RT at 4124.).  However, upon examination of photograph 69-G,

7    which appeared to show the same area, Morey testified that he was not sure if a beer can was

8    visible.  (RT at 4124-4125.)  It is not clear to this court how Morey's testimony about a

9    photograph of the back of the building is relevant to petitioner's claim that Morey testified falsely

10   regarding the location of the crushed can.[37]  In any event, because the jury heard that Morey was

11   not sure whether the photograph showed a beer can, petitioner certainly suffered no prejudice as a

12   result of any claimed "false" testimony.

13        Petitioner has shown that his trial attorneys had plenty of ammunition to attack Morey's

14   credibility regarding both the location of the crushed beer can and the preparation of the crime

15   scene sketch.  However, petitioner's hyperbolic statements that Morey's prior crime scene

16   sketches were "exculpatory" and that people's exhibit 3 had been "doctored" are simply

17   unsupported by the evidence before this court.[38]  The prior sketches, which did not show the

18   location of the beer cans, would certainly have been helpful to show that Morey did not follow

19   crime scene protocol when he failed to record the location of the beer cans before he removed

20   them.  Petitioner cites no authority for the proposition that the prosecution may not create a crime

21   scene sketch for use at trial as the evidence develops.  In any event, based on petitioner's

---

22   [37]  In his brief petitioner states that Morey testified that the crushed beer can was visible in
23   photographs of the cashier's office.  (ECF No. 516 at 126:18-22.)  The undersigned has been
     unable to find any reference in other portions of petitioner's brief to such testimony or any
24   citation to the record to support that contention.

25   [38]  Petitioner also takes a quotation out of context from the prosecutor's questions and Morey's
26   testimony to argue Morey testified that the notation on the sketch for the crushed beer can had
     "particular significance."  The trial transcript shows that the prosecutor had simply started asking
27   Morey questions about the sketch.  He did so by asking Morey why the number "1" was marked.
     He followed that question with similar ones about each of the other numbered markings on the
28   sketch.  (RT at 4108-4110.)

1    argument and evidence, it does not follow that the prosecutor knew or should have known the

2    crime scene sketch was false in its depiction of the scene.

3          With respect to Morey's trial testimony that he had a "list" of the beer cans' locations,

4    petitioner overstates the importance of that testimony and takes it out of context.  Petitioner

5    makes much of the fact that this "list" turned out to be Dolliver's report's identification of the

6    beer cans.  That report did not reflect where each can had been found.  (App. 56 to 1999 State

7    Pet.)  However, the jury heard Morey testify that the "list" was Dolliver's report.  (RT at 4114.)

8    Further, the testimony regarding the "list" involved Morey's attempt to recall the location of one

9    of the other beer cans.  (RT at 4113-4114.)  When asked where he found the beer can marked

10   exhibit 66-A, Morey testified, "I don't remember.  Let me find my list here and I can --."  (RT at

11   4113:13-14.)  He continued, "I don't seem to have my – there was one beer can that was found in

12   the trashcan.  And there were two that were found by the south side of the building.  And I don't

13   remember without my list which one was in the trashcan."  (RT at 4113:26 – 4114:2.)  Morey was

14   asked, "[w]hat list are you talking about now?"  (RT at 4114:3.)  Morey explained:  "That we, as

15   we marked them with the latent print expert.  His report, you have the latent prints report back on

16   the cans, there was one can that there were no prints found on.  And it was the one in the

17   trashcan."  (RT at 4114:4-8.)

18         Morey's trial testimony was not so misleading to amount to prosecutorial misconduct.  In

19   particular, the undersigned notes that Morey did not hesitate or appear to need to look at the list to

20   identify the location of the beer can marked exhibit 66-B, the crushed can.  (RT at 4115:7-8.)

21   Petitioner does, however, show that his trial attorneys should have made clear to the jury that

22   Morey was attempting to "recall" the location of beer cans in a backward fashion – by looking at

23   the fingerprint results first.  However, that issue is addressed above in the discussion of

24   petitioner's claim 5.  Petitioner has not shown the California Supreme Court was unreasonable in

25   rejecting his claim 9.  Accordingly, federal habeas relief with respect to that claim should be

26   denied.

27   ////

28   ////

1          C.  <u>Narrowing Claim – Claim 36</u>

2          Unlike the other claims discussed herein, petitioner has not been granted an evidentiary

3   hearing on his claim 36.  That claim is the subject of petitioner's pending motion to expand the

4   record or for an evidentiary hearing.  (ECF No. 470.)  In his claim 36, petitioner argues that

5   California's special circumstances are so numerous and so broad that at least one can be found in

6   almost any first degree murder case.  Therefore, his argument continues, California's special

7   circumstances fail to narrow the class of murderers eligible for the death penalty as required by

8   the Eighth Amendment.  In state court, petitioner relied upon a study by law professor Steven

9   Shatz in which it was concluded that "[o]nly approximately 11.4 percent of those murderers who

10  are "statutorily eligible" for the death penalty are actually sentenced to death."  (1999 State Pet. at

11  129 (citing Shatz & Rivkind, <u>The California Death Penalty Scheme Requiem for Furman</u>? (1997)

12  72 N.Y.U.L. Rev. 1283).)  Professor Shatz determined "statutory eligibility" for the death penalty

13  by looking at first degree murder cases in which special circumstances were found by a trier of

14  fact or could have been found, based on Professor Shatz's own review of the facts of the case.

15         In 2004, this court granted petitioner's request for discovery on claim 36.  The court

16  looked to the decision in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), for the rule that "a death

17  penalty scheme must narrow the class of persons eligible for the death penalty in such a way that

18  those receiving it are not 'a capriciously selected random handful.'"  (July 27, 2004 Order (ECF

19  No. 137) at 2.)  The court noted that studies cited in <u>Furman</u> "estimated that . . . only 15 to 20% of

20  death-eligible murderers were actually sentenced to death." (<u>Id.</u> at 3.)  In granting petitioner's

21  request to conduct significant discovery to support a study of murder and manslaughter cases in

22  California, this court ruled that the "success of petitioner's legal theory with respect to the

23  narrowing claim hinges on whether the death penalty scheme in California actually results in as

24  capricious an application of the penalty as under the pre-<u>Furman</u> schemes." (<u>Id.</u> at 6.)

25         Petitioner raised this claim in his state appeal and again in his first state habeas petition.

26  The California Supreme Court rejected this claim both times.  In its appellate decision, that court

27  held simply:

28  ////

                                          106

1

2

3

4

> Defendant reiterates various arguments that we have rejected. We see no reason to reconsider our previous decisions. California's death penalty law adequately distinguishes between those first degree murders that are death eligible and those that are not. (People v. Fairbank (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

5

6

People v. Riel, 22 Cal. 4th 1153, 1224 (2000).  The California Supreme Court also rejected this claim summarily on habeas review.

7

8

      For the reasons set out below, the undersigned finds that petitioner has failed to show the California Supreme Court's rejection of this claim was unreasonable.

9

      1.   Legal Standards

10

11

12

13

14

15

16

17

18

19

20

21

22

23

      The Eighth Amendment's narrowing requirement is the product of a series of Supreme Court decisions beginning with Furman.  In Furman the Court held the Georgia and Texas capital sentencing statutes violated the Eighth and Fourteenth Amendments.  However, there was little clear agreement among the justices on the underlying rationale for that decision.  Five justices wrote separate concurring opinions.  The opinions of Justices Stewart and White are considered some basis for a "majority" holding in Furman.  See 408 U.S. at 401 (Burger, J., dissenting) (stating that while it is "not entirely clear" what the holding is, the Stewart and White opinions are the "two pivotal concurring opinions").  Both Justice Stewart and Justice White focused on the fact that the states' capital sentencing statutes made every murderer eligible for the death penalty but provided no guidance to assist juries in deciding when to impose that penalty.  As a result, "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."  Id. at 313 (White, J., concurring).  Justice Stewart similarly focused on the apparent arbitrariness of imposition of the death penalty:

24

25

26

27

28

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.  My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race.  But racial discrimination has not been proved, and I put it to

1
2
3

> one side.  I simply conclude that the Eighth and Fourteenth
> Amendments cannot tolerate the infliction of a sentence of death
> under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

4   Id. at 309-310 (footnotes and citations omitted).

5          The Supreme Court later explained that in Furman it had held that the death penalty

6   "could not be imposed under sentencing procedures that created a substantial risk that it would be

7   inflicted in an arbitrary and capricious manner."  Gregg v. Georgia, 428 U.S. 153, 188 (1976).

8   Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination

9   of whether a human life should be taken or spared, that discretion must be suitably directed and

10  limited so as to minimize the risk of wholly arbitrary and capricious action."  Id. at 189 (opinion

11  of Stewart, Powell, and Stevens, JJ.).  In his concurring opinion in Gregg, Justice White described

12  how a constitutionally permissible death penalty statute should work:

13
14
15
16
17
18

> As the types of murders for which the death penalty may be
> imposed become more narrowly defined and are limited to those
> which are particularly serious or for which the death penalty is
> peculiarly appropriate as they are in Georgia by reason of the
> aggravating-circumstance requirement, it becomes reasonable to
> expect that juries even given discretion not to impose the death
> penalty will impose the death penalty in a substantial portion of the
> cases so defined.  If they do, it can no longer be said that the
> penalty is being imposed wantonly and freakishly or so infrequently
> that it loses its usefulness as a sentencing device.

19  Id. at 222-23.  The Court in Gregg upheld Georgia's revised death penalty statute which, at a

20  separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to

21  be true before it imposed a death sentence.  Id. at 198-205.

22         Thereafter, the Supreme Court examined Georgia's aggravating circumstances and held

23  that each must "genuinely narrow the class of persons eligible for the death penalty and must

24  reasonably justify the imposition of a more severe sentence on the defendant compared to others

25  found guilty of murder."  Zant v. Stephens, 462 U.S. 862, 877 (1983).  The Court concluded that

26  each aggravating circumstance must "provide a principled basis for distinguishing" the

27  petitioner's case "from the many other murder cases in which the death penalty was not imposed

28  under the statute."  462 U.S. at 878 n. 16.

1    Subsequently, the narrowing principles described by the Court in Zant were applied to

2    Louisiana's death penalty sentencing statute:

3        To pass constitutional muster, a capital sentencing scheme must
         "genuinely narrow the class of persons eligible for the death penalty
4        and must reasonably justify the imposition of a more severe
         sentence on the defendant compared to others found guilty of
5        murder."  Under the capital sentencing laws of most States, the jury
         is required during the sentencing phase to find at least one
6        aggravating circumstance before it may impose death.  By doing so,
         the jury narrows the class of persons eligible for the death penalty
7        according to an objective legislative definition.[39]

8    Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (internal citations omitted).  Here, petitioner

9    points out that the Ninth Circuit Court of Appeals has twice invalidated capital punishment

10   schemes for failure to comply with the mandate of Furman.  In United States v. Harper, 729 F.2d

11   1216 (9th Cir. 1984), the court considered the death penalty provisions of the Espionage Act,

12   former 18 U.S.C. § 794. The Ninth Circuit in Harper, however, did not address the narrowing of a

13   death eligible pool of defendants under the statute at issue -- the issue raised in the present case.

14   Instead, the court held that the Espionage Act's failure to provide any legislated guidelines to

15   direct the fact-finder's discretion in imposing the death penalty violated the requirements of

16   Furman and the Eighth Amendment.  729 F.2d at 1224-26.

17       The second case upon which petitioner relies also does not persuasively support his claim

18   for federal habeas relief.  In United States v. Cheely, 36 F.3d 1439, 1442 (9th Cir. 1994), the

19   court did examine a statute's narrowing of the class of those eligible for the death penalty.  At

20   issue in Cheely was a federal statute that authorized imposition of the death penalty for mailing

21   explosives.  The Ninth Circuit found the death penalty authorization in that statute too broad

22   because, by definition, it made one eligible for the death penalty even if guilty of no more than

23   involuntary manslaughter.  36 F.3d at 1443.  In so holding, the Ninth Circuit noted that the

24   Supreme Court had required that a mental state of at least reckless indifference to human life

---

25   [39] Respondent repeatedly argues that adequate narrowing of death eligible defendants is
     accomplished in a number of ways, including through the exercise of the discretion by local
26   prosecutors in charging crimes and special circumstances.  Respondent's definition of narrowing
     is clearly too expansive.  As defined by the Supreme Court in Lowenfield, narrowing, for
27   purposes of Eighth Amendment jurisprudence, must be accomplished through "objective
     legislative" standards.  Lowenfield, 484 U.S. at 244.
28

1    during the commission of a felony is necessary for imposition of the death penalty.  Id. at 1443, n.

2    9 (citing Tison v. Arizona, 481 U.S. 137, 157-58 (1987)).  The court found that the statute's

3    overbreadth, along with the lack of guidance provided to a sentencing jury, created the "potential

4    for impermissibly disparate and irrational sentencing."  Id. at 1444.  In so holding the Ninth

5    Circuit observed that:  "When juries are presented with a broad class, composed of persons of

6    many different levels of culpability, and are allowed to decide who among them deserves death,

7    the possibility of aberrational decisions as to life or death is too great."  Id. at 1445.  Cheely's

8    holding is therefore inapposite here:  petitioner is not arguing that the California statutory scheme

9    is so broad that it encompasses those for whom the death penalty is legally inappropriate.

10          Respondent, on the other hand, argues that the Ninth Circuit has twice rejected precisely

11    the same challenge petitioner makes here.[40]  As with petitioner's argument, the cases relied upon

12    by respondent are not controlling.  Petitioner's claim presented in this case is significantly

13    different than those considered by the Ninth Circuit in Karis v. Calderon, 283 F.3d 1117, 1141 n.

14    11 (9th Cir. 2002) and Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001).  In both of those

15    earlier cases, the court ruled without considering any available evidentiary support.  This court

16    has held previously that because those decisions did not involve the consideration of the type of

17    evidence introduced in support of petitioner's claim here, the Ninth Circuit's decisions Karis and

18    Mayfield are distinguishable and do not resolve petitioner's narrowing claim.  (July 27, 2004

19    Order (ECF No. 137) at 8-9.)

20    _____

21    [40]  Respondent also relies upon the Supreme Court's decision in Pulley v. Harris, 465 U.S. 37, 53 (1984) in which the Court held that California's 1977 statute "limits the death sentence to a small

22    subclass of capital-eligible cases."  Because petitioner's claim 36 specifically challenges the changes made to California's capital sentencing scheme by the 1978 Briggs Initiative, the

23    decision in Pulley is not controlling.  California's 1977 statute included far fewer special circumstances than the 1978 statute.  Pulley, 465 U.S. at 51, n.13 (noting that the 1978 statute

24    "greatly expanded" the category of special circumstances).  While respondent states that the decision in Brown v. Sanders, 546 U.S. 212 (2006) "conclusively confirms the correctness of

25    Respondent's position," that case too is not on point.  In Brown, the Court considered the invalidation of two of four special circumstances. The Court did not, as respondent claims here,

26    state that "special-circumstance findings 'are sufficient to satisfy Furman's narrowing requirement.'"  (ECF No. 476 at 8:3-4.)  Rather, in Brown the court merely stated that the two

27    remaining special circumstances in that case were "sufficient to satisfy Furman's narrowing requirement."  546 U.S. at 224.

28

1      To summarize, the goal of the Eighth Amendment's narrowing requirement is to limit the

2   possibility of arbitrary and capricious imposition of the death penalty.  States may accomplish this

3   by enacting objective legislative standards to limit the pool of those eligible for the death penalty

4   in a way that reasonably justifies imposition of a more severe sentence on them.  The sentencer

5   may then exercise discretion to determine if that sentence should be imposed in a particular

6   case.[41]  If the death eligible pool is so large that it includes persons with vastly different levels of

7   culpability, then the discretionary decision-making at the selection stage is not sufficiently

8   limited. Without sufficiently objective limits with respect to when that ultimate sentence is

9   appropriately imposed, the system risks arbitrary and capricious application of the death penalty

10   upon those who are not necessarily the most deserving of the greatest punishment.

11              2.   Discussion

12      The first question for this court is whether to determine the reasonableness of the state

13   court's appellate decision or its decision on habeas.  Petitioner argues that because the narrowing

14   claim was raised in both state proceedings, this court should assume the silent habeas ruling has

15   the same basis as the explicated appellate ruling.  However, in state court, petitioner distinguished

16   the appellate proceeding from the habeas proceeding when he argued that "dual presentation" was

17   proper because his appellate claim was based on the record and the habeas claim was based on

18   extra-record facts.  (1999 State Pet. at pp. 126 n.28.)  Those extra-record facts appear to be

19   contained in the study conducted by Professor Steven Shatz.  (Id. at 128-130.)  Further, the

20   California Supreme Court's rejection of petitioner's argument on appeal cited one case, People v.

21   Fairbanks, 16 Cal. 4th 1223, 1255 (1997), which in turn relied upon two prior California Supreme

22   Court decisions:  People v. Carpenter, 15 Cal. 4th 312, 419-20 (1997) and People v. Crittenden, 9

23   Cal. 4th 83, 154-56 (1994).  In neither Carpenter nor Crittenden, nor the cases cited in those

24   _____

25   [41] The final selection process necessarily involves greater discretion because it requires
     "particularized consideration of relevant aspects of the character and record of each convicted
26   defendant" Abdul-Kabir v. Quarterman, 550 U.S. 233, 247 (2007) (quoting Woodson v. North
     Carolina, 428 U.S. 280, 303 (1976)), and consideration of "any aspect of a defendant's character
27   or record and any of the circumstances of the offense that the defendant proffers as a basis for a
     sentence less than death." Abdul-Kabir, 550 U.S. at 247-48 (quoting Lockett v. Ohio, 438 U.S.
28   586, 604 (1978)).

1   decisions, did the court consider extra-record evidence.  In fact, the court in Crittenden noted that

2   the defendant had made no showing that his narrowing claim was "empirically accurate."  15 Cal.

3   4th at 155.  Because the narrowing claim petitioner made on state habeas stated that it was

4   attempting to do just that, the undersigned will not assume that the California Supreme Court

5   denied the habeas narrowing claim on the same grounds that it rejected petitioner's narrowing

6   claim argument on appeal.

7        The question, then, is whether petitioner established a prima facie case for relief in state

8   court and the California Supreme Court could not have reasonably held otherwise.  This court

9   must review the state court record to "determine what arguments or theories . . . could have

10   supported, the state court's decision; and then [ask] whether it is possible fairminded jurists could

11   disagree that those arguments or theories are inconsistent with the holding in a prior decision of

12   [the Supreme] Court."  Richter, 562 U.S. at 102.  As discussed above, the Ninth Circuit has

13   rejected a claim that California's statutory scheme, on its face, fails to adequately narrow.  Karis,

14   283 F.3d at 1141 n. 11.  See also Vieira v. Chappell, No. 1:05-cv-1492 AWI, 2015 WL 641433

15   (E.D. Cal. Feb. 5, 2015); Montiel v. Chappell, No. 1:96-cv-5412 LJO, 2014 WL 6686034, **87-

16   89 (E.D. Cal. Nov. 26, 2014); Berryman v. Ayers, No. 1:05 CV 05309 AWI, 2007 WL 1991049,

17   *183-185 (E.D. Cal. Jul. 10, 2007).  While, as discussed above, Karis does not control resolution

18   of petitioner's claim as presented here, it is nonetheless instructive when considering the

19   reasonableness of the California Supreme Court's ruling.  Has the United States Supreme Court

20   clearly established a rule that the evidentiary showing made by petitioner would, if proved,

21   demonstrate an Eighth Amendment violation?  The undersigned cannot find the law clear cut

22   beyond all reasonable disagreement.  The United States Supreme Court has not clearly

23   established a benchmark for determining when a state's death-eligible class is so broad that it

24   violates the Eighth Amendment.  Other courts have similarly so held.  See Frye v. Warden, No.

25   2:99-cv-628 KJM CKD, 2015 WL 300755, *67 (E.D. Cal. Jan. 22, 2015) (petitioner fails to show

26   clearly established federal law compels a different result than that in Karis); Hawkins v. Wong,

27   No. CIV S 96-1155 MCE, 2013 WL 3422701, *3 (E.D. Cal. Jul. 8, 2013) (no clearly established

28   federal law that only those death penalty schemes in which a large percentage of death-eligible

1  inmates receive the death penalty adequately narrow the death-eligible class); Carter v. Chappell,

2  No. 06CV1343 BEN KSC, 2013 WL 1120657, *198-201 (S.D. Cal. Mar. 18, 2013).

3       Moreover, the showing petitioner made before the California Supreme Court through the

4  study conducted by Professor Shatz does not measure the same universe of cases measured by the

5  Court in Furman.  In Furman, the Court looked to those who were in fact eligible for the death

6  penalty because they had been convicted of a death eligible crime and determined that those

7  among them who were actually sentenced to death were so few that the penalty was arbitrarily

8  applied.  In Professor Shatz's study, he examined the universe of those potentially eligible for the

9  death penalty, a number far greater than those who had in fact been convicted of a death-eligible

10  offense, and the number of those in fact sentenced to death.  Here, the California Supreme Court

11  could reasonably have determined that this apples to oranges comparison was insufficient support

12  for a prima facie showing of an Eighth Amendment violation.

13       Thus, it cannot be said that the California Supreme Court's rejection of petitioner's

14  narrowing claim was unreasonable.  Because petitioner has not satisfied the requirements of 28

15  U.S.C. § 2254(d) with respect to his claim 36, federal habeas relief should be denied as to that

16  claim.  For the same reasons, petitioner's pending motion for an evidentiary hearing or an

17  expansion of the record with respect to his claim 36 should be denied.

18                               CONCLUSION

19       Based on the foregoing findings and for all the reasons set forth above, IT IS HEREBY

20  RECOMMENDED that:

21       1.  The court find petitioner has satisfied 28 U.S.C. § 2254(d) for his claims 2 and 5 with

22            respect to the special circumstance and penalty phase determinations.

23       2.  The court find petitioner has failed to satisfy § 2254(d) for his claims 2 and 5 with

24            respect to the guilt phase determination.

25       3.  The court find petitioner has failed to satisfy § 2254(d) for his claims 6, 9 and 36.

26       4.  Petitioner's Motion to Expand the Record or for an Evidentiary Hearing on his claim

27            36 (ECF No. 470) be denied.

28       5.  Federal habeas relief be denied as to petitioner's claims 6, 9 and 36.

1         These findings and recommendations are submitted to the United States District Judge

2   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days after

3   being served with these findings and recommendations, any party may file written objections with

4   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

5   Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

6   objections within the specified time may waive the right to appeal the District Court's order.

7   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

8   Dated:  October 30, 2015

9

10

                                                  DALE A. DROZD

11                                                  UNITED STATES MAGISTRATE JUDGE

12  riel 2254d.fr

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

114